# EXHIBIT B

# Artemis Defense Institute

Expert Witness report and findings: USA v Schlotterbeck, Vlha and DeKoning

Statement of Expert: This report has been produced by Steven D. Lieberman. I am a member of the California Bar (#179992) and the Washington DC Bar (#1644005). I am the co-owner of the Artemis Defense Institute, a weapons training institution located in Lake Forest California, and an FFL holder (9-33-059-01-5B-04725). I have been practicing law since 1995 focusing on weapons regulations and use of force throughout that time. I am a founding partner in the Law Offices of Lieberman and Taormina LLP. We provide legal services to Police Officers, Military Personnel, CCW Holders, and other firearms related cases that have civil rights implications.

Materials Reviewed:

United States of America v Travis Schlotterbeck, James Bradley Vlha, Jacob DeKoning Indictment

Totality of the discovery provided by USA, including all reports and transcripts

USC 921 (a) (10)

CFR 478.11(a)

ATF 2009-2

ATF 2010-10

Do I Need a License to Buy and Sell Firearms? (ATF Publication)


Synopsis of Conclusion:

Defendants did not engage in any illegal conduct. During the investigatory time period, Defendants were completely authorized under federal law to engage in the conduct they are now being prosecuted for.


Material facts of the case

On or about May 21, 2015 the ATF began an undercover investigation of the defendants who either owned or worked at Sign Imaging a Cerakoting company in Los Angeles. Cerakoting is a chemical process that adheres, usually a colored coating to a substrate product, typically, but not exclusively metal. Many firearms owners have their weapons cerakoted to either change the appearance of the firearm for aesthetic reasons, or as a protectant. The Defendants did not possess an FFL (Federal Firearms License) and the bulk of their business

was non-firearm related. Since they were firearms enthusiasts, they had a section of the shop demarcated as the "Gunsmithing" room, where they would, as hobbyists, work on their own individual weapons, and those of friends. There is no evidence that the name "Gunsmithing" was ever communicated to the public, and was not being used as a legal definition of the activities taking place there. It was simply a way of articulating where tools and safes were located in as an unrelated component to the Defendants over all business.

During this time within the gun community at large a process of weapons acquisition began referred colloquially as "building out an 80%er". An 80% lower receiver is a general way of describing an innocuous block of metal that is intended to eventually become a *fully manufactured firearm* but is not yet at that state of production. As such it is not yet susceptible to regulation by a governmental authority.[1] Federal Law does allow individuals to make their own personal firearms without an FFL, so long as the individual does not transfer the fully completed firearm[2]. A culture developed within the gun community, specifically within the AR-15 shooting enthusiast community, to acquire "80% lowers", and "mill them out" thus making them legally compliant, non-searlized AR-15 fully manufactured firearms. 80% lowers were sold during this time by a number of brick and mortar as well as online retail stores direct to consumers, as no federal licensing was required.

Many customers of AR-15 80% lowers did not have the technology or tooling to complete the process of converting the innocuous lower into a fully manufactured firearm. Thus a culture of "building parties" began.[3]. People who had legally acquired AR-15 80% lowers would either meet as a group, or go individually to machine shops where the owner of the shop would provide access to a CNC machine that had a "jig" and preprogrammed information to allow the machine to cut out the excess material and convert an 80% lower to a fully manufactured firearm. Since the owner of the CNC machine could not legally do the work for the owner of the 80% lower owner, a ceremonial process usually took place where the owner of the CNC machine would instruct verbally the owner of the lower in how to place the lower in the machine, and which button to push to activate the process. This process allowed the owner of the CNC machine to rightly claim, that they had not engaged in the manufacturing of the firearm, and since the actual "manufacturer" was the owner of the lower, they were lawfully engaged in the development of a home built firearm.

The ATF had a CI approach Mr. Kwan, the defendants, and/or others at Sign Image and asked for assistance in "building" an AR-15. One or more Defendants assisted the CI (who was a felon) in acquiring an 80% lower. Mr. Kwan assisted the CI in "milling out" the 80% lower at a separate machine shop, where the CI engaged in the actual act of "pushing the button". Defendants Schlotterbeck and Vlha were never present when Mr. Kwan and others milled the 80% lower. At times Mr. Kwan would be assisted by Defendant Dekoning in milling the 80% lower. The milling never occurred at Sign Imagining, and the defendants did not possess equipment to produce a firearm. CI then returned to the Sign Image and asked for assistance in accumulating the parts necessary for completing the weapon, and assistance in putting them together.

---

[1] The term 80% is by definition vague. It does not mean that the underlying metallic block is in fact exactly 80% of the way towards completion as a fully functioning lower receiver. The term simply refers to the fact that a substantial amount of work is still required before the metal block has reached the stage where it is subject to federal regulation.

