TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorney
Environmental and Community Safety Crimes Section
       1300 United States Courthouse
       312 North Spring Street
       Los Angeles, California 90012
       Telephone: (213) 894-3819
       Facsimile: (213) 894-0141
       E-mail:   Brian.Faerstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                    UNITED STATES DISTRICT COURT

               FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 19-00343-GW |
|---|---|
| Plaintiff, | GOVERNMENT'S TRIAL MEMORANDUM |
| v. | Trial Date: May 24, 2022 |
| TRAVIS SCHLOTTERBECK and JAMES BRADLEY VLHA, | Trial Time: 9:00 AM |
| Defendants. | Location:   Courtroom of the Hon. George H. Wu |

     Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorney Brian Faerstein,
hereby files its Trial Memorandum.

//

//

//

//

//

1    Leave is respectfully requested to file additional memoranda as

2    may become appropriate during the course of trial.

3    Dated: May 6, 2022                    Respectfully submitted,

4                                          TRACY L. WILKISON
                                           United States Attorney
5
                                           SCOTT M. GARRINGER
6                                          Assistant United States Attorney
                                           Chief, Criminal Division
7

8                                          _____/s/_____
                                           BRIAN R. FAERSTEIN
9                                          Assistant United States Attorney

10                                         Attorneys for Plaintiff
                                           UNITED STATES OF AMERICA
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

DESCRIPTION                                                                    PAGE

GOVERNMENT'S TRIAL MEMORANDUM.....................................  1

I.    STATUS OF THE CASE..........................................  1

      A.    Charges...............................................  1

      B.    Trial Status..........................................  1

      C.    Pretrial Status of Defendants.........................  1

      D.    Government's Case-in-Chief............................  1

      E.    Motions in Limine.....................................  3

      F.    Stipulations..........................................  4

      G.    Trial Indictment......................................  4

      H.    Forfeiture Allegation.................................  4

II.   THE CRIMES AND THEIR ELEMENTS...............................  5

      A.    Conspiracy to Engage in the Business of Manufacturing
            Firearms Without a License............................  5

      B.    Engaging in the Business of Manufacturing Firearms
            Without a License; Aiding and Abetting................  5

      C.    Sale of a Firearm to a Prohibited Person..............  6

III.  STATEMENT OF FACTS AND EVIDENCE.............................  7

      A.    Manufacture and Sale of Rifle to CI
            on September 23, 2015.................................  8

      B.    Manufacture and Sale of Rifle to UC-1
            on October 27, 2015...................................  9

      C.    Manufacture and Sale of Pistol to UC-1
            on February 11, 2016.................................. 10

      D.    Manufacture and Sale of Pistol to UC-2
            on March 16, 2016..................................... 11

      E.    Manufacture and Sale of Pistol to UC-1
            on May 6, 2016........................................ 12

      F.    Manufacture and Sale of Rifle to UC-2
            on June 15, 2016...................................... 13

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                              PAGE

    G.   Additional Evidence Relating to Charges............... 13

II. EVIDENTIARY ISSUES......................................... 15

    A.   Authentication and Foundation......................... 15

        1.   Video and Audio Recordings...................... 15

        2.   Transcripts of Recordings....................... 16

        3.   Photographs..................................... 16

        4.   Firearms, Magazines and Other Physical Evidence.. 17

    B.   Summary Exhibits and Summary Witness.................. 18

        1.   Summary Exhibits................................ 18

        2.   Summary Witness................................. 20

    C.   Hearsay and Exceptions to Hearsay.................... 21

        1.   Defendants' Statements as Admissions of a Party
             Opponent........................................ 21

        2.   Defendants' and Co-Conspirator Kwan's Statements
             as Co-Conspirator Statements.................... 22

        3.   Public Records.................................. 25

    D.   Expert and Lay Opinion Testimony..................... 25

        1.   Federal Firearms Requirements................... 26

        2.   Digital Devices................................. 27

        3.   Lay Opinion of Law Enforcement Agents........... 27

    E.   Truthful Testimony Provisions of Plea Agreement....... 29

    F.   Cross-Examination of Defendants and Defense Witnesses. 30

    G.   Affirmative Defenses................................. 32

    H.   Reciprocal Discovery................................. 32

III. CONCLUSION................................................ 33

## TABLE OF AUTHORITIES

DESCRIPTION                                                              PAGE

**Federal Cases**

Bourjaily v. United States,
    483 U.S. 171 (1987)  ......................................... 23

Crawford v. Washington,
    541 U.S. 36 (2004)  .......................................... 23

Lucero v. Stewart,
    892 F.2d 52 (9th Cir. 1989)  ................................. 17

Reyes v. United States,
    383 F.2d 734 (9th Cir. 1967)  ................................ 18

Sendejas v. United States,
    428 F.2d 1040 (9th Cir. 1970)  ............................ 23-24

United States v. Allen,
    425 F.3d 1231 (9th Cir. 2005)  ............................... 24

United States v. Bailleux,
    685 F.2d 1105 (9th Cir. 1982)  ............................... 31

United States v. Barragan,
    871 F.3d 689 (9th Cir. 2017)  ................................ 22

United States v. Black,
    767 F.2d 1334 (9th Cir. 1985)  ............................... 30

United States v. Chu Kong Yin,
    935 F.2d 990 (9th Cir. 1991)  ................................ 15

United States v. Cuozzo,
    962 F.2d 945 (9th Cir. 1992)  ................................ 30

United States v. Dhinsa,
    243 F.3d 635 (2d Cir. 2001)  ................................. 15

United States v. Dorsey,
    677 F.3d 944 (9th Cir. 2012)  ................................ 29

United States v. Freeman,
    498 F.3d 893 (9th Cir. 2007)  ................................ 28

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                    PAGE

United States v. Gadson,
    763 F.3d 1189 (9th Cir. 2014) ................................ 28

United States v. Gay,
    967 F.2d 322 (9th Cir. 1992) ................................ 31

United States v. Harrington,
    923 F.2d 1371 (9th Cir. 1991) ............................... 17

United States v. Hegwood,
    977 F.2d 492 (9th Cir. 1992) ................................ 32

United States v. Henderson,
    241 F.3d 638 (9th Cir. 2000) ................................ 17

United States v. Johnson,
    594 F.2d 1253 (9th Cir. 1979) ............................... 18

United States v. Kaiser,
    660 F.2d 724 (9th Cir. 1981) ............................... 17-18

United States v. King,
    587 F.2d 956 (9th Cir. 1978) ................................ 15

United States v. Lloyd,
    807 F.3d 1128 (9th Cir. 2015) ............................... 24

United States v. Mendoza-Prado,
    314 F.3d 1099 (9th Cir. 2002) ............................... 32

United States v. Monroe,
    943 F.2d 1007 (9th Cir. 1991) ............................... 29

United States v. Ortega,
    203 F.3d 675 (9th Cir. 2000) ................................ 21

United States v. Pree,
    408 F.3d 855 (7th Cir. 2005) ................................ 20

United States v. Reid,
    634 F.2d 469 (9th Cir. 1980) ................................ 31

