

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,

                    Plaintiff,

        vs.                              Case No. CR 19-343-GW

TRAVIS SCHLOTTERBECK,
JAMES BRADLEY VLHA,
                    Defendants.
_____/

REPORTER'S TRANSCRIPT OF
PRETRIAL CONFERENCE
Thursday, June 23, 2022
8:30 a.m.
LOS ANGELES, CALIFORNIA

TERRI A. HOURIGAN, CSR NO. 3838, CCRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4311
LOS ANGELES, CALIFORNIA  90012
(213) 894-2849

UNITED STATES DISTRICT COURT

2

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    UNITED STATES ATTORNEY'S OFFICE
    United States Attorney
    BY:  BRIAN R. FAERSTEIN
         DANIEL BOYLE
     Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California  90012


**FOR THE DEFENDANT:  TRAVIS SCHLOTTERBECK**

    EDWARD M. ROBINSON, A PROFESSIONAL LAW CORPORATION
    BY:  EDWARD M. ROBINSON
         BRIAN A. ROBINSON
    Attorneys at Law
    21515 Hawthorne Boulevard, Suite 730
    Torrance, California  90503


**FOR THE DEFENDANT:  JAMES BRADLEY VLHA**

    LAW OFFICE OF JEROME J. HAIG
    BY: JEROME J. HAIG
    Attorney at Law
    21143 Hawthorne Boulevard, Suite 454
    Torrance, California  90503

**UNITED STATES DISTRICT COURT**

|     |                                                                              |
| --- | ---------------------------------------------------------------------------- |
| 1   | **LOS ANGELES, CALIFORNIA; THURSDAY, JUNE 23, 2022**                          |
| 2   | **8:30 a.m.**                                                                 |
| 3   | **--oOo--**                                                                   |
| 4   | THE COURT:  All right.  Let me call the matter of                             |
| 5   | *United States versus Schlotterbeck and Vlha.*                               |
| 6   | Let me have appearances starting with government                             |
| 7   | counsel first.                                                                |
| 8   | MR. BOYLE:  This is AUSA Dan Boyle.  I believe Brian                          |
| 9   | Faerstein is dialing in as we speak.                                          |
| 10  | THE COURT:  All right.                                                        |
| 11  | THE COURTROOM DEPUTY:  I will allow him once we have                          |
| 12  | him, Judge.                                                                   |
| 13  | THE COURT:  We also have the defendants.                                      |
| 14  | THE COURTROOM DEPUTY:  Mr. Schlotterbeck, please                             |
| 15  | start your video.                                                            |
| 16  | THE COURT:  Let me ask Mr. Boyle, where is your                              |
| 17  | cohort actually signing on?                                                  |
| 18  | MR. BOYLE:  Mr. Faerstein is attempting to sign in                          |
| 19  | now.  I just messaged him, Your Honor.                                        |
| 20  | My apologies for the delay.                                                   |
| 21  | THE COURT:  He's on.                                                          |
| 22  | All right.  For the defense, we have?                                         |
| 23  | MR. ROBINSON:  Good afternoon, Edward Robinson and                           |
| 24  | Brian Robinson is with me.  He's not on the screen, and we are               |
| 25  | here virtually with Mr. Schlotterbeck, who is also present.                   |

1          THE COURT:  And the other defense counsel, you are

2   muted.

3          MR. HAIG:  Sorry, Jerome Haig appearing for

4   Mr. Vlha, who is also present via WEBEX at a separate location

5   from myself.

6          THE COURT:  There has already been a waiver filed?

7          MR. HAIG:  Yes, Your Honor.

8          THE COURT:  All right.  As to both defendants?

9          THE COURTROOM DEPUTY:  Yes.

10          THE COURT:  All right.  We're here for pretrial.

11   There is lots to talk about today.

12              Let me ask this question, the matter is currently

13   set for trial on July the 12th.

14              Let me ask, I don't know if I can get a July 12th

15   date, because I have to put in and I'm going to try to get it,

16   but let me ask, how long is this case expected to last?

17          MR. FAERSTEIN:  Well, Your Honor, you know, I think

18   originally the government was projecting four to five days and

19   that would include what we anticipate would be the defense

20   cross-examination of the case, I think closer to five.

21              And that was I think our intention with our prior

22   dates.  We understand Your Honor has another trial the week

23   after, I'm not certain if that is not scheduled.

24          THE COURT:  I have lots of trials, but the other

25   problem I'm attending a conference between the 18th and 21st of

1  July.  And so I presume you don't want this case to be broken

2  up, so if there is the possibility of it being a five-day

3  trial, we're not going to be able to do it in the time between

4  the 12th and the 15th, and that is assuming I can get the 12th.

5              So if I can't get the day I asked for, if that is

6  the case, do you want to postpone this for another point in

7  time?

8              MR. HAIG:  I think that is a good idea.  I don't see

9  that we could get the trial done before the 18th, Your Honor,

10  not in my view.

11             THE COURT:  Mr. Robinson?  What is your client's

12  position?

13             MR. ROBINSON:  We would agree with Mr. Haig's

14  statement.  We are not opposed to continuing the matter.  I

15  think I put this on the record last time that my daughter is

16  getting married on September 17th, out of town, and I need the

17  week before open.

18             THE COURT:  Let's put it this way, I'm not going to

19  deprive you of that expense, you are paying for it, I presume?

20             MR. ROBINSON:  I'm paying for it as we speak, Your

21  Honor.

22             THE COURT:  I won't deprive you of that expenditure.

23  Just so I'm very clear on this, when would you have to leave,

24  you would have to leave by what date?

25             MR. ROBINSON:  Your Honor, the week before.  One

1   second, please let me grab my -- I think the week before the

2   wedding is September 12th, 13th, 14th, 15th, 16th, I can't do a

3   trial.