[2] 18 USC 921

[3] USA v Roh SCAR 14-167 JVS

The Defendants acquired the parts, which under federal law are completely unregulated, on behalf of the CI. They assembled the firearm and subsequently turned it over to the CI. There were other discussions about additional firearms, suppressors, fully automatic firearms, but there is no indication that any overt acts took place to provide these additional services. This same pattern repeated itself with the ATF now using an Undercover Agent to engage in substantially the same process, each time selling the Agent an 80% lower receiver and directing them where to go to get in "milled out".

Legal Analysis

The United States has complained that the Defendants have engaged in activities that would require the issuance of an FFL, (Federal Firearms License). They have conflated the idea that the piecing together of an AR-15 is tantamount to the manufacturing of an AR-15. This is fundamentally incorrect. USC 921 (a) (10) states "The term "manufacture" means any person engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution; and the term "licensed manufacture" means any such person licensed under the provision of this chapter". CFR 478.11(a) further clarifies by stating that the Manufacturer of Firearms, [is] a person who devotes his time, attention and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale distribution of firearms manufactured.

There is no evidence that any of the Defendants were "engaged in the manufacturing of firearms". There is actually dispositive evidence that they were not. The Defendants did not sell "fully manufactured firearms". They sold the raw building block the 80% lower receiver which is legal to possess, buy, or sell without federal legal impediment. Not only is this product not regulated by ATF, if they did have an FFL, there would have been no possible way for them to comply with ATF standards for record keeping for these products. Simply stated, the ATF only regulates "firearms" that have reached a point in the manufactured process where they are required to be serialized. The Defendants did not have a single product offered for sale on their premises that fit this standard.

This point is further driven home by the somewhat amusing, but recognized process of "pushing the button". This process was time consuming, silly, and potentially could have resulted in the abandonment of the "sale" of the 80% lower by the customer. Still the Defendants insisted that the customer engage in this legal charade since it was the only legal way for the CI or the Undercover Agent to legally acquire a home built AR-15 lower.

Failing to show that the act of selling an 80% lower to a customer constitutes the illegal sale of a firearm, the USA now wants to conflate what "fully manufactured firearm" means. The AR-15 is a unique firearm, in that it resembles largely the customization possibilities of a "Tinker Toy" kit. While the Tinker Toy kit allows multiple disparate units to be attached to a base unit, so does the AR-15 lower receiver allow multiple disparate units to be attached to it to create a unique customized product.

The AR-15 in its fully assembled state has an iconic visual appearance. However the bulk of the items seen in the picture of an AR-15 are completely unregulated disparate pieces of metal that have no legal distinctive properties. The only singular aspect of an AR-15 pistol or rifle that has any legal value at all is the serialized lower receiver. If the lower receiver is legal to possess then the addition of the barrel, the upper receiver, the stock, the sights etc. do not magically make it illegal. Likewise, the reverse is true. An illegal lower cannot be cured by the addition of secondary parts.

Assembling the desperate parts onto the *fully manufactured firearm,* the completed lower, so as to allow the firearm to now expel a projectile is not a legally actionable event. If it were any range safety officer that broke apart an AR-15 that a shooter was having malfunction issues with to verify that it was safely operating would be "manufacturing a firearm" when they reassembled it. Clearly something that the law would never accept.

The evidence that I reviewed in the sworn statements as well as the charging document does show that the defendants did acquire parts for customers that had fully assembled firearms, and did legally connect those disparate parts onto the fully assembled firearms. They did not manufacture fully assembled firearms.

Conclusion

The USA as well as certain State governments have invested a considerable amount of time and treasure in attempting to criminalize the acquisition of AR-15's. The component quality, as well as the simplicity of the AR-15 has made this extremely difficult. In regulating one component they create fertile ground for creative individuals to achieve the same goal, namely AR-15 ownership, through unorthodox methodologies. Once it has been deemed "legal" the second amendment community does an excellent job of promulgating this information to the public at large.

This is what happened with the development of the 80% receiver market. A pathway towards legal ownership of home built firearms was forged, and many people took advantage of it. The Defendants were assisting people in doing what was legally allowable for them to do.

The USA has tried to argue that their actions were illegal, in that selling that base unit the 80% lower required a federal license. They are incorrect in this assertion. They then have tried to expand the definition of "manufacturing a completed firearm" to the actions of snapping on component parts to a completed firearm. The USA cannot have it both ways. A competed firearm is a completed firearm, it does not become a "more completed" firearm when component parts are attached.

Steven D. Lieberman
CA Bar # 179992
DC Bar # 1644005