## <u>TABLE OF AUTHORITIES (CONTINUED)</u>

<u>DESCRIPTION</u>                                                        <u>PAGE</u>

<u>United States v. Rizk</u>,
   660 F.3d 1125 (9th Cir. 2011) ............................... 19

<u>United States v. Scholl</u>,
   166 F.3d 964 (9th Cir. 1999) ............................... 32

<u>United States v. Schoneberg</u>,
   396 F.3d 1036 (9th Cir. 2005) ............................... 29

<u>United States v. Shaw</u>,
   829 F.2d 714 (9th Cir. 1987) ............................... 29

<u>United States v. Shirley</u>,
   884 F.2d 1130 (9th Cir. 1989) ............................... 20

<u>United States v. Smith</u>,
   591 F.3d 974 (8th Cir. 2010) ............................... 16

<u>United States v. Soulard</u>,
   730 F.2d 1292 (9th Cir. 1984) ............................... 21

<u>United States v. Torres</u>,
   908 F.2d 1417 (9th Cir. 1990) ............................... 16

<u>United States v. Turner</u>,
   528 F.2d 143 (9th Cir. 1975) ............................... 16

<u>United States v. Valerio</u>,
   441 F.3d 837 (9th Cir. 2006) ............................... 22

<u>United States v. Vera</u>,
   770 F.3d 1232 (9th Cir. 2014) ............................... 28

<u>United States v. Zavala-Serra</u>,
   853 F.2d 1512 (9th Cir. 1988) ............................... 24

**Federal Statutes**

18 U.S.C. § 371 ........................................... 1, 5

18 U.S.C. § 922 ........................................ 1, 5, 6

## TABLE OF AUTHORITIES (CONTINUED)

DESCRIPTION                                                          PAGE

**Other**

Fed. R. Crim. P. 16 ............................................... 25, 33

Fed. R. Crim. P. 26.2 ............................................. 33

Fed. R. Evid. 106 ................................................. 22

Fed. R. Evid. 404 ............................................. 3, 30, 32

Fed. R. Evid. 405 ................................................. 32

Fed. R. Evid. 608 ................................................. 31

Fed. R. Evid. 701 ............................................... 27, 28

Fed. R. Evid. 702 ................................................. 26

Fed. R. Evid. 801 ............................................. *passim*

Fed. R. Evid. 803 ................................................. 25

Fed. R. Evid. 901 ............................................... 15, 16

Fed. R. Evid. 902 ................................................. 25

Fed. R. Evid. 1006 ................................................ 18

**GOVERNMENT'S TRIAL MEMORANDUM**

## I.   STATUS OF THE CASE

### A.   Charges

On June 11, 2019, a federal grand jury returned a three-count indictment against Travis Schlotterbeck ("Schlotterbeck"), James Bradley Vlha ("Vlha"), and Jacob Dekoning ("Dekoning").   The indictment charged defendants with conspiracy to engage in the business of dealing in and manufacturing firearms without a license in violation of 18 U.S.C. § 371 (Count One) and engaging in the business of dealing in and manufacturing firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A) (Count Two).   Schlotterbeck also was charged with selling a firearm to a prohibited person, in violation of 18 U.S.C. § 922(d)(1) (Count Three).

On February 20, 2020, on the government's own motion, the Court dismissed the indictment as to Dekoning only.   (Dkt. Nos. 70, 71.)

On April 20, 2022, the government informed defense counsel that, with respect to Counts One and Two of the indictment, it would be proceeding on a theory of engaging in the business of manufacturing firearms without a license only, without submitting the alternate theory of dealing in firearms to the jury.

### B.   Trial Status

Trial against Schlotterbeck and Vlha is set to commence on May 24, 2022.   Trial by jury has not been waived.

### C.   Pretrial Status of Defendants

Schlotterbeck and Vlha are on bond pending trial.

### D.   Government's Case-in-Chief

The estimated time for the presentation of the government's

case-in-chief is approximately four days.  This includes the estimated time for cross-examination of the government's witnesses.

Subject to certain stipulations currently being negotiated between the parties, the government expects to call approximately eight witnesses: (1) Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Senior Industry Operations Investigator Thomas Chimileski, Jr.; (2) ATF Special Agent Stephanie Crebbs; (3) ATF Special Agent Hercules Fandino; (4) Ping-Yi "Jesse" Kwan ("Kwan," who is a defendant in a related case);[1] (5) ATF Special Agent Jason Moore; (6) ATF Special Agent Daniel Thompson; (7) ATF Special Agent Monika Uchiyama; and (8) ATF confidential informant.  Absent certain stipulations regarding factual matters and the authenticity and admissibility of certain exhibits, the government also would anticipate calling some or all of the following witnesses, which would likely extend the estimated timing of the government's case-in-chief: (9) Federal Firearms Licensing Center Supervisor Stephanie Custer; (10) Computer Examiner Gregory Estes; (11) Computer Examiner Terry Hom; (12) Jennifer Igercic, City of Bellflower City Clerk's Office; and (13) ATF NIBIN Technician Jill Jacobson.[2]

As described further herein, a substantial portion of the government's evidence will be presented in the form of clips of video and audio recordings of covertly recorded meetings and phone

---

[1] Kwan pleaded guilty in a separate proceeding to an information alleging that, among other things, Kwan engaged in the business of manufacturing and dealing in firearms without a license.  See Case No. CR 19-292-GW, Dkt. Nos. 1, 19.  Kwan has not yet been sentenced in that case.

[2] The government reserves the right to call additional witnesses as necessary, including in rebuttal should defendants present a case.

1    calls involving or pertaining to defendants, as well as other
2    physical and photographic evidence, compilations and summary
3    exhibits from voluminous digital evidence, text messages, other
4    records and documents, and Schlotterbeck's statements to ATF.

5        **E.   Motions in Limine**

6        The government has filed three motions in limine.

7        The government's MIL #1 seeks to admit certain evidence and
8    permit argument regarding defendants' willfulness.  (Dkt. No. 80.)
9    Specifically, the government seeks to admit, under Federal Rule of
10   Evidence 404(b)(2), evidence of defendants' firearms purchases
11   before or during the course of the alleged conspiracy for the
12   limited purpose of proving their knowledge and absence of mistake
13   regarding the unlawful nature of their alleged conduct here.  The
14   government also seeks to admit, as part of the charged conduct
15   and/or as inextricably intertwined, evidence relating to defendants'
16   companion sales of large-capacity magazines of ammunition and
17   discussions with undercover agents regarding obtaining silencers.

18       The government's MIL #2 seeks to admit certain statements
19   Schlotterbeck made to ATF during a voluntary interview on June 21,
20   2017, while a search warrant was being executed at businesses
21   Schlotterbeck controlled in Bellflower, California.  (Dkt. No. 81.)
22   Defendant's statements are admissions of a party opponent under Rule
23   801(d)(2)(A), and do not pose any Bruton issues in this case.

24       The government's MIL #3 seeks to exclude the proffered
25   testimony of Steven D. Lieberman, Esq., a criminal defense attorney
26   and use-of-force trainer the defense jointly noticed as a purported
27   expert witness in this case.  (Dkt. No. 82.)