4             THE COURT:  For example, if the trial were to end by

5   September 9th, you could do the trial?

6             MR. ROBINSON:  If the trial were to end?

7             THE COURT:  September 9th, sorry, I misspoke.

8             MR. ROBINSON:  Yes, Your Honor, I would be able

9   to -- I can do that.

10            THE COURT:  Okay.

11            MR. ROBINSON:  But I do know we have discussed this

12   with the government, and they had an issue in August, as I

13   recall.

14            THE COURT:  Let me ask the government, do you guys

15   still have an issue in August?

16            MR. FAERSTEIN:  Yes, Your Honor.  We have witness

17   availability issues in August, and my co-counsel has

18   availability issues that are not movable at the end of August

19   and early September, so July was our hopes.

20            THE COURT:  Let me ask you this, you are talking

21   about Mr. Boyle's schedule?

22            MR. BOYLE:  Yes.

23            THE COURT:  Let me ask Mr. Boyle, when do you have

24   to leave or do you have another matter?

25            MR. BOYLE:  It's not so much departure as an

1   arrival, Your Honor.  My wife is due with our second child in

2   late August.

3           THE COURT:  You can't tell her to hold off on it for

4   a little bit while you finish this trial?

5           MR. BOYLE:  My wife apparently wants the child to

6   arrive sooner than later.  We would strongly like to keep the

7   current trial date, doing whatever is possible to keep that

8   date.

9           THE COURT:  Well, the only problem is it would cause

10  there to be a situation where we would have to take a four-day

11  break in between.

12           In other words, assuming that I can get the 12th

13  of July, but I don't even know if I can get the 12th of July, I

14  have to ask.

15           I tell you what, so let me just ask Mr. Boyle,

16  her due date is when?

17           MR. BOYLE:  It is currently the last week of August,

18  Your Honor.

19           THE COURT:  So if you were in trial the first week

20  of August, that wouldn't be a problem?

21           MR. BOYLE:  If the Court sets a trial date the first

22  week of August, I will make that work and the government, of

23  course, will make that work, Your Honor.

24           THE COURT:  All right.  Why don't I do this, let me

25  see what I can do about dates and then I will get back to you

1  guys.

2          What I will do is I will set this matter back on

3  calendar just for scheduling discussions on the 30th of June.

4          MR. HAIG:  Your Honor, if that is the case, this is

5  Jerome Haig, could Mr. Robinson stand in for me?  I'm going to

6  be in England on vacation from next Tuesday, well, actually I'm

7  going on a staggered vacation that starts tomorrow, and I won't

8  be back until July 7th, but I will be out of the country

9  starting on June -- next Tuesday, which will be June 28th.

10          THE COURT:  Okay.

11          MR. HAIG:  If Mr. Robinson is standing in, I am okay

12  with that.

13          THE COURT:  Why don't we have Mr. Robinson stand in

14  for you.

15          MR. HAIG:  If he's all right with that?

16          MR. ROBINSON:  I am.

17          THE COURT:  Actually, you are going to be back by?

18          MR. HAIG:  I'm back on the evening of July 7th.

19          THE COURT:  In that case, I will put it for June

20  the 30th, and it will just be discussing scheduling and so just

21  give Mr. Robinson your availability.

22          MR. HAIG: All right.

23          MR. FAERSTEIN:  Your Honor, if I may -- just I guess

24  preview one issue.  I was just checking our witness

25  availability schedule, and I don't know if this was prepared

1   for the last hearing, we had -- one of our key witnesses is out

2   the first two weeks of August.

3          I think it's a pre-planned vacation, it's the

4   kind of thing that we're going to be having to navigate in

5   August, so I will, of course, confirm that, but I am expecting

6   that that is not going to work.

7          THE COURT:  Well, we will talk about that on the

8   30th.

9          You can clue me in, and, again, since I'm in part

10  continuing this because I'm going to be at a conference,

11  obviously, I'm not going to deprive Mr. Robinson of his

12  wedding, and Mr. Haig his English beer, and Mr. Boyle with yet

13  another child, I will accommodate everybody.

14         MR. HAIG:  Your Honor, just so you know, and I know

15  it doesn't really matter, but I have got a family issue the

16  same week that Mr. Robinson does as well.  I know that the

17  Court wasn't going to interrupt that.

18         THE COURT:  Well, let's put it this way, if he can't

19  be available, I'm not going to have you standing in his place.

20         MR. HAIG:  For planning purposes, not that I'm a

21  huge beer drinker, is the Court envisioning continuing the 7/12

22  date yet?

23         THE COURT:  I don't know if I can get the 7/12 date;

24  in other words, I don't know because in our district we have to

25  make arrangements with the Chief Judge and, you know, so what

1    he does is every two weeks on a Friday he asks for those judges

2    who have trials within the next following two weeks to give him

3    a list, and then what he does is he sets dates.

4              Like, for example, I'm going to start a trial on

5    June the 30th, but I previously asked that I be able to start

6    on June the 28th.  He couldn't give me the 28th, so I'm

7    starting on June 30th.

8              I was planning to make a request for July

9    the 12th, but I don't know if I could get July 12th, it might

10   very well be if I ask for July 12th, I might not get July 12th,

11   I might get something else.

12             MR. HAIG:  If you get July 12th, hypothetically, you

13   are going to be gone for those four days, then we have already

14   said the 12th isn't going to work.

15             THE COURT:  Let me ask you this, I'm thinking about

16   trying to start maybe on the 22nd of July, because that is a

17   date that most people don't like, it's a Friday, not as many

18   judges would be asking for a Friday start date, so I can make a

19   request to start on the July the 22nd, because that would

20   hopefully complete the trial within the first week of August or

21   something of that sort.

22             Let me ask, Javier, what are the other cases I

23   have?