28

                                    3

As of the time of this filing, defendants have not filed responses to these motions (the date for oppositions was May 6, 2022), and the motions remain pending.  Defendants also did not file any motions in limine by April 29, 2022, the date for motions in limine pursuant to the Court's order.  (Dkt. No. 79.)

**F.   Stipulations**

The parties are negotiating certain stipulations regarding factual issues and the authenticity, foundation, and admissibility of a significant number of exhibits that may obviate the need for the government to call certain witnesses in its case-in-chief.

**G.   Trial Indictment**

The government sent defense counsel a proposed trial indictment that (1) removed defendant Dekoning consistent with his dismissal from the case;[3] and (2) removed the alternate theory of "dealing in" firearms without a license from Counts One and Two.  Counsel for defendant Vlha proposed other deletions relating to certain allegations, to which the government objects.  The parties will continue to meet and confer although the government may be amenable to the indictment not being sent back to the jury room.

**H.   Forfeiture Allegation**

Notwithstanding the forfeiture allegation in the indictment, the government does not anticipate seeking to forfeit any property in a forfeiture phase of trial (in the event of a conviction(s)).

---

[3] Assuming Dekoning is removed from a trial indictment or the indictment is not sent back with the jury, it will not be necessary to instruct the jury on the absence of Dekoning from the case.  It would be improper for defendants to comment on the dismissal of Dekoning as a defendant in any event.  See generally Ninth Circuit Model Criminal Jury Instruction No. 2.15.

4

## II.   THE CRIMES AND THEIR ELEMENTS

### A.   Conspiracy to Engage in the Business of Manufacturing Firearms Without a License

Schlotterbeck and Vlha are charged in Count One with conspiring to engage in the business of manufacturing firearms without a license, in violation of 18 U.S.C. § 371.  In order for a defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, beginning on or about May 21, 2015, and ending on or about June 21, 2017, there was an agreement between two or more persons to engage in the business of manufacturing firearms without a license, as charged in the indictment;

Second, the defendant became a member of the conspiracy knowing of its object and intending to help accomplish it; and

Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

### B.   Engaging in the Business of Manufacturing Firearms Without a License; Aiding and Abetting

Schlotterbeck and Vlha also are each charged in Count Two with engaging in the business of manufacturing firearms without a license, in violation of 18 U.S.C. § 922(a)(1).  In order for a defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant was willfully engaged in the business of manufacturing firearms within the dates specified in the indictment; and

Second, the defendant did not then have a license as a firearms

5

manufacturer.

Willfully, as used in this statute, requires proof that the defendant knew that his conduct was unlawful, but does not require proof that the defendant knew of the federal licensing requirement.

This count expressly alleges an aiding and abetting theory as well.  In order for either defendant to be found guilty of a charge based on aiding and abetting, the government must prove each of the following elements beyond a reasonable doubt:

First, the charged crime was committed by someone;

Second, defendant aided, counseled, commanded, induced or procured that person with respect to at least one element of the crime charged;

Third, defendant acted with the intent to facilitate the crime charged; and

Fourth, defendant acted before the crime was completed.

**C.   Sale of a Firearm to a Prohibited Person**

Schlotterbeck is charged in Count Three with selling a firearm to a prohibited person in violation of 18 U.S.C. § 922(d)(1).  In order for Schlotterbeck to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly sold a firearm to an informant working on behalf of the ATF; and

Second, the defendant knew or had reasonable cause to believe that the informant had been convicted in any court of a crime punishable by imprisonment for a term exceeding one year.

6

1    **III. STATEMENT OF FACTS AND EVIDENCE**

2         The government expects that the evidence at trial will

3    establish, among others, the following facts.

4         Between approximately May 21, 2015, and June 21, 2017,

5    defendants Schlotterbeck and Vlha, along with co-conspirator Kwan

6    and others, worked together to manufacture for sale multiple custom-

7    ordered AR-15-type firearms lacking serial numbers (commonly

8    referred to as "ghost guns").  These activities predominantly took

9    place at the businesses Schlotterbeck controlled in Bellflower,

10   called Sign Imaging and Live Fire Coatings (together, the

11   "Bellflower shops").[4]  Defendants and co-conspirator Kwan took

12   custom orders for AR-15-type firearms (both rifles and pistols),

13   obtained the firearm parts, arranged for certain parts

14   (specifically, unfinished lower receivers) to be drilled for use,

15   and assembled and finished (including through the use of a

16   protective ceramic coating known as Cerakote) the AR-15-type

17   firearms for sale.  None of the co-conspirators nor the storefronts

18   Schlotterbeck controlled had a federal firearms license.

19        Defendants and co-conspirator Kwan manufactured and sold six of

20   these firearms to a confidential informant (the "CI") and two

21   undercover agents ("UC-1" and "UC-2," and, together, the "UCs")

22   working with the ATF between on or about July 7, 2015, and June 15,

23   2016.  The evidence will demonstrate that the co-conspirators had

24   other customers as well and engaged in additional so-called "builds"

25   and sales of AR-15-type firearms on a custom-order basis.  The

26   _____

27   [4] Sign Imaging was licensed with the City of Bellflower; Live Fire

28   Coatings was not.

evidence will further show that defendants and co-conspirator Kwan

engaged in this conduct for the principal objective of livelihood

and profit, without a license to do so.

A substantial portion of the government's evidence will be

presented through clips of recorded meetings between one or more of

the co-conspirators and the ATF CI and/or UCs, along with recorded

telephone calls and text messages exchanged between these

individuals.  The meetings, calls, and text messages, all of which

were produced in discovery as well as summarized in detail in ATF

reports of investigation, relate to the discussions, negotiations,

and transactions underlying defendants' and co-conspirator Kwan's

manufacture and sales of the six AR-15-type firearms purchased by

the CI and UCs.[5]  The government summarizes and provides examples

below of some but not all of the evidence that it will seek to

introduce at trial regarding these six firearm sales.

**A.    Manufacture and Sale of Rifle to CI on September 23, 2015**

The government will present evidence that the CI met with

Schlotterbeck during a recorded meeting at the Bellflower shops on

July 7, 2015, during which Schlotterbeck informed the CI that he

could "build" an AR-15-type firearm for sale and "we do it all the

time."  Schlotterbeck and the CI preliminarily discussed the terms

of a sale, with Schlotterbeck informing the CI that "your budget's

gonna determine what you get."  The CI also told Schlotterbeck about

---

[5] The government has prepared clips (with synchronized captions from
transcripts of the recordings for the Court's and jury's
convenience) of relevant portions of the meeting and call
recordings.  The government has provided copies of these clips to
the defense for its review.

his prohibited status, informing, in part, Schlotterbeck's knowledge in connection with his alleged sale of a firearm to a prohibited person (Count Three).