24             THE COURTROOM DEPUTY:  You have the Zendejas trial,

25   that is for the 19th of July.

1          THE COURT:  Uh-huh.

2          THE COURTROOM DEPUTY:  I don't know if they're going

3    to start before 7/25.

4          THE COURT:  If we could start -- okay, like some

5    time on July 8th or something like that.  I have to see what

6    Judge Gutierrez says.  I think I can do that, so if I were to

7    see if we can get July the 22nd as a start date, I envision

8    this case would not take more than five days, right?

9          MR. ROBINSON:  Edward Robinson.  My only concern

10   with that is I have a healthcare fraud case in front of Judge

11   Wright that is set for the 26th of July, and to the extent

12   anything is ever etched in stone, that one is.  It's old like

13   this case.

14          This case might be -- it's an old healthcare

15   fraud case, and I have -- I don't want to tread on his

16   schedule.  I appreciate the timing of all of these things, but

17   that is something I should consider.

18          THE COURT:  He is going to be in the same position,

19   he may ask for that day, but he might not get it.

20          MR. ROBINSON:  True.

21          THE COURT:  I mean, if you start a case, you start a

22   case, and you can just blame me.  Judge Wright and I are -- he

23   started I think two weeks before I did on the federal bench, so

24   we're kind of, like, chummy, so just blame me, that will be all

25   right with him.

1          MR. ROBINSON:  Okay.

2          THE COURT:  I will try to shoot for the 22nd of

3     July, but we will talk about it again on the 30th and we will

4     see what the situation is at that point in time.

5          MR. HAIG:  Is the 12th, like, out?

6          THE COURT:  I'm going to see.  I will let you guys

7     know further on, on the 30th.  I'm going to be talking to Judge

8     Gutierrez to see what the lay of the land is.

9               Let's get back to the pretrial, that's what we're

10    here for.  I will try to get as much done as we can at this

11    point.

12              I have the government's statement of the case.  I

13    want a joint statement of the case.  If the parties can't agree

14    on a joint statement, I will read the indictment, I presume,

15    you would rather have me read the indictment?  You would

16    probably want to get together on a joint statement of the case,

17    so, I would want that.

18              I have the joint exhibit list, and with the

19    stipulations regarding the evidence, that is fine.  I also have

20    a joint witness list, that seems to be fine.

21              A joint verdict form, which seems to be fine.  I

22    do have joint jury instructions and disputed jury instructions

23    and supplemental disputed jury instructions, and the closer it

24    gets to the trial date, I will look at all of that stuff and

25    talk to you guys further about that, but I wanted to indicate I

1    have that.

2              I also have stipulations of fact.  The only

3    question I had about the stipulations of fact is how is that

4    going to be presented to the jury?  Is it going to be a

5    situation where on Day 1, they will get a copy of that, or is

6    it going to be the situation where somebody would read it to

7    the jury at some point in time?

8              How are the parties thinking that is going to be

9    presented?

10             MR. FAERSTEIN:  This is Brian Faerstein speaking for

11   the government.

12             I think our intention is to read them to the

13   jury, either at the beginning or maybe the end of our case.  Of

14   course, we're open to the Court's preferences with respect to

15   that.

16             THE COURT:  Probably it would be better to read it

17   to them.  I haven't looked at what the facts are.  Usually

18   normally, it's a situation where you read them at the start of

19   the case, but also they are facts that the jury would get a

20   copy of them and so that is a suggestion, but again, if you

21   guys agree, I will agree with your agreement.

22             MR. FAERSTEIN:  I was going to say, I should have

23   mentioned it, it would be our intention to mark them as

24   exhibits as well.  I suppose in that way we would move to admit

25   the exhibits of each stipulation and read it.

1          THE COURT:  Let me put it this way, each stipulation

2    would not be an exhibit.  In other words, there would be a

3    single document which would be the stipulations, that would be

4    marked as an exhibit, I have no problem with that, but I don't

5    see that you would be marking each stipulation as a separate

6    exhibit, there is no need.

7          MR. FAERSTEIN:  That's fine, Your Honor.

8          THE COURT:  All right.  Mr. Haig, do you have

9    something else you wanted to add?

10         MR. HAIG:  Well, just sometimes reading them at the

11   beginning of the case, the jury might not even know the context

12   yet.  So, I think we can figure out when is the best time to

13   read it.

14         THE COURT:  I'm not insisting, so if you guys all

15   agree, then whatever you agree upon, I would agree upon.

16              What I would also need is I would need the voir

17   dire questions from both sides.  I haven't gotten that yet.

18   Let me just indicate, I do the voir dire, but I give each side

19   additional time to do follow-up questions, and I usually think

20   I'm fairly thorough about this, but what I also want each side

21   to do is give me their proposed voir dire questions.

22              Normally what I do is I give both sides ten

23   additional minutes after I finish my voir dire questions, and

24   if it's a situation where the attorneys have used up their time

25   but they want to ask some additional questions, just ask me on

1    a sidebar and let me know what the additional questions are.

2              Just, I don't want to waste time by asking the

3    jurors what their favorite magazine is.  If I think you have

4    wasted time or what a lot of attorneys do is they start

5    attempting to pre-condition jurors, which you can't do, and if

6    I find you have done that, I won't give you additional time.

7              If you ask good questions and you just need

8    additional time, I will usually give you additional time, but

9    that's the way I conduct voir dire.

10             MR. HAIG:  Would that be ten minutes for each

11   defendant or ten minutes for the defense total?

12             THE COURT:  Ten minutes each side.  Each of you

13   would get five minutes.