The CI eventually placed an order with Schlotterbeck for an AR-15-type rifle, for which the CI paid Schlotterbeck $1,000 as a down payment.  The CI later met with Schlotterbeck in a recorded meeting on September 22, 2015, to take one of the firearm parts the co-conspirators had ordered as part of the build – an unfinished lower receiver – to be drilled with certain cavities (also referred to as being "milled out," "machined" or "cut") at a third-party machine shop.  The evidence will show that Schlotterbeck paid for this machining process, and the additional step of the CI visiting the third-party shop at Schlotterbeck's direction and pressing a button to start the machining process was largely a charade in the context of this case.  The CI returned the following day, September 23, 2015, and met with Kwan and Vlha to take possession of and pay the remaining $1,000 balance for the completed AR-15-type rifle.

UC-1 accompanied the CI during this meeting and was introduced as another customer for firearms.  Both Vlha and Kwan informed UC-1 that he could contact any of the three of them (Schlotterbeck, Vlha or Kwan) to order a firearm, with Vlha explaining, "Yup, we're all good.  We all talk to each other."

**B.   Manufacture and Sale of Rifle to UC-1 on October 27, 2015**

Following his introduction to Vlha and Kwan on September 23, 2015, UC-1 met with Schlotterbeck and Vlha at the Bellflower shops on October 8, 2015.  During this recorded meeting, both defendants spoke at length about all aspects of their business of manufacturing

customized AR-15-type firearms for sale, including, among other
things, the types of parts, pricing, timing, Cerakote finishing
options, manner of placing firearm orders, and prior sales.

For instance, during the course of the approximately one-hour-
long meeting, defendants discussed keeping a low-profile for their
illegal business (Vlha: "Especially when it comes to guns its like .
. . Like, who do you, who do you know that's not gonna open his
mouth"); timing of obtaining parts (Vlha: "it probably takes about a
week to get everything, uh, because we'll have to get things from
different places"); pricing of firearms (Schlotterbeck: "the twelve
hundred dollar range, you're not going to get pretty much any of
that. It's just going to be, like, the most basic, but like, decent
gun"); and the uniqueness of the firearms (Schlotterbeck: "Yeah, and
you will get something that you can't buy in a store").  UC-1 placed
an order for an AR-15-type rifle and paid $740 as a down payment.

UC-1 returned to the Bellflower shops on October 22, 2015,
after Vlha and Kwan communicated with UC-1 in separate text message
exchanges.  During the recorded meeting on October 22, Kwan took UC-
1 to the third-party machine shop and Kwan paid to get the lower
receiver milled out (as part of the same charade described above).
UC-1 met Kwan and Vlha to pick up and pay the remaining $760 balance
for the AR-15-type rifle at the Bellflower shops on October 27.

**C.   Manufacture and Sale of Pistol to UC-1 on February 11, 2016**

In December 2015 and January 2016, UC-1 exchanged text messages
with both Kwan and Vlha regarding an additional AR-15-type firearm
order.  On January 26, 2016, UC-1 asked whether Vlha had "anything
[he] could check out for ideas," indicating he (UC-1) was looking

for something "more compact."  In response, Vlha sent a text message image of an AR-15-type rifle that appeared to have a short barrel.

UC-1 ultimately met with Schlotterbeck and Vlha in a recorded meeting at the Bellflower shops on January 26, 2016, to purchase another AR-15-type firearm.  Similar to the October 8, 2015 meeting, defendants discussed in detail the specifications and pricing of the AR-15-type firearm that UC-1 would be ordering.  Importantly, both defendants informed UC-1 that they could use a finished lower receiver that was already "cut" for building UC-1's next customized AR-15-type firearm, without taking UC-1 back through the charade of visiting the third-party machine shop.  Schlotterbeck explained that they already "got a bunch [of lower receivers] done for people that, like-like this," and stated they could use a pre-cut lower receiver so long as UC-1 said he got the lower receiver milled out himself, noting that "obviously there's a bit of a sketchy situation if we don't know the guy."  Vlha similarly said the completed lower receivers were for "returning customers on the builds."  UC-1 gave Schlotterbeck $750 as a down payment on the AR-15-type pistol order (and ordered magazines of ammunition as well), and Schlotterbeck confirmed he would be interested in UC-1 bringing in more customers.

UC-1 returned to the Bellflower shops on the evening of February 11, 2016, where he met with Kwan, to pick up and pay the remaining $850 balance for the AR-15-type pistol and four magazines, and to introduce UC-2 as an additional new customer.

**D.    Manufacture and Sale of Pistol to UC-2 on March 16, 2016**

During the recorded February 11, 2016 meeting, UC-2 placed an order with Kwan for an AR-15-type pistol.  Similar to defendants'

comments to UC-1 on January 26, 2016, Kwan informed UC-1 and UC-2 that they could use a pre-cut lower receiver for the build, but "we only do it to people we know."  Kwan confirmed that UC-2 wanted the same type of build as UC-1 ordered for the pistol he picked up that evening, stating, "You want to do the same thing, we'll just do the exact same thing."  UC-2 requested they Cerakote the pistol in yellow and red colors in the theme of the movie "Ironman," and paid $750 of the $1,500 purchase price upfront.

The UCs returned to the Bellflower shops on the evening of March 16, 2016, to pick up UC-2's "Ironman" pistol (along with two magazines) and for UC-1 to order another AR-15-type firearm.

**E.   Manufacture and Sale of Pistol to UC-1 on May 6, 2016**

During the recorded March 16, 2016 meeting, Kwan and Vlha met with the UCs and discussed the specifications and finish for UC-1's next firearm build.  UC-1 paid Kwan $820 upfront for the next AR-15-type pistol UC-1 was ordering in a "Stormtrooper" finish.

The UCs met with Schlotterbeck and Vlha at the Bellflower shops during a recorded meeting on May 6, 2016 to pick up UC-1's latest AR-15-type firearm order.  UC-1 paid the remaining $950 balance for the pistol (and magazines) to Schlotterbeck (after paying the initial portion to Kwan).  UC-2 asked Schlotterbeck if he could contact him to purchase another firearm, and Schlotterbeck gave UC-2 his phone number and said "text me."

During this meeting, both defendants talked about the general habits of their customers for other firearm orders.  Schlotterbeck said, "Not everybody comes back uh- . . . Usually, a lot of people, most people that buy one, they're happy and they just- . . . And

then other people are the opposite." Vlha similarly explained, "We get some, like, some of our friends just get one, and then that's it . . . We're always building one . . . Always got one [U/I] build."

**F.    Manufacture and Sale of Rifle to UC-2 on June 15, 2016**

On June 13, 2016, UC-2 sent a text message to Schlotterbeck, asking, "Can I come thru on Wednesday to order up another one of them things?" Schlotterbeck wrote back, "Yeah see you Wednesday" and "Rifle or pistol?" Kwan called UC-2 thereafter to take UC-2's order over the phone, and UC-2 placed an order for his second AR-15-type firearm build without having to pay any money upfront.

During a recorded meeting on June 15, 2016, UC-2 met Schlotterbeck at the Bellflower shops to pick up the AR-15-type rifle. Schlotterbeck commented that Kwan had gone "overkill on the parts" and discussed certain aspects of the functionality of the firearm. UC-2 paid Schlotterbeck the full $1,600 payment for the firearm and an illegal 30-round large-capacity magazine. UC-2 informed Schlotterbeck that he had friends that also would like to purchase custom-ordered AR-15-type firearms, and Schlotterbeck told UC-2 to put them in contact with him "as long as you trust them."