14             MR. HAIG:  I see.

15             THE COURT:  And we're going to have 12 jurors, two

16   alternates.  The government gets six peremptories and the

17   defense gets ten.  I'm not going to provide for extra

18   peremptories.  The defense will get ten.  They will be

19   exercising jointly, so each defendant would get five.  And as

20   to the alternates, each side gets one challenge, but if the

21   parties also say the parties can attempt to stipulate; in other

22   words, after the 12 original are given, if the parties can get

23   together and agree on the alternate jurors, they would agree

24   upon that, you can also agree on the order in which those

25   alternates would be staggered.  But if you can't, each side

1    would get additional peremptories for a challenge.

2            Also, the for cause challenges would be done on

3    sidebar, the peremptories would be done in front of a jury.

4            MR. FAERSTEIN:  May I just jump in with respect to

5    the alternates.  During our last hearing the government raised

6    the possibility of having more than two alternates, and given

7    the rising COVID numbers, I think that is still a concern, and

8    will be, unfortunately, in later July, so I think we discussed

9    maybe three or four would be our preference.

10           THE COURT:  I wouldn't agree to four, I might agree

11   to three, but I wouldn't agree to four.  I'm not even going to

12   agree to three.  I don't know of any jurors that we have had

13   have had problems.  I mean, obviously it depends.  The closer

14   it gets, if the numbers, for example, get really bad, then

15   obviously, I have no problem with having more alternates, but

16   it really just depends on what the situation is at that point

17   in time.

18           The closer it gets, we will talk about it and

19   frankly, on the day of trial, you know, at this point in time

20   I'm going to say two, but on the day of trial, depending upon

21   what the statistics are, I could also agree to have more.

22           MR. FAERSTEIN:  Yes, Your Honor.

23           THE COURT:  Okay.  Any questions that either side

24   have about the voir dire at this point?

25           MR. FAERSTEIN:  No.

1          THE COURT:  We also have a motion to dismiss.  I

2     issued a tentative on this.  I presume the Court's motion on

3     the motion to dismiss, everyone has seen it?

4          MR. FAERSTEIN:  Yes, Your Honor.

5          THE COURT:  Does somebody want to argue something?

6          MR. ROBINSON:  I don't want to argue anything other

7     than to say that -- and I think this applies to the difficulty

8     that we're having with respect to statement of the case.

9          To boil this trial down, it's going to come down

10    to whether or not the government can prove that either

11    defendants manufactured without a license, and we have attacked

12    the term "manufacturing" both factually and as implied.

13         THE COURT:  Let me stop you, do you really think

14    manufacturing is that vague?  I don't see the vagueness aspect

15    of it.

16         I have had lots of these cases, and to tell you

17    the honest truth, you are the first people that said, oh we

18    think that manufacturing is somewhat ambiguous.  I don't see

19    where the ambiguity is.

20         MR. ROBINSON:  Well, the ambiguity is based upon the

21    way in which the case is pled, but also the term itself.

22         The way the case is pled, and you can surmise

23    this is going to be our defense, is that there was a division

24    of labor, there was the milling of the lower receiver, which

25    you have seen does not amount to a firearm under the federal

```
 1   firearm law, and then the assembling of the parts.
 2          THE COURT:  Let me stop you.  Let me ask you, there
 3   is no dispute that in the end there were completely assembled
 4   AR-15s.
 5          Does anybody dispute that?
 6          MR. ROBINSON:  No.  They are not being -- the
 7   defendants are not being prosecuted for dealing the weapon
 8   without a license.
 9          The government elected not to pursue that object
10   of the conspiracy, and so all we're talking about, and the only
11   decision that the jury has to make in this case is whether or
12   not the defendants have manufactured without a license.
13          And manufacturing, if the Court were inclined to
14   define the term that allowed for a conviction based upon
15   assembling, as opposed to changing the nature of raw material,
16   then it would direct a verdict against the defendants.
17          Congress elected not to define the term
18   "manufacturing."  The government has cited a dictionary
19   definition.  We have cited a dictionary definition, they are at
20   odds with each other.
21          THE COURT:  Let me stop you.  I reference you to the
22   Fourth Circuit decision.  What is wrong with that definition?
23          MR. ROBINSON:  What is wrong with that definition,
24   and we addressed it in our reply brief, is that the *Broughman*
25   case is a civil case and it deals with regulation, and as we
```

1   all know what we're dealing with is the criminal statute, so

2   the vagueness challenge has to be dealt with at a much higher

3   level of scrutiny.

4          The only thing that was at issue in *Broughman* is

5   whether or not, I guess, you could call him an intervenor, the

6   plaintiff, whether he had to pay the additional $50 a year to

7   get a manufacturing license and a dealing license.

8          And the Circuit Court affirmed declaratory relief

9   just from the Circuit Court, and they said, well you have to

10  comply with the regulatory purpose, not the criminalizing of

11  the regulatory purpose of the Gun Safety Act making assembling

12  a weapon is enough for manufacturing, but that is not what we

13  have here.

14         This is really like the *Santos* case, the Supreme

15  Court case that dealt with the definition of proceeds to the

16  money laundering statute.  And the Supreme Court said proceeds

17  could be based upon a common usage and understanding of the

18  term the profits or gross revenue and the Supreme Court said

19  when we have got a criminal case, proceeds are acceptable by

20  two definitions, they are going to reverse the conviction, in

21  effect, direct Congress to define the term proceeds, which is

22  exactly what they did the following year.

23         Congress came back and said, well proceeds for

24  the purpose of money laundering in a criminal case is gross

25  receipts.  There is no definition of manufacturing in the

1    criminal code.

2              So, Mr. Schlotterbeck and Mr. Vlha could have

3    believed they weren't doing anything wrong because they are not

4    placed on notice that assembling is different from

5    manufacturing, and that they were trying to abide by the law,

6    so they are not acting willfully.