**G.    Additional Evidence Relating to Charges**

In addition to the government's extensive video, audio, and text message evidence, the government also will be offering additional evidence, including, among other things:

- Physical and photographic evidence of the AR-15-type firearms the CI and UCs purchased as well as the magazines that were negotiated as part of those sales.

13

- Photographic and/or physical evidence obtained during the course of surveillance and the execution of search warrants at the Bellflower shops on June 21, 2017.

- Evidence obtained from the search of Schlotterbeck's cell phone, including text messages to be introduced through summary exhibits and a summary witness, described further below.

- Evidence obtained from the search of three hard drives seized from Sign Imaging, including documentary and photographic evidence further demonstrating the nature, scope, and promotion of the co-conspirators' illegal firearms trafficking business.

- Evidence of statements made by defendant Schlotterbeck during a voluntary interview with ATF on June 21, 2017, which is the subject of the government's motion in limine #2.

- Evidence of the federal firearms licensee status during the course of the conspiracy of the defendants, the Bellflower shops, and other relevant individuals and entities.

- Evidence through expert witness testimony of an ATF Senior Industry Operations Investigator and Industry Operations Intelligence Specialist (described further in section II.D.1 below).

- Evidence relating to the confidential informant's criminal history as it relates to Count Three of the indictment against defendant Schlotterbeck.

- Evidence, for a limited purpose as set forth in the government's motion in limine #1, relating to defendants' purchases of firearms through apparently lawful channels as compared to the illegal firearms business they operated.

## II. EVIDENTIARY ISSUES

### A. Authentication and Foundation

Federal Rule of Evidence requires that a proponent of evidence make a prima facie showing of authenticity so that a reasonable juror could find "that the item is what the proponent claims it is." Fed. R. Evid. 901(a); United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th Cir. 1991). This requirement "does not erect a particularly high hurdle, and the proponent of the evidence is not required to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." United States v. Dhinsa, 243 F.3d 635, 658-59 (2d Cir. 2001) (citations omitted). The government need make only a prima facie showing of authenticity. Chu Kong Yin, 935 F.2d at 996.

The parties are meeting and conferring on potential stipulations to a number of the government's exhibits. However, absent stipulations to some or all of the government's proffered evidence, the government may need to authenticate certain types of exhibits, including the following categories of evidence.

#### 1. Video and Audio Recordings

The government will introduce a significant number of prepared clips of video and audio recordings arising out of the covert CI and UC operations during the course of the investigation. The government also intends to introduce several audio clips from Schlotterbeck's voluntary interview with ATF.

A recording is admissible upon a showing that it is "accurate, authentic, and generally trustworthy." United States v. King, 587 F.2d 956, 961 (9th Cir. 1978). For example, testimony that a

1   recording depicts evidence that the witness observed is sufficient

2   to authenticate the recording.  Fed. R. Evid. 901(b)(1); United

3   States v. Smith, 591 F.3d 974, 979-80 (8th Cir. 2010).  Agents and

4   witnesses involved in the subject meetings and calls have knowledge

5   of how the recordings were made.  In addition, other agents observed

6   the events in real-time while the recordings were made and have

7   familiarity with the individuals interviewed and their voices.  They

8   are therefore qualified to testify about who can be seen and heard

9   in the recordings.  Fed. R. Evid. 901(b)(5); United States v.

10  Torres, 908 F.2d 1417, 1425 (9th Cir. 1990) ("Testimony of voice

11  recognition constitutes sufficient authentication.").

12      The government has provided notice to defendants of what

13  portions of the recordings it may seek to admit at trial and

14  provided the defense with copies of those recording clips.

15          2.   Transcripts of Recordings

16      The government has prepared written transcripts of video and

17  audio recordings as an aid to the jury in listening to recordings.

18  See United States v. Turner, 528 F.2d 143, 167 (9th Cir. 1975)

19  (permitting the transcripts of sound recordings to be used

20  contemporaneously with the introduction of the recordings into

21  evidence).  Copies of the government's transcripts have been

22  provided to the defense, and the transcripts will be displayed on a

23  screen simultaneous to the playing of the video and audio files.

24  The transcripts themselves will not be offered into evidence.

25          3.   Photographs

26      The government intends to offer a number of photographs,

27  including, among other things, photos taken of the AR-15-type

28

16

firearms and ammunition purchased by the CI and UCs and photos taken during the execution of search warrants at the Bellflower shops.

Photographs may be authenticated by a witness who "identif[ies] the scene itself [in the photograph] and its coordinates in time and place." Lucero v. Stewart, 892 F.2d 52, 55 (9th Cir. 1989).  It is not necessary to have the photographer establish the foundation for the photograph.  Any person sufficiently familiar with the area in the photograph can be the proponent of the photograph.  Id.; see also United States v. Henderson, 241 F.3d 638, 650 (9th Cir. 2000) ("A lay witness may give an opinion regarding the identity of an individual depicted in a photograph provided the witness has had sufficient contact with the defendant to achieve a level of familiarity that renders the lay opinion helpful.").

### 4.   Firearms, Magazines and Other Physical Evidence

The government also intends to offer physical evidence of the actual purchased firearms and ammunition, other firearms-related items seized during the search warrant executions, and the seized digital devices (if necessary for admission of digital evidence).

To be admitted into evidence, a physical exhibit must be in substantially the same condition as when the crime was committed. The Court may admit the evidence if there is "a reasonable probability the article has not been changed in important respects." United States v. Harrington, 923 F.2d 1371, 1374 (9th Cir. 1991). Factors the Court may consider in making this determination include the nature of the item, the circumstances surrounding its preservation, and the likelihood of intermeddlers having tampered with it.  See United States v. Kaiser, 660 F.2d 724, 733 (9th Cir.

1981).  In establishing chain of custody as to an item of physical evidence, the government is not required to call all persons who may have come into contact with the piece of evidence.  Reyes v. United States, 383 F.2d 734 (9th Cir. 1967).  Moreover, a presumption of regularity exists in the handling of exhibits by public officials.  Kaiser, 660 F.2d at 733.

**B.   Summary Exhibits and Summary Witness**

1.   Summary Exhibits

The government intends to offer evidence from digital devices seized during the execution of search warrants at the Bellflower shops, including text messages and other digital evidence obtained from Schlotterbeck's cellular phone and three hard drives seized from Sign Imaging.  The digital evidence is voluminous, and the government intends to offer this evidence through summary exhibits or compilations from the case agent's review of the digital devices.

Federal Rule of Evidence 1006 provides:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006; see also id., 1972 Adv. Comm. Notes ("The admission of summaries of voluminous books, records, or documents offers the only practicable means of making their contents available to judge and jury.  The rule recognizes this practice, with appropriate safeguards."); United States v. Johnson, 594 F.2d 1253, 1255 (9th Cir. 1979) ("The purpose of Rule 1006 is to allow the use of summaries when the volume of documents being summarized is so

1  large as to make their use impractical or impossible; summaries may
2  also prove more meaningful to the judge and jury.").