7              And if the Court is inclined to instruct the jury

8    to make available for usage or assembling is a proper

9    definition of the crime, they were never on notice at the time

10   they were engaged in this conduct that their behavior could be

11   prosecuted criminally and face prison time, and that's why we

12   have raised this vagueness challenge.

13             THE COURT:  Let me hear from the government, what is

14   the government's response?

15             MR. FAERSTEIN:  Yes, Your Honor.  And we laid this

16   all out in our briefing as well.

17             First, you know, it is our view, that the Fourth

18   Circuit decision in *Broughman*, which was, you know, adopted by

19   the District of Nevada in a criminal case in the context of,

20   you know, manufacturing ammunition without a license, which is

21   the same statute essentially that the assembly of firearms can

22   make them suitable for use is an adequate definition of

23   manufacturing, and it's a common meaning, and that's what the

24   Courts look to when a term is not defined by Congress.

25             That being said in this case, not only do we have

1    the assembly of the completed firearms, we have from soup to

2    nuts containing the parts, including unfinished parts as

3    alleged in the indictment, arranging to have them machined,

4    which changes the structure of the raw material for purposes of

5    assembly, that lower receiver to the upper barrel and other

6    components to complete -- finished completed firearms that they

7    then sold.

8              There is no notice issue here.  This is, as we

9    decided -- as we argued that the Ninth Circuit has guided us

10   for these types of challenges.

11             This is an applied challenge and it clearly

12   incorporates, not only the assembly, but this additional aspect

13   of milling lower receivers in the context of the complete

14   manufacture of a completed weapon.

15             THE COURT:  Let me ask this, does the government

16   concede that it has waived the dealing aspect?

17             MR. FAERSTEIN:  We waived it, we are not going to be

18   arguing dealing at trial as an alternate theory, yes, Your

19   Honor.  I don't know when we waived it, but we will not be

20   presenting it to the jury as an alternate theory even though it

21   was part of the indictment.

22             But I will say -- sorry, Your Honor.

23             THE COURT:  Let me ask, can I ask why out of

24   curiosity is the situation where the government doesn't want to

25   present dealing at trial?

1          MR. FAERSTEIN:  I prefer not to say, though, you

2     know, it has to do with -- we think the manufacturing theory is

3     not subject to any potential vagueness challenges, and we think

4     it's for the reason we stated in our brief, whereas the dealing

5     theory, you know, potentially they could have made an argument.

6     Our view is the conduct in this case essentially is

7     manufacturing firearms -- completed weapons for sale for the

8     purpose of profit.

9          THE COURT:  Let me ask Mr. Robinson, again, your

10    argument about manufacturing, you know, is applied in this

11    case.  I mean, in this case, the manufacturing was, you know,

12    the end result, and the end result is a completed operable

13    AK-15.  Why isn't that manufacturing?

14         MR. ROBINSON:  Your Honor, your question I would

15    suggest is based upon a premise that the selling or the giving

16    or the handing over of the completed weapon is somehow part of

17    the manufacturing process.  It's not.

18              Mr. Faerstein and Mr. Boyle have elected not to

19    pursue the dealing object, and we have formed our defense

20    strategy both legal and factual to that representation.  We

21    appreciate that.

22              So the question then becomes is giving the

23    unfinished lower receiver to a third party to mill, which

24    parenthetically, does not convert that lower receiver to a

25    handgun with the definition of the Handgun Safety Act and then

assembling parts so that you have a completed firearm, because

you can build your own weapon at home if you want, and you can

get these other parts off the Internet if you want.

These other parts that are attached to the lower

receiver are not regulated, and because of those things --

because of the efforts taken by Mr. Schlotterbeck and Mr. Vlha

to not mill the lower receiver, maybe it is an issue of fact, I

get that, but to not mill the lower receiver is done so that

they can abide by the law.  Whether it's a loophole or not,

doesn't change the analysis.

So Congress has not defined manufacturing.  They

just haven't.  And the tag-along that it's done for profit does

not cure the vagueness with respect to the term.

THE COURT:  I agree with you, whether or not it's

sold is really irrelevant, they could give it away.

MR. ROBINSON:  Well --

THE COURT:  I mean, but the thing about it is, the

goal was a completed AR-15, that is the goal.

It's not a situation where they are, like, you

know, putting together, like, oh let's make 50 percent of it

and then throw it away or something of that sort, then I could

understand you may have an argument of some sort about whether

or not that particular item was manufactured.

But the end result of -- I mean, it's a

conspiracy too.  In other words, the government has alleged a

1   conspiracy to end up with completed AR-15s.

2            So, you know, in that context, I don't see why

3   the term "manufacturing" is vague.

4            MR. ROBINSON:  Let me raise this issue now, because

5   I think it's going to inform -- it's going to inform the

6   defense's objections and legal theory throughout this

7   prosecution.

8            Let's assume that there is an agreement between

9   the defendants that they are not going to be involved with the

10  milling of a lower receiver, that that is going to be milled by

11  the purchaser of the lower receiver.

12           By the way, when the person purchases the lower

13  receiver, it's not a firearm, and therefore, there is no

14  license requirement, so if you --

15           THE COURT:  Let me stop you.  Actually, I agree with

16  that.  I presume the government agrees with that as well?

17           MR. FAERSTEIN:  Purchasing an unfinished lower

18  receiver does not require -- to sell an unfinished lower

19  receiver does not require a license; is that the proposition,

20  Your Honor?

21           THE COURT:  Yes.

22           MR. FAERSTEIN:  Unfinished lower receivers were not

23  subject to serialization and manufacturing licenses.

24           What I will just say in terms of where

25  Mr. Robinson is going, but what he is describing is not what is

1    alleged in this indictment and is not what the facts are going

2    to bear out at trial.

3              So, you know, in terms of this being a motion to

4    dismiss, we're going a bit far afield of not only the

5    allegations, but also the facts.