3      A summary exhibit may be admitted as substantive evidence when
4  the proponent establishes that the underlying documents upon which
5  the summary is based are voluminous, admissible, and available for
6  inspection.  Johnson, 594 F.2d at 125-26; see also United States v.
7  Rizk, 660 F.3d 1125, 1130 (9th Cir. 2011).  Although the materials
8  underlying the summary must be admissible, they need not themselves
9  be admitted into evidence.  Rizk, 660 F.3d at 1130—31.

10     Here, the summary exhibits predominantly will consist of
11  verbatim excerpts of text message exchanges between defendant
12  Schlotterbeck and other customers, suppliers, defendant Vlha, and
13  co-conspirator Kwan, reproduced on individual slides.  The excerpts
14  are from a voluminous 880-page Cellebrite report and accompanying
15  compilation of hundreds of images and other data files derived from
16  the responsive materials on Schlotterbeck's phone.  The underlying
17  Cellebrite report and accompanying materials were produced to the
18  defense on October 10, 2019.  As discussed further below, the text
19  messages are admissible as admissions of a party opponent, co-
20  conspirator statements, or non-hearsay, and are relevant to the
21  nature, scope, and promotion of the co-conspirators' illegal
22  firearms trafficking business.  The government anticipates
23  finalizing and producing the text message summary exhibits to the
24  defense during the week of May 9, 2022, so the defense will have an
25  opportunity to inspect the summary exhibits prior to trial.

26     The government also will be offering compilation exhibits of
27  photographs and documents seized from the Sign Imaging hard drives.

28

These exhibits are not summary exhibits, as they are the actual photographic and documentary records seized from the hard drives. These records were first produced to the defense on October 10 and December 17, 2019, and they were later attached as appendices to ATF Report of Investigation (ROI) 80, produced on February 3, 2021.

### 2. Summary Witness

The government anticipates that ATF Special Agent Monika Uchiyama will testify about the summary exhibits from defendant Schlotterbeck's phone and the compilation exhibits from the three Sign Imaging hard drives. Agent Uchiyama initially reviewed the materials on these digital devices as part of the responsiveness review of the devices under the search warrants, and she later completed detailed reports (ATF ROIs 61 and 80) regarding the responsive contents of the devices.

With respect to the summary exhibits of the text messages from Schlotterbeck's phone, a summary witness may properly testify about, and use a chart to summarize, evidence that is voluminous and complex. The court and jury are entitled to have a witness "organize and evaluate evidence which is factually complex and fragmentally revealed." United States v. Shirley, 884 F.2d 1130, 1133-34 (9th Cir. 1989) (agent's testimony regarding her review of various telephone records, rental receipts, and other previously offered testimony held to be proper summary evidence, as it helped jury organize and evaluate evidence; summary charts properly admitted); see also United States v. Pree, 408 F.3d 855, 869 (7th Cir. 2005) ("When a summary witness simply testifies as to what the government's evidence shows, he does not testify as an expert

witness."). Further, a summary witness may be assisted by others in the preparation of summary evidence; the assistance provided by other people in the preparation of summary evidence goes to its weight, not its admissibility. See <u>United States v. Soulard</u>, 730 F.2d 1292, 1299 (9th Cir. 1984).

### C. Hearsay and Exceptions to Hearsay

In its MIL #2, the government seeks to admit at trial certain statements Schlotterbeck made to ATF during a voluntary interview as admissions of a party opponent. The government also intends to offer (1) Schlotterbeck's and Vlha's statements in text messages and clips of audio-recorded phone calls and video-recorded meetings with the CI and/or one or both of the UCs; (2) Kwan's similar communications with the CI and/or one or both of the UCs, in some cases including one or both of defendants; and (3) text messages obtained from Schlotterbeck's cell phone. The statements in these recordings and text messages are admissible as admissions of a party opponent, co-conspirator statements, and/or non-hearsay.

#### 1. <u>Defendants' Statements as Admissions of a Party Opponent</u>

Hearsay is an out of court declarant's statement that a party offers in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Statements by a party opponent when offered against that party are excluded from the hearsay definition. Fed. R. Evid. 801(d)(2)(A); <u>United States v. Ortega</u>, 203 F.3d 675, 682 (9th Cir. 2000). Defendants Schlotterbeck's and Vlha's statements during the course of their communications with the CI and/or the UCs, as well as Schlotterbeck's text communications, are not hearsay

1    when offered against each defendant individually because they are
2    statements by a party-opponent.  Fed. R. Evid. 801(d)(2)(A).

3         However, as the government explained in its MIL #2,
4    incorporated by reference herein, defendants cannot admit their own
5    out of court statements unless a hearsay exception applies.  (See
6    Dkt. No. 81 at 7-8.)  Nor does the "rule of completeness" under Rule
7    106 allow defendants to circumvent the hearsay exception requirement
8    even where the government has admitted segments of a conversation
9    without including the entire conversation.  (See id.)

10        In addition, statements that provide context to defendants'
11   statements, including the CI's and UCs statements in meetings,
12   calls, and text messages, are also admissible as such statements are
13   not being offered for the truth of the matter asserted but rather to
14   provide context for the defendants' statements.  Fed. R. Evid.
15   801(c); see also United States v. Valerio, 441 F.3d 837, 844 (9th
16   Cir. 2006) (informant's statements on a recording are admissible to
17   give context to defendant's statements); United States v. Barragan,
18   871 F.3d 689, 705 (9th Cir. 2017) ("[T]he informant's statements on
19   the tapes were not hearsay because, as the court instructed the
20   jury, they were offered only for context, not for 'the truth of the
21   matter asserted.'").

22             2.   Defendants' and Co-Conspirator Kwan's Statements as
                    Co-Conspirator Statements
23

24        Defendants' statements, along with co-conspirator Kwan's
25   statements, also are admissible against both defendants as co-
26   conspirator statements.  Declarations by one co-conspirator during
27   the course of, and in furtherance of, a conspiracy may be used

28

                                    22

against another conspirator because such declarations are not

hearsay.  Fed. R. Evid. 801(d)(2)(E).  Statements made in

furtherance of a conspiracy also are not "testimonial" and,

consequently, do not violate the Confrontation Clause.  Crawford v.

Washington, 541 U.S. 36, 56 (2004).  Accordingly, under Rule

801(d)(2)(E), the introduction of co-conspirator statements requires

only a foundation that: (1) the declaration was made during the

course of the conspiracy; (2) it was made in furtherance of the

conspiracy; and (3) there is, including the co-conspirator's

statement itself, sufficient proof of the existence of the

conspiracy and of the defendant's connection to it.  Bourjaily v.

United States, 483 U.S. 171, 173, 181 (1987).