6              MR. ROBINSON:  Let me address what Mr. Faerstein has

7    just said.

8              Whether that is the case or not, the definition

9    of the term "manufacturing" in our position, it cannot be

10   defined by the parties through a suggestion to the Court with

11   respect to just any definition.

12             It can't be defined in a way that would have

13   given Mr. Schlotterbeck and Mr. Vlha notice at the time they

14   were doing that -- what they were doing is illegal.

15             So let me just finish this point, and then I will

16   stop talking.

17             We have evidence of an agreement between Vlha,

18   Schlotterbeck and others that they are not going to do the

19   milling, that the purchaser of the unregulated unfinished lower

20   receiver is the one who is going to do the milling.  That

21   receiver is brought back and then there is assembling of the

22   AR-15.

23             Then, that is assembly --

24             THE COURT:  That is precisely the problem.  I don't

25   understand why you don't think that the assembling -- why the

1    assembling can't constitute manufacturing?

2              MR. ROBINSON:  Because the common ordinary

3    dictionary definition, which is the first tentative

4    construction for manufacturing, does not include assembling,

5    so, if the --

6              THE COURT:  Let me ask, is a Ford Motor car

7    manufactured?

8              MR. ROBINSON:  It's manufactured, and then it's

9    assembled.  The parts are manufactured, they are forged and

10   milled or whatever that may be.

11             THE COURT:  But Ford is considered to be a

12   manufacturer of automobiles, isn't it?

13             MR. ROBINSON:  Well, I guess.

14             THE COURT:  If you are just saying that there is no

15   manufacture because certain components are not finalized by the

16   conspirators -- alleged conspirators, but are in fact given to

17   somebody else to do something with, and then given back in a

18   completed form, and then those parts are assembled, hey, it

19   seems to me there is a manufacturer there.

20             MR. ROBINSON:  So, look at it this way, if we can.

21             The unfinished lower receiver is not a firearm.

22   It does not become a firearm in the case of an AR-15.

23             The lower receiver, it never does because of the

24   other discussions, but that lower receiver does not become a

25   firearm subject to licensing requirements until it is milled,

1   until its raw form is changed by some form of milling.

2          Now look, we are dealing with a criminal statute

3   and there is a willfulness requirement, and while there is case

4   law that says a willfulness requirement can in most

5   circumstances cure a vague statute, it doesn't here, because if

6   Mr. Schlotterbeck and Mr. Vlha genuinely believed that they

7   were not violating the law because of the way in which their

8   agreement had a third party do the milling of the lower

9   receiver, and after that, there is mere assembly, how on earth

10  can they be placed on constitutional notice of criminal

11  prosecution and incarceration when that term is never defined?

12         If we try to define that term for them in this

13  jury trial, it's going to be a situation where they could be

14  convicted for the mere assembly of the AR-15, long after the

15  conduct for which they never had any notice that what they were

16  doing was lawful because they believed they were following the

17  law.

18         We have got competing everyday ordinary --

19         THE COURT:  I understand your position, let me hear

20  a quick response from the government.

21         What is the government's response to that

22  argument?

23         MR. FAERSTEIN:  First of all, looking back to the

24  definition of manufacturing, the Fourth Circuit District of

25  Nevada, we think assembly is a common meaning -- common and

1   ordinary meaning for purposes of putting defendants on notice.

2         Second of all, in this case we don't only have

3   the assembly of completed lower receivers that were done by

4   third parties or by the customer, in fact, the allegations are

5   that the defendants arranged to have the lower receivers milled

6   for two of the -- first two of six deals.  The customers had a

7   token role in that, and this is part of the applied challenge

8   here.

9         But on the other four, the defendants were

10   arranging to have the lower receivers that they ordered

11   unfinished.  They were arranging to have those milled for

12   purposes of assembling with the other parts that they obtained

13   to complete -- excuse me, to manufacture completed AR-15 type

14   firearms.

15         So when you are looking at assembly alone, which

16   we believe is adequate, or assembly plus having coordinating --

17   arranging to have the lowers actually milled and completed for

18   purposes of this scheme, both are there, and, you know, there

19   is no notice issue, and there is no arbitrary and

20   discriminatory enforcement issues --

21        THE COURT:  I have heard enough.  You know, when we

22   get to trial itself, then you will probably be arguing again a

23   definition for manufacture, but it does not seem to me that it

24   is sufficiently vague that I would grant at this point in time

25   a motion to dismiss the indictment as the indictment is worded

1   in this case.

2              Mr. Haig, do you want to say something?

3              MR. HAIG:  I do, Your Honor.  I know that

4   Mr. Robinson has obviously set forth the defense's position,

5   but there are a couple of things I wanted to note just from the

6   Court's tentative, and I would like to clear it up.

7              The Court, on page 3 of the top, talks about the

8   *Skilling* case, and specifically that a criminal statute must

9   clearly define the conduct and a statute that is

10  unconstitutionally vague cannot be saved by a more precise

11  indictment nor by judicial construction that writes in specific

12  criteria that its text does not contain.

13             I would ask, are there -- would there be jury

14  instructions defining what the proscribed conduct would be?  In

15  this case, that is exactly what happened here.

16             The Court, in Footnote 6, asked the question

17  about whether it was unclear whether there was a tentative

18  order that ever adopted the ruling by Judge Selna in the *Roh*

19  case.

20             It wasn't here and the reason why there wasn't,

21  Your Honor, is because that defendant, Mr. Roh, at the end of a

22  bench trial where both sides presented their own evidence that

23  defendant was going to be convicted by Judge Selna of dealing

24  in completed firearms -- fully assembled, as Mr. Faerstein,

25  said soup to nuts; however, the government did not want an

1   adverse ruling in Court of Appeal based on an imprecise

2   indictment and a faulty record.  I think it must have been what

3   they said, and when I inquired two years ago about why we

4   weren't entitled to a diversionary disposition in this case

5   where the conduct was miles away from what Mr. Roh had done, I

6   was told that the indictment in this case was drafted in a way

7   that was more precise, that we're not going to have those types

8   of situations.