The evidence at trial -- including the clips of numerous

recorded meetings, calls and text messages summarized in part in the

Statement of Facts and Evidence section above, physical evidence of

the AR-15-type firearms, digital and photographic evidence from

search warrant executions at the Bellflower shops, and witness

testimony, among other things -- will prove that a conspiracy

existed at least between May 21, 2015, and June 21, 2017; that

defendants Schlotterbeck and Vlha (along with co-conspirator Kwan)

each had knowledge of and participated in the conspiracy; and the

proffered statements were made during the course of and in

furtherance of the conspiracy.  Even though defendants and co-

conspirator Kwan did not participate in each meeting, call or text

message, a defendant need not be present at the time the co-

conspirator made the statement.  See Sendejas v. United States, 428

F.2d 1040, 1045 (9th Cir. 1970) ("It is well settled that a

conversation between two co-conspirators which takes place out of the presence of a third co-conspirator is admissible into evidence against the third co-conspirator.").

Moreover, "[i]t is well established that statements made by a co-conspirator need not be made to a member of the conspiracy to be admissible under Rule 801(d)(2)(E)." United States v. Zavala-Serra, 853 F.2d 1512, 1516 (9th Cir. 1988). Co-conspirator statements are admissible when made to third parties, such as government informants and undercover agents. Id.; United States v. Lloyd, 807 F.3d 1128, 1160-61 (9th Cir. 2015) ("It is not necessary that the statement be made to another member of the conspiracy for it to come under [R]ule 801(d)(2)(E)."). The focus is not a statement's "actual effect in advancing the goals of the conspiracy, but on the declarant's intent in making the statement." Zavala-Serra, 853 F.2d at 1516.

Here, defendant Schlotterbeck's and Vlha's and co-conspirator Kwan's statements to each other and the CI and/or UCs, as well as Schlotterbeck's text messages on his phone, were made to further the conspiracy to illegally manufacture firearms for sale. Among other things, the co-conspirators coordinated with each other and their customers (including the CI and the UCs in the recordings) to apprise the buyers about their options for ordering customized AR-15-type firearms, take orders and obtain parts for the builds, establish trust with their buyers given the illicit nature of the transactions, and promote additional business and referrals through the completed transactions.[6]

---

[6] Admission of Schlotterbeck's and Vlha's statements in the meeting and call recordings and text messages against the other does not present any Bruton issues at trial. While "Bruton precludes the

24

1

               3.   <u>Public Records</u>

2       The government intends to offer public records, absent certain

3 stipulations, including certified copies of the CI's conviction

4 records, a certified business license for Sign Imaging, and

5 certified copies of information bearing on defendants' apparently

6 lawful purchases of firearms (as described in the government's MIL

7 #1, Dkt. No. 80, incorporated herein by reference).  Public records,

8 reports, statements, or data compilations of public offices or

9 agencies setting forth the activities of the office or agency, or

10 matters observed pursuant to a duty imposed by law as to which

11 matters there was a duty to report, are admissible as an exception

12 to the hearsay rule.  Fed. R. Evid. 803(8).  Domestic public

13 documents bearing a seal of the United States, any state, or a

14 political subdivision, department, officer, or agency thereof, and a

15 signature purporting to be an attestation or execution, are self-

16 authenticating and do not require extrinsic evidence of

17 authentication as a condition precedent to admissibility.  Fed. R.

18 Evid. 902(1).  The same is true of certified copies of public

19 records.  Fed. R. Evid. 902(4).

20      **D.   Expert and Lay Opinion Testimony**

21       The government has provided disclosure to defendants concerning

22 two areas of potential expert testimony under Federal Rule of

23 Criminal Procedure 16(a)(1)(G): (1) federal firearms requirements

24 and related issues; and (2) forensic analysis of the digital devices

25

26 admission of a defendant's confession implicating a co-defendant
during a joint trial . . . a statement made by a co-conspirator

27 during and in furtherance of the conspiracy [is] not barred by
<u>Bruton</u>."  <u>United States v. Allen</u>, 425 F.3d 1231, 1235 n.5 (9th Cir.

28 2005) (internal citation omitted).

involved in this case (absent a stipulation on that issue).[7]  If specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a qualified expert witness may provide opinion testimony on the issue in question. Fed. R. Evid. 702.

### 1.   Federal Firearms Requirements

The government intends to call ATF Senior Industry Operations Investigator / Industry Operations Intelligence Specialist Thomas M. Chimileski, Jr. to testify regarding the federal firearms licensing system, the types of licenses required based on various types of activities, administrative requirements attendant to certain types of licenses, and restrictions on engaging in certain activities without a federal firearms license (FFL).  The government anticipates Investigator Chimileski also will testify regarding regulatory matters relating to certain license types and the manufacture of firearms for sale; the system of tracking firearms manufactured for sale, including serialization and marking requirements, and issues attendant to firearms lacking serial numbers, or so-called "ghost guns;" records and other information maintained by federal and state authorities concerning the manufacture, sale and registration of firearms, including, among other things, the California Automated Firearms System, which maintains dealers records of sale (DROS); the nature, characteristics, and components of the type of AR-15-type firearms

---

[7] The government provided the defense with a disclosure regarding the government's anticipated expert witness testimony on April 22, 2022, pursuant to the Court's order (Dkt. No. 79) and the parties' agreement to extend their cross-disclosure deadline by one week.

and ammunition involved in this case as well as the assembly of such

firearms; and other aspects relating to the customization of

firearms, including Cerakote and related processes.

>    2.   Digital Devices

Absent a stipulation, the government intends to call Computer

Examiner Gregory Estes and/or Computer Examiner Terry Hom – both

currently or formerly with the FBI's Computer Analysis Response Team

at the Orange County Regional Computer Forensic Laboratory - to

testify regarding the procedures followed in the imaging,

processing, extraction, analysis, and/or review of data obtained

from Schlotterbeck's cellular telephone and the three hard drives

seized from Sign Imaging during the course of this investigation.

>    3.   Lay Opinion of Law Enforcement Agents

The government may elicit lay opinion testimony by law

enforcement agents, primarily through the ATF UCs and ATF Special

Agent Monika Uchiyama who reviewed the digital devices in this case.

For example, SA Uchiyama will testify about text messages in

Schlotterbeck's cell phone, many of which contain shorthand related

to firearms, such as "lower," "cutting" and "milling out," "80s" (in

reference to so-called "80% finished lower receivers), "builds,"

"rails," "bolts," and other vague or unfamiliar terms to a lay

person.  The UCs also may testify about their understanding as to

the meaning of vague, unclear, or coded statements made by

defendants and co-conspirator Kwan during the course of their

recorded meetings, calls and text messages.

Federal Rule of Evidence 701 provides that, "[i]f a witness is

not testifying as an expert, testimony in the form of an opinion is

limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Thus, under Ninth Circuit law, an officer's interpretation of intercepted calls or code words, for example, is admissible lay opinion because it is based on the officer's "direct knowledge of the investigation." See United States v. Freeman, 498 F.3d 893, 902, 904-05 (9th Cir. 2007) ("A lay witness may provide opinion testimony regarding the meaning of vague or ambiguous statements [in recorded conversations]"). "A lay witness's opinion testimony necessarily draws on the witness's own understanding, including a wealth of personal information, experience, and education, that cannot be placed before the jury." United States v. Gadson, 763 F.3d 1189, 1208 (9th Cir. 2014). But a lay opinion witness "may not testify based on speculation, rely on hearsay or interpret unambiguous, clear statements." United States v. Vera, 770 F.3d 1232, 1242 (9th Cir. 2014). Lay witness testimony is "even if the testifying officer was not a participant in the recorded conversation." Gadson, 763 F.3d at 1207.