9          Now, the government has taken away dealing and

10   deal planning might have an issue, and manufacturing is the

11   easiest way for them to get a conviction in this case, but

12   again, they are doing exactly what the Court in *Skilling* said

13   that they can't do.

14          And I fear, Your Honor, you are trying to devise

15   some sort of definition for manufacturing that is going to go

16   back to the jury.

17          THE COURT:  Basically what you are saying is that

18   the Congress has to define every single word in a criminal

19   statute?  It doesn't.

20          It's often held that where Congress does not --

21   you know, the statute itself does not contain a definition, one

22   can look at the common definitions that stem from a dictionary,

23   for example, and you know, the way you guys are trying to

24   stretch manufacturing, I mean, it's because you have this

25   particular little quirk that insofar as who actually -- the

1   proper term is "milled" the lower receiver, but again, the

2   defendants aren't charged with milling the lower receiver.

3              The defendants are charged with manufacturing the

4   completed AR-15.

5              MR. HAIG:  Well, there is nothing illegal with

6   getting a milled lower receiver from a second party and putting

7   all of those components together.

8              So if the Court's and the defendant's theory or

9   the plaintiff's theory were correct here then --

10             THE COURT:  Let me stop you.  Maybe I'm going under

11  a supposition that doesn't a person have to have a license to

12  manufacture for other people an AR-15?

13             MR. HAIG:  For other people, yes, Your Honor.

14             THE COURT:  Okay.

15             MR. HAIG:  But the operative thing, and this is what

16  Judge Selna found as well, as long as the end customer is

17  involved in the charade of pushing the button quote/unquote on

18  the milling machine, then he has manufactured -- he or she has

19  manufactured a firearm.

20             THE COURT:  But in this particular case, the

21  government's indictment says that as to four, that charade was

22  not even done, so therefore, you know, it seems to me this

23  indictment under anyone's approach is sufficient in that

24  regard.

25             MR. HAIG:  Well --

```
1              THE COURT:  Let me ask Mr. Faerstein, isn't that the
2    government's position?
3              MR. FAERSTEIN:  Yes, it is, Your Honor.  And with
4    respect to the Roh case, in particular, the Court actually
5    found that even where a customer did take part in that initial
6    charade of pressing the button, the defendant then taking that
7    completed lower receiver and assembling all of the other parts
8    into an AR, it was manufactured.
9              THE COURT:  In other words, in the Roh case, the
10   problem was that there were two counts.  The first count was as
11   to, I think, it was hundreds of lower receivers that had been
12   processed.
13              That was what Selna focused on, on the one hand,
14   and the other one, insofar as the completed ARs, he had no
15   problem with that.
16              In the end, Roh pled, so, you know, that is the
17   reason why the matter wasn't resolved.
18              MR. HAIG:  He didn't, Your Honor.  He was going
19   through diversion, and the case has been dismissed because he
20   successfully completed 12 months of diversion, and now he's
21   free to do whatever he wants.
22              THE COURT:  Well maybe I'm not looking at it right,
23   but the only thing that is stated in the record that I saw in
24   that case, which is 14-167, was the fact that there was the
25   motion to dismiss for unconstitutional vagueness and it was
```

1   taken off calendar, and it was taken off calendar because the

2   defendant elected to plea.

3              Maybe there is something else that was done after

4   that, but that's what was indicated in the record.

5              MR. HAIG:  He got diversion right away, that case

6   has been dismissed.

7              THE COURT:  Again, I don't really care about that, I

8   mean, but all I can say is that, again, you guys have cited to

9   me a tentative ruling from Judge Selna, not even a completed

10  ruling from Judge Selna, and, you know, even the tentative

11  ruling doesn't help you, because again, Judge Selna was

12  focusing on the receiver aspect where the defendant was charged

13  *vis-a-vis* the receivers.

14             But there was a second charge, which was as to

15  completed ARs and Judge Selna had no problem with the count as

16  to the completed ARs.

17             I understand the defense's position, you

18  understand my position, I hope, and my position at this point

19  in time is I'm going to deny the motion to dismiss.

20             All right.  So we have taken care of that one.

21             Obviously, I'm sure we are going to -- around the

22  time of trial -- we're going to be -- you guys and myself --

23  are going to be going over the jury instructions on this point

24  about manufacturing.  I understand that.

25             All right.  Now turning to the motions in limine,

1    the defendant has one and the government has three, as I can

2    tell you.

3              Turning to the defendant's Motion in Limine

4    No. 1, which is to exclude reference to the term "ghost gun"

5    meaning a firearm without a serial number or otherwise

6    referring to a firearm that has been unserialized or having no

7    serial number.

8              The defense argues such is pejorative and/or it

9    is prejudicial, however the defendants really don't cite to any

10   case that basically has held that.

11             And I do understand obviously Federal Rules of

12   Evidence 401 through 403, but let me just ask the defense, you

13   have no case that has said that?

14             MR. HAIG:  I looked, Your Honor, all the cases that

15   have really been cited are cases that the Court has difficulty

16   with on a pretrial or --

17             THE COURT:  Let me put it this way, I have found

18   cases where the Courts themselves -- I don't know if they used

19   them in front of the jury, but they used the term "ghost gun"

20   as if it's not uncommon.

21             MR. HAIG:  So I think the operative thing here, Your

22   Honor, is the Court has to determine whether the term "ghost

23   gun" -- I didn't mean to cut you off if the Court wasn't done.