Here, the UCs' understanding as to their communications with the co-conspirators will be based on their direct knowledge of the investigation and their understanding of the context of the co-conspirators' statements. Similarly, SA Uchiyama, who served as the lead case agent for the duration of the years-long investigation, is well versed in the defendants' business, their manner of communications, and the context of their communications. Therefore,

28

law enforcement lay opinion testimony should be admissible at trial.

**E.    Truthful Testimony Provisions of Plea Agreement**

The government intends to call a cooperating witness who has pleaded guilty to various charges.  The witness has a plea agreement that includes a provision that requires the cooperating witness to fully cooperate with the government, including by testifying as a witness if called upon to do so.  The plea agreement also includes provisions requiring the cooperating witness to be honest and forthcoming, and to render truthful testimony.

"Eliciting testimony on direct examination that a witness entered into a plea agreement that requires truthful testimony may constitute vouching."[8]  United States v. Dorsey, 677 F.3d 944, 953 (9th Cir. 2012).  However, "referring to a plea agreement's mandate to be truthful does not constitute vouching for a witness if such references are 'made in response to an attack on the witness's credibility because of his plea bargain,' including an attack in defense counsel's opening statement."  Id. (quoting United States v. Monroe, 943 F.2d 1007, 1013-14 (9th Cir. 1991)); see also id. at 954 ("Defense counsel implied in his opening statement that Fomby was a liar and that he was biased because he got 'a deal from the government.'  The prosecutor permissibly responded to this attack by

---

[8] If such testimony is inadvertently elicited on direct examination before any attack on the cooperating witnesses' credibility in opening or otherwise, a curative instruction would be in order, see United States v. Shaw, 829 F.2d 714, 717-18 (9th Cir. 1987), and of course defense counsel must be permitted fulsome cross examination, see United States v. Schoneberg, 396 F.3d 1036, 1043 (9th Cir. 2005) (finding error where truthfulness provision was elicited on direct examination, and defense counsel's cross examination "was cut off" in a manner that – when viewed alongside the language of the curative instructions – "vitiated" defense counsel's point).

eliciting testimony that Fomby's plea agreement required him to tell the truth.  When the defense opens a door, it should not be surprised to see the prosecutor enter.").

Here, the government anticipates that defense counsel will attack the cooperating witness's credibility, perhaps as early as in the opening statement.  If so, the government should be permitted to elicit testimony regarding the truthful testimony provision during direct examination.

**F.   Cross-Examination of Defendants and Defense Witnesses**

1.   Scope of Cross-Examination

A defendant who testifies at trial waives his right against self-incrimination and subjects himself to cross-examination concerning all matters reasonably related to the subject matter of his testimony.  The scope of defendant's waiver is coextensive with the scope of relevant cross-examination.  United States v. Cuozzo, 962 F.2d 945, 948 (9th Cir. 1992); see also United States v. Black, 767 F.2d 1334, 1341 (9th Cir. 1985) ("What the defendant actually discusses on direct does not determine the extent of permissible cross-examination or his waiver.  Rather, the inquiry is whether 'the government's questions are reasonably related' to the subjects covered by the defendant's testimony.") (internal quotations and citation omitted).

2.   Other Act Evidence

Defendants' credibility will be crucial if either defendant chooses to testify.  Rule 404(b) does not proscribe the use of other act evidence as an impeachment tool during cross-examination.  United States v. Gay, 967 F.2d 322, 328 (9th Cir. 1992).  Thus,

cross-examination about other possible untruthful conduct in which either defendant may have engaged is necessary for the jury to weigh whether his testimony is credible.  In addition, Rule 608(b) "specifically contemplates inquiries into prior behavior in order to challenge a witness's credibility.  Evidence of prior frauds is considered probative of the witness's character for truthfulness or untruthfulness."  Id.; see also United States v. Reid, 634 F.2d 469, 474 (9th Cir. 1980) ("The fact that appellant made the false statements [in a letter] eight years prior to trial did not destroy the relevance of the statements for impeachment purposes.").

Moreover, the prejudicial effect of such evidence, if any, can be addressed by a limiting instruction.  Gay, 967 F.3d at 328.  "All evidence which tends to establish the guilt of a defendant is, in one sense, prejudicial to that defendant, but that does not mean that such evidence should be excluded."  United States v. Bailleux, 685 F.2d 1105, 1111 (9th Cir. 1982).  Admission of evidence regarding the defendant's other acts might only constitute unfair prejudice if the jury in this case considered the evidence to establish a defendant's propensity to commit the charged crime. However, this potential unfair prejudice can be cured by a limiting instruction that the jury should consider the evidence only for the purpose for which it is introduced.  Gay, 967 F.3d at 328.

### 3.   Cross-Examination of Defense Witnesses

Similarly, if either defendant calls a character witness, the government should be allowed to cross examine that witness with information pertaining to how the witness's opinion of defendant's character would change if the witness were confronted with a

31

specific instance of defendant's conduct that rebuts that opinion. A character witness who offers an opinion about or discusses defendant's reputation for good character on direct examination can be cross examined with relevant specific instances of conduct. Under Fed. R. Evid. 404(a)(2)(A), character evidence is admissible when offered by the prosecution to rebut "evidence of a pertinent trait" of character offered by a defendant.  See also Fed. R. Evid. 405(a).  "[W]hen the defendant 'opens the door' to testimony about an issue by raising it for the first time himself, he cannot complain about subsequent government inquiry into that issue." United States v. Mendoza-Prado, 314 F.3d 1099, 1105 (9th Cir. 2002) (quoting United States v. Hegwood, 977 F.2d 492, 496 (9th Cir. 1992)).  Such cross examination can be properly phrased in the form of "have you heard" or "did you know" questions regarding defendant's criminal conduct.  See United States v. Scholl, 166 F.3d 964, 974 (9th Cir. 1999).

> **G.   Affirmative Defenses**

Neither defendant has given notice of any affirmative defenses or an intent to rely on any affirmative defense, including mental incapacity, entrapment, or duress, or an alibi defense, in response to the government's requests for such notice.  Therefore, to the extent either defendant may attempt to rely on such a defense, the government reserves the right to object and to move to preclude the defendant from asserting such a defense.

> **H.   Reciprocal Discovery**

The government has requested reciprocal discovery, Jencks material, and expert disclosures from defendants in multiple

discovery letters.  Defendants have yet to produce any reciprocal discovery to which the government is entitled under Rules 16 and 26.2 of the Federal Rules of Criminal Procedure or the Jencks Act. Thus, to the extent defendants may attempt to introduce or use any documents at trial that they have not previously produced, the government reserves the right to object and to seek to have such documents precluded.

**III.  CONCLUSION**

The government respectfully requests leave to file such supplemental memoranda as may become necessary during trial.