24             THE COURT:  I'm looking at you.

25             MR. HAIG:  The term "ghost gun" or without a serial

1    number, proving any of those facts are not relevant to any of

2    the charges in the indictment against any of the defendants.

3    They are not charged with selling a ghost gun, specifically

4    producing and manufacturing your own firearm, which is what we

5    posit the end-users were fully doing in this case is not

6    against the law.

7                    You or I or anybody sitting in this court without

8    a criminal record can make our own gun and --

9            THE COURT:  Let me stop you.  Let me address this

10   question to government, that is the question I have.  In other

11   words, if you drop dealing as a basis, how do you counter the

12   defense argument that, oh, we were making these things for

13   ourselves.

14           MR. BOYLE:  Your Honor, the way we encountered that

15   is the defendant sold all six of the charged firearms.

16           THE COURT:  I understand that, but the defense is

17   saying you are not bringing this case on the basis of dealing,

18   which it leaves it open for the defendants saying, well, we did

19   this, you know, we built these for ourselves, which apparently

20   they don't need a license for.

21                   Now you are saying we will counter that by

22   showing they sold these guns.  Well, isn't that dealing?

23           MR. BOYLE:  No, Your Honor, because sale is an

24   element of the manufacturing charge, Your Honor.

25                   As the defense points out, Your Honor, simply

1   manufacturing a gun that is not intended to be sold for one's

2   personal use, that would not require a license.

3            However, where one is manufacturing for the

4   purposes of profit, and I believe Mr. Faerstein could give us

5   the full definition, that is an element of the manufacturing

6   defense, Your Honor.

7            THE COURT:  Let me put it this way, the government

8   makes it difficult for itself and what I consider to be

9   somewhat of a strange position.

10           In other words, I don't understand why you

11  dropped dealing.

12           MR. BOYLE:  I'm deferring to Mr. Faerstein on that.

13           THE COURT:  So, in other words, you are going to

14  point the finger at him?

15           MR. BOYLE:  He has the entire explanation, Your

16  Honor.

17           With respect to the motion in limine, I think our

18  position is Rule 403 sets a fairly high standard.

19           Under the commencement of that rule, the evidence

20  would have to be such that would cause a jury to essentially

21  disregard --

22           THE COURT:  Let me put it this way, I agree with you

23  to the extent it seems to me that, you know, the reference to

24  unserialized guns or ghost guns is not so prejudicial, so, you

25  know, that the jury could not follow jury instructions.

1          Frankly, to tell you the truth, let me indicate

2    to the defendants, you know, I will make you guys remind me, I

3    will make a reference to whether or not any juror has ever

4    heard the term "ghost gun," and if it endears some sort of

5    response, what that response is will let you know that the

6    jurors have any concern about ghost guns.

7          But I don't think that just the use of the term

8    is somewhat pejorative or something like that, it gives rise to

9    especially a sense that some of these terms that the defendants

10   are objecting to are terms that are going to be referred to.

11   In other words, some of these guns -- or actually all of the

12   guns don't have serial numbers on them.

13          MR. HAIG:  That is true, Your Honor, whether they

14   have a serial number or not are not elements of the offense.

15          THE COURT:  But it is going to come in in a sense

16   that, for example, other manufacturers of guns, you know, have

17   serial numbers on them, means of identification, and that is

18   distinguishing these products from other forms in other

19   manufacturers of firearms.

20          And I would agree with you, you know, the jury

21   can be informed that obviously if somebody manufactures ARs for

22   themselves, you know, they don't need a license and they

23   wouldn't be putting a serial number on it.

24          MR. HAIG:  Right, then you have got to instruct the

25   jury on legal ownership and possession of unserialized weapons.

As to the issue of whether the weapon is serialized or not is

not something that the jury needs to decide as to whether the

defendant is guilty or not guilty.

And the Court has also said ghost guns aren't a

pejorative term, and President Biden and Senator Padilla would

disagree.

THE COURT:  Supreme Court apparently has no problems

with concealed weapons.

MR. HAIG:  Sure.

THE COURT:  And the constitutional right to carry a

concealed weapon, you know, I don't understand what your worry

is about.

MR. HAIG:  I'm worried about the fact that people --

that people don't ordinarily know that a weapon, if it doesn't

have a serial number is legal to make, own, or possess.  But it

what it is, and it was at that time and it still is now.

So by talking about a weapon being unserialized,

the pejorative term "ghost gun" you are entering into this case

evidence that is not relevant for the government to prove any

of the elements of the offense.

It's not inextricably intertwined.  None of the

defendants in any of the text messages mentioned anything

about, oh, isn't that great you can get a gun without a serial

number.  You have got to follow what we're doing -- none of

those things ever happened as to whether or not the serial

1  number is not relevant.

2          THE COURT:  I have to switch reporters, and so let's

3  take a short break, not that I don't want to hear from you

4  anymore, Mr. Haig, but I don't really -- this is a good excuse

5  for a pause.  We're going to switch reporters.

6          (Proceedings concluded at 12:58 p.m.)

7                          *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3     COUNTY OF LOS ANGELES   )
                              )
4     STATE OF CALIFORNIA     )

5

6          I, TERRI A. HOURIGAN, Federal Official Realtime

7     Court Reporter, in and for the United States District Court for

8     the Central District of California, do hereby certify that

9     pursuant to Section 753, Title 28, United States Code that the

10    foregoing is a true and correct transcript of the

11    stenographically reported proceedings held in the

12    above-entitled matter and that the transcript page format is in

13    conformance with the regulations of the judicial conference of

14    the United States.

15

16    Date: 29th day of June, 2022.

17

18

19                          /s/ TERRI A. HOURIGAN

20    _____
                TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
21                      Federal Court Reporter

22

23

24

25