

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,

                        Plaintiff,

        vs.                              Case No. CR 19-343-GW

TRAVIS SCHLOTTERBECK,
JAMES BRADLEY VLHA,
                        Defendants.
_____/

REPORTER'S TRANSCRIPT OF
PRETRIAL CONFERENCE
Tuesday, June 28, 2022
10:00 a.m.
LOS ANGELES, CALIFORNIA

TERRI A. HOURIGAN, CSR NO. 3838, CCRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4311
LOS ANGELES, CALIFORNIA  90012
(213) 894-2849

UNITED STATES DISTRICT COURT

1                    **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4        UNITED STATES ATTORNEY'S OFFICE
         United States Attorney
5        BY:      BRIAN R. FAERSTEIN
             DANIEL BOYLE
6         Assistant United States Attorneys
         United States Courthouse
7        312 North Spring Street
         Los Angeles, California  90012
8

9

    **FOR THE DEFENDANT:  TRAVIS SCHLOTTERBECK**
10

         EDWARD M. ROBINSON, A PROFESSIONAL LAW CORPORATION
11       BY:  EDWARD M. ROBINSON
             RACHAEL ROBINSON
12       Attorneys at Law
         21515 Hawthorne Boulevard, Suite 730
13       Torrance, California  90503

14

15  **FOR THE DEFENDANT:  JAMES BRADLEY VLHA**

16       LAW OFFICE OF JEROME J. HAIG
         BY: JEROME J. HAIG
17       Attorney at Law
         21143 Hawthorne Boulevard, Suite 454
18       Torrance, California  90503

19

20

21

22

23

24

25

                    **UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, JUNE 28, 2022

 2                              8:30 a.m.

 3                               --oOo--

 4

 5              THE COURTROOM DEPUTY:  Please come to order.  This

 6    United States District Court is now in session.  The Honorable

 7    George H. Wu, Judge presiding.

 8              THE COURT:  Let me call the matter of United States

 9    versus Schlotterbeck, et al.

10              Let me have appearances, starting with government

11    counsel first.

12              MR. FAERSTEIN:  Good morning, Your Honor.  AUSA

13    Brian Faerstein and Dan Boyle on behalf of the United States.

14              THE COURT:  All right.  And for the defense on

15    video, we have?

16              MR. ROBINSON:  On behalf of Mr. Schlotterbeck, we

17    have Edward Robinson and Rachael Robinson.

18              Mr. Schlotterbeck is appearing, we're all

19    appearing virtually.

20              THE COURT:  All right.  In court, we have?

21              MR. HAIG:  Good morning, Your Honor.  Jerome Haig

22    appearing for Mr. Vlha, since I was already in the courthouse,

23    and Mr. Vlha who is present on WEBEX.

24              THE COURT:  This is a continuation of pretrial stuff

25    and there has also already previously been a waiver of in-court
```

```
 1    in-person appearance from the defendants.
 2              We have just a few things still on the burner --
 3    still on this burner at this point in time.
 4              First of all, the Court has received the
 5    defendants ex parte application to continue the trial.
 6              I have looked at it and also the government's
 7    response.
 8              My initial reaction would be no, I don't
 9    understand what the point is for the continuance.  I mean, if
10    you guys want to do further investigation on the history of
11    something or what exactly do you want to do during this interim
12    period of time?
13              I don't think that the recent Supreme Court
14    decision does anything or affects this case at all, so what
15    exactly do you want?
16              MR. ROBINSON:  With respect to Mr. Schlotterbeck, if
17    I sound halting, I have these earpieces and I'm in the hallway
18    over at 312, so that is the reason I sound a little bit odd
19    here.
20              With respect to Count 3, Mr. Schlotterbeck is
21    charged with selling to a felon.
22              And when you look at the Bruen case, and you look
23    at Judge Comey Barrett's dissent in the Seventh Circuit case,
24    which is now -- which the majority has been abrogated and she
25    goes directly to the history and the text analysis doing away
```

 1   with any type of other interested means-end scrutiny --

 2         THE COURT:  Well, let me stop you.  All of that

 3   stuff is there.  You could spend, like, six hours in a law

 4   library and accomplish all that you need to do.  So I don't

 5   understand why you need to extend.  The trial is not supposed

 6   to start until July the 22nd, about a month away.

 7         MR. ROBINSON:  I anticipate the following, and

 8   Ms. Robinson and Mr. Haig and I have been speaking with some of

 9   the defender offices across the country, in light of *Bruen*

10   there is going to be challenge for a felon in possession sales

11   to a felon and other Title 18 charges.

12              Those challenges are going to get to the Supreme

13   Court very quickly.  And I don't --

14         THE COURT:  Let me put it this way, who knows what

15   the Supreme Court -- maybe the Supreme Court will want persons

16   to be able to have handguns on the street corner.  That may be

17   their next ruling, and that wouldn't surprise me, but I'm not

18   going to wait to see if that in fact is what they are going to

19   do.

20              One could imagine the current Supreme Court is

21   making all sort of strange decisions, but, you know, if they do

22   it -- obviously, if your clients get convicted, I mean, I guess

23   this case could be the case that you would want to raise that

24   issue to the Supreme Court, and that is fine.

25              I just had a case that came back from the Supreme

1    Court, so it would be a another one I can put on my diary that

2    this case of mine went to the Supreme Court.  It's always fun

3    to have these trading cards, like baseball cards.

4              I don't think -- frankly, I don't see it as

5    affecting this case, because again, it would be so inconsistent

6    that it does not seem to give rise to a serious reason for

7    delaying the case, especially if it's a matter of law.

8              And again, I understand you want to look into the

9    area, but you could look into the area and you can make the

10   arguments and preserve the arguments, which is all you are

11   entitled to do.

12             You are not entitled to wait and see if some

13   Appellate Court or even the Supreme Court would buy the

14   argument, because the law is at this point what the law is.

15        MR. ROBINSON:  We're not saying that we're entitled

16   to that, Your Honor.  We just thought it might be prudent.

17             But I appreciate the Court's position, and with

18   your permission, if we could have a briefing schedule, and we

19   could at least brief the issue with respect to Count 3.

20             I think Counts 1 and 2 are a little bit

21   different.  I know that Mr. Haig has some comments with regards

22   to Count 1 and 2.

23        THE COURT:  Let me ask Mr. Haig, what are your

24   comments with respect to Counts 1 and 2?

25        MR. HAIG:  My comments as to Count 1 and 2, I think

1    the government has a rather strict view of the *Bruen* case, and

2    the *Bruen* case expanded -- blew a hole in *Heller*.  *Heller* just

3    dealt with the possession of handgun for self-defense in one's

4    own residence.

5              This case deals with handgun regulations.  It

6    strips away the two-step approach that has been approved in

7    every Circuit in this country, and says that if a firearm

8    regulation is --

9              THE COURT:  Let me stop.  We're not talking about a

10   firearm regulation, we're talking about the statute itself.

11             MR. HAIG:  Well, the statute itself, which is part

12   of the Gun Control Act of 1968, I believe, is a firearm

13   regulation.

14             THE COURT:  Of course, but I didn't think -- the

15   Supreme Court didn't say you cannot have any regulation.

16             MR. HAIG:  No.  But what it did say, and I just want

17   to read a very short quote, if I can, Your Honor, from Justice

18   Thomas in the majority opinion.

19             He said:  When confronting present-day firearm

20   regulations, the historical inquiry that Courts must conduct

21   will involve reasoning by analogy, like all analogical

22   reasoning determining whether a historical regulation is a

23   proper analog for a distinctly modern firearm regulation,

24   requires a determination of whether the two regulations are

25   relatively similar.

```
1              He gave an example as well, Your Honor.

2              He says:  For instance, if a gun law is

3    addressing a societal problem that also existed in the 18th

4    Century, it is evidence that the modern law is unconstitutional

5    if there was no similar regulation then.

6              So, therefore, Your Honor, that is a very broad

7    ruling, and it is current law today that one can build one's

8    own weapon without going through a federal firearm's license

9    dealer.

10             THE COURT:  Nobody disagrees with that.

11             MR. HAIG:  Right.  So I'm assuming, and I don't know

12   because I haven't done the historical research, that that was

13   also true in 1791.

14             If it was true in 1791 that one could build one's

15   own firearm without getting a proper permit from the

16   government, then aiding and abetting a person doing that, it

17   would be --

18             THE COURT:  Well, the problem is that that statement

19   is so devoid of any connection with anything, because again,

20   the society that existed at that point in time is very

21   different than the society that exists now.

22             I understand what the Supreme Court is trying to

23   say, but the problem is, is that again, the society is so

24   different then, so -- and frankly, until *Heller*, nobody thought

25   that the Second Amendment was what the Supreme Court now thinks
```

```
 1    the Second Amendment is.
 2              Previously, no Court went even half as far as
 3    what Heller did.  So therefore, to say that, well, you have to
 4    consider what was thought of back then, part of what was
 5    thought of back then was they didn't consider the Second
 6    Amendment to be what the Supreme Court now thinks it is.
 7              So what are we supposed to draw from that?  The
 8    fact that it assumed certain things that you didn't need to do
 9    because, in fact, that was the accepted dogma back then, I
10    understand times have changed.
11              But conversely, however, I think we're getting
12    far afield of what this case is really about.  This case is
13    really about this question as to whether or not the defendants
14    did that which is charged in the indictment.
15              Although, I have a question to the government
16    about when the government amended its indictment, because I
17    didn't see the amendment.
18              MR. HAIG:  If I can follow up on that, Your Honor.
19    I do not disagree with a word the Court is saying from my own
20    personal view and from a historical view of jurisprudence on
21    the Second Amendment.
22              However, what the Court said is essentially what
23    Justice Stephen Breyer said in his dissent on Bruen.  And that
24    analysis has been rejected by --
25              THE COURT:  I'm not saying that, because again, the
```

1   discussion that is the foundation of the most recent Supreme

2   Court case is whether or not the state can refuse to license

3   persons to carry hand weapons for their self defense outside of

4   their home.  That was the issue.  I didn't see them saying we

5   have changed the law, there is no restrictions on firearms.

6          Had they said that, I would agree with you that

7   this case should go down the toilet, but that's not what they

8   said.

9          What they said was in considering what the issue

10  was whether or not a license -- not that licenses couldn't be

11  required -- they didn't say that.

12         MR. HAIG:  They didn't, but the thing is --

13         THE COURT:  Now, I do understand that somebody

14  somewhere will now, and I accept that.  And it will probably --

15  you may be right -- it may be go up to the Supreme Court, but

16  I'm not going to waste my time at this point waiting for the

17  two years that it will take before bringing this case to trial.

18         MR. HAIG:  Well, I'm not asking for a -- we're not

19  asking for a delay, Your Honor, for Supreme Court action on

20  similar types of cases, what we're asking for is a delay so

21  that two things can happen.

22         One, so the Department of Justice can determine

23  whether charging cases such as this is appropriate in light of

24  *Bruen* and two, Your Honor --

25         THE COURT:  Let me ask you, has the Department of

**UNITED STATES DISTRICT COURT**

```
 1    Justice given any indication -- let me ask the AUSA, has your
 2    department indicated that they want you to slow down on these
 3    types of cases or anything of that sort?
 4             MR. FAERSTEIN:  Your Honor, well I am sort of loathe
 5    to speak about internal iterations, but I would say no, that
 6    has not happened.  I want to respond to something that Mr. Haig
 7    just argued.
 8             MR. HAIG:  I'm not done.
 9             THE COURT:  He's says he's not finished talking.  I
10    will allow you to finish your sentence and we will go back to
11    him.
12             MR. FAERSTEIN:  Yes, Your Honor.  The historical
13    analysis that Mr. Haig was referring to, we don't even get
14    there in this case because the first step is to look at the
15    plain text, and this was briefed in our opposition, the plain
16    text of the Second Amendment.
17             If the conduct at issue is not covered by that
18    plain text, you don't even look to the historical precedent.
19             In *Bruen*, they were dealing with carrying a
20    firearm in public for self-defense.
21             The Supreme Court said that is clearly covered by
22    the right to keep and bear arms, just as it was in *Heller*,
23    having a gun at your home.
24             But what we're dealing with here is far afield
25    from that reading of the Second Amendment.  It's not within the
```

1   plain text of the Second Amendment.

2            THE COURT:  Well, let me put it this way, one could

3   argue the current Supreme Court believes -- what was at the

4   time originally used for undefined constitutional rights, the

5   penumbra, was that the suggestion?

6            They basically said the Second Amendment has its

7   penumbra, and that it goes really far afield.  That is fine and

8   dandy, but I agree with you, it's not really relevant to the

9   facts of this particular case.

10           MR. HAIG:  Well, the reason we think it is, Your

11  Honor, is because we think that the current statute that the

12  defendants are charged with, the conspiracy and the actual

13  substantive offense, and Count 1 is a conspiracy to commit the

14  substantive offense in Count 2, is unconstitutional under the

15  Second and Fourteenth Amendment as applied to the defendants in

16  this case because the underlying conduct, if I can just --

17           THE COURT:  Let me stop you.  I'm not saying you

18  can't make the argument.  I'm just saying, okay, make the

19  argument at some point in time, and I will rule on it, but we

20  still have a trial on the 22nd on July.

21           MR. HAIG:  Mr. Robinson talked about a briefing

22  schedule.

23           I think our *ex partes*, while written as quickly

24  and as proficiently as we could on both sides, we don't have

25  time to delve into the historical analysis.

1              I know that the government doesn't think it's

2    necessary we do.

3              We do think it is necessary because if you are

4    aiding and abetting a legal act in Counts 1 and 2 or aiding and

5    abetting -- or actually committing a sale to somebody who may

6    no longer be prohibited from possessing a weapon because he did

7    not have a dangerous felony conviction, which historically was

8    the requirement to disenfranchise someone under their Second

9    Amendment rights, then --

10             THE COURT:  When you say historically to

11   disenfranchise somebody from his Second Amendment rights, what

12   are you referring to?

13             MR. HAIG:  I'm referring to the dissent by Justice

14   Comey Barrett in --

15             THE COURT:  She wasn't on the Supreme Court then.

16             MR. HAIG:  No, she wasn't, Your Honor.  Her dissent

17   was flagged as being an appropriate reaction to --

18             THE COURT:  In other words, she believed that -- in

19   other words, what would you do, you would be doing some sort of

20   -- what do you call the analysis?

21             MR. HAIG:  Historical analysis, Your Honor.

22             THE COURT:  No, what do you call it when you are

23   trying to figure out if state convictions are less similar to

24   federal convictions?

25             MR. ROBINSON:  May I jump on this issue, because it

 1    only applies to Mr. Schlotterbeck.

 2              There is no question that Judge Barrett's dissent

 3    has been adopted, at least, in the reasoning in *Bruen*, and I

 4    took the time last night to listen to the *Bruen* oral argument

 5    and for what it's worth, I will put this in the brief, Justice

 6    Cavanaugh was quoting from the Seventh Circuit dissent which is

 7    now being treated as the law as the majority opinion was

 8    abrogated at least on Westlaw by the *Bruen* case.  But it

 9    doesn't matter --

10              THE COURT:  But what I don't understand, again, I

11    understand you guys want to make an argument.  You are free to

12    make the argument, it's just that the trial is going forward.

13              MR. ROBINSON:  With respect to Count 3, that is

14    fine, because what you are saying, Your Honor, I couldn't agree

15    with you more.

16              THE COURT:  Well, you could actually, because you

17    could stop now, but I will allow you to finish your sentence.

18              MR. ROBINSON:  Thank you.  It's crazy, but you will

19    see -- I hope we will be able to show you that the craziness

20    now is law of the land, and what happened in 1791 governs the

21    way in which we regulate handguns in 2022.

22              THE COURT:  But let's put it this way, there really

23    wasn't a regulation of that sort back then.  That is the

24    problem.

25              In other words, you are talking about a situation

1    where the structures weren't there, because of the fact that --

2    in other words, if one were to accept your argument, then we

3    would have to deconstruct the American society to a time when

4    the federal government was much, much smaller and things of

5    that sort.

6             Of course, then we also have to adjust the

7    federal tax stuff as well, so that means states like California

8    would get to keep most of their money rather than sending most

9    of their money to Mississippi and Alabama.

10            Things would be entirely different, I understand

11   that, but that is one of the problems is that this stuff -- I

12   understand you want to make the arguments, and I'm perfectly

13   happy to have you make those arguments, I'm perfectly willing

14   to entertain those arguments, I'm sure the AUSAs are chomping

15   at the bit in responding to those arguments, but that is

16   something that will be addressed.

17            But again, we're talking about a trial that is

18   going to start on July the 22nd.

19            MR. ROBINSON:  And, Your Honor, if I may, has that

20   date been blessed by --

21            THE COURT:  It hadn't been blessed, because the time

22   frame is the end of this week to ask for it, so I will be

23   asking for it, and I will let you know as soon as possible.

24            Obviously, if we don't get it, if we don't get

25   the 22nd, I'm sure we're going to get the next week, because

```
 1    the other problem is -- I'm starting -- at the beginning of
 2    August -- I'm starting another three-week criminal trial, so I
 3    have to get yours out of the way, so to speak, not that it's
 4    not as important.
 5              MR. HAIG:  Following up on Mr. Robinson, we would
 6    like to brief this issue, I know the Court can't prevent us
 7    from doing that.
 8              THE COURT:  I could try to prevent you, but why
 9    would I?
10              MR. HAIG:  I guess you could, right, but will the
11    Court set some sort of briefing schedule?
12              THE COURT:  You can talk about it.  Whatever you
13    guys agree upon regarding a briefing schedule would be fine
14    with me.
15              Again, you know, if you want to argue it at some
16    point in time in the midst of the trial, that is fine, as long
17    as it's not in front of the jury, I don't care, it's not a
18    problem.
19              MR. HAIG:  Okay.
20              THE COURT:  So you guys agree on the schedule for
21    that.
22              Then the next issue is you didn't agree on a
23    joint statement that should be read to the jury.
24              Frankly, in my -- how many years have I been a
25    Judge -- many, more than 20, I have never had that situation
```

1    where the parties did not agree.

2              I'm not going to force you, you guys are all

3    adults, and if you want to read the redacted indictment, that

4    is fine with me.

5              The only thing is, I will require the AUSA to

6    read it.  I'm not going to read it.

7              You, the AUSA, will read the redacted indictment,

8    and you are going to have to do it two times.

9              The first time is when the jury eventually comes

10   in so the jury understands what this case is about, and once

11   the jury is selected then -- well, the second time may be -- I

12   don't know if you guys stipulate not to read it again, that is

13   fine.

14             But certainly at the very, very start of the

15   trial, the AUSA is going to be required to read it.

16             Is that understood by everybody?

17             MR. ROBINSON:  Yes, Your Honor.

18             MR. FAERSTEIN:  Yes, Your Honor.

19             MR. ROBINSON:  Your Honor, if I could just say, it's

20   not out of a sense of petulance that we are not agreeing, it is

21   because the term "manufacturing" is a legal issue we need to

22   preserve.  The government has been very understanding about

23   that.

24             And this is going to be 90 percent of what will

25   happen in this trial, it will center around legal issues and

 1    not factual issues.

 2              THE COURT:  I agree, that's the reason why I have

 3    some questions about your expert, but I will get to that in a

 4    moment.

 5              All right, so that's fine.  The AUSA will read

 6    the redacted indictment.

 7              And I obviously will inform the jury that an

 8    indictment is not evidence or anything of that sort, it's just

 9    a statement as to what this case is about, so I will say that.

10    If I don't say that, remind me to say that, and I will say that

11    at the start of the trial as well.

12              MR. HAIG:  There was one issue on the redacted

13    indictment that we objected to, I think the last sentence of

14    Paragraph 5.

15              THE COURT:  Okay.  I don't have if from front of me.

16              MR. HAIG:  Perhaps the government can read it

17    because I would have to shovel through the paperwork here.

18              MR. FAERSTEIN:  I can read it, Your Honor.  In the

19    stipulation regarding the redacted trial indictment, we made

20    clear that the parties are still reserving their rights with

21    respect to challenges to evidentiary issues and legal issues

22    and jury instruction issues.

23              I think what Mr. Haig is referring to is they

24    view certain language in the indictment as surplusage, we

25    don't.  But they are not waiving that argument by agreeing to

1  the redacted indictment.

2          MR. HAIG:  I found it, Your Honor.

3          THE COURT:  Actually, I can get it on my computer.

4             Well, I'm more visual than you guys are, I want

5  to see it in all its full glory.

6          MR. HAIG:  It's on page 2, Your Honor.

7          THE COURT:  I will get there in a second.  So this

8  is docket -- what is the docket number on this one?

9          MR. FAERSTEIN:  131-1 is the proposed clean version.

10         THE COURT:  Okay.  So you are talking about the

11  indictment as redacted and what page?

12         MR. HAIG:  Page 2, Your Honor, Paragraph 5 and just

13  the last sentence.

14         THE COURT:  Well, let me just ask, you are reading

15  the indictment, that is what is stated in the indictment, you

16  know I understand -- what really is the objection to this?

17         MR. HAIG:  The objection is, again, it's saying that

18  there is something inherently wrong with this firearm.

19         THE COURT:  No.  It's not saying anything is wrong

20  with it.  It's saying certain firearms, if they have serial

21  numbers and things of that sort, they are traceable, whereas

22  other firearms that do not have serial numbers are not

23  traceable, it's common sense.

24         MR. HAIG:  It is common sense, Your Honor, but it's

25  not relevant to any of the charges as I noted last week during

1   our hearings, and it's not an element that needs to be proven

2   or disproven.

3           THE COURT:  Well, let me ask the government, what is

4   the government's response?

5           MR. FAERSTEIN:  Well, Your Honor, the fact that the

6   firearms they sold don't have serial numbers is reflected by

7   the fact that they were manufacturing these firearms without a

8   license illegally.

9               This was one of the ways that they were skirting

10  the restrictions for the requirements of the federal firearms

11  licensing system by selling to customers and not serializing

12  them and that had real ramifications in terms of these firearms

13  were just not traceable.

14              It's in the indictment, Your Honor.

15          THE COURT:  You are arguing something different.

16  Your argument now is different than what the sentence says.

17          MR. FAERSTEIN:  Well, I'm sorry, Your Honor.  This

18  is a fact that is, as we have alleged and as Your Honor has

19  found with respect to the government's Motion to Limine No. 1,

20  the fact that these firearms are not serialized is part and

21  parcel of the conduct of this case.

22          THE COURT:  Well, let me stop you.  I will agree

23  with the defense on this.  I will eliminate that sentence.  You

24  can always put it in later on and you can raise it, you are

25  going to be able to raise it.

1               But at this point in time, we're telling the jury

2       generally what this case is about.

3               What you are saying is different than what this

4       sentence says, and again, there is no sense at this point in

5       time in making it more complex than it otherwise would be.

6               I will agree with the defense just insofar as

7       this sentence is concerned.

8               All right.  Now, we have done that.

9               Okay.  Let me ask this question:  The government

10      obviously is agreeing to take out the words "dealing" and "in

11      dealing in firearms."

12              Did the government actually amend the indictment

13      to remove those references?

14              MR. FAERSTEIN:  Your Honor, we did not, but we are

15      narrowing a theory that was alleged, and the parties have

16      stipulated that this is not an amendment in the indictment,

17      it's simply a narrowing in the stipulation we filed yesterday.

18              There are alternate theories under 922(a)(1)(A),

19      and we are not presenting one of those theories to the jury,

20      and that is, you know, why we are simplifying or streamlining

21      the indictment simply for trial.

22              THE COURT:  Well, when you say you were

23      simplifying --

24              MR. FAERSTEIN:  Simplifying may be the wrong word,

25      Your Honor, but we are going to be presenting one of the

1    alternate theories to the jury that is not an amendment of the

2    indictment --

3             THE COURT:  This is the problem I have.  You want to

4    focus on the business of manufacturing.

5             The business of manufacturing goes over a bit

6    with the notion of dealing.  And if you drop dealing, it makes

7    it more confusing rather than less confusing, in my mind.  This

8    is one of the problems I have.

9             So I understand what you want to do, I just don't

10   know if it's advisable for you to do that, but I'm not going to

11   change the government's case.

12            I mean, if the government wants to drop dealing,

13   okay, I will accept that, but don't come back and complain to

14   me about other consequences of your having done that.  That is

15   all I'm saying.

16            MR. FAERSTEIN:  Yes, I understand.  Can I just

17   hopefully add a point of clarification on this?

18            THE COURT:  Yes.

19            MR. FAERSTEIN:  Under the statutory definition of

20   engaging in the business, the statute and this is 921(a) --

21            THE COURT:  I know, it's subpart 21, I have read it.

22            MR. FAERSTEIN:  Right.  For the definition of

23   engaging in the business as a dealer, it speaks to the

24   repetitive purchase and resale of the firearms.

25            So that is different than the manufacturing of

1    new firearms for sale.  It's the purchase of existing firearms

2    in the resale.  There is also a gunsmithing definition.

3              But the dealing definition is actually narrower

4    than it sounds just on its face.

5              With respect to the engaging in the business as a

6    manufacturer, that still also requires the sale or distribution

7    of the firearms.

8              THE COURT:  But let me ask you this:  A person can

9    be a dealer if the person engages in the business of repairing

10   firearms or making or fitting special barrel stocks or trigger

11   mechanisms to firearms.  That doesn't involve sell and resell,

12   it just involves that.

13             MR. FAERSTEIN:  Sorry, Your Honor.  That involves

14   that service for someone else's preexisting firearm, whereas

15   here, our theory, and we believe the facts are -- this is sort

16   of the essential facts here, is that they were creating new

17   firearms for sale to multiple customers for the purpose of

18   livelihood and profit.

19             So the sale component is still integral and

20   something we have to prove as part of the engaging in the

21   business of manufacturing without a license.

22             THE COURT:  All right.  I presume defense doesn't

23   have any comment on that?

24             MR. HAIG:  No, Your Honor.

25             MR. ROBINSON:  No.

1          THE COURT:  Well, it is what it is then.

2                Now, insofar as the expert stuff, as I see it,

3     the defense only has a couple of objections to the government's

4     expert Chimileski.

5                And the objection is if he is testifying as to

6     regulatory matters relating to certain FFL types and the

7     manufacturing of firearms for sale, et cetera, and those things

8     are noted on page 6 of docket number filing, that is Docket

9     No. 132.

10                Let me ask defense counsel, those are your only

11     objections as to what you expect -- well, what the government

12     is expecting Chimileski to testify about?

13          MR. ROBINSON:  Yes.

14          MR. HAIG:  Base upon the government's proffer, yes.

15          MR. ROBINSON:  Yes.

16          THE COURT:  So let me ask the government, what is

17     your response to their objection?

18          MR. FAERSTEIN:  Well, Your Honor, I mean, we don't

19     think that manufacturing is vague.

20                My understanding of their objection is that it's

21     meant to preserve their argument that manufacturing is vague.

22                Our expert is not going to be discussing the

23     legal definition of manufacturing.  He will be discussing his

24     day-to-day responsibilities in the field as a regulator and how

25     he approaches entities that have manufacturing licenses or that

1    are applying for manufacturing licenses.

2                So this is part and parcel of his analysis and

3    his expertise, it's not something he's going to be speaking to

4    in terms as a legal definition of manufacturing.

5                MR. ROBINSON:  Your Honor, that is why we really

6    narrowed our position with respect to the government's proffer.

7    We understand where Mr. Faerstein and Mr. Boyle are going with

8    this testimony.  We just need to make sure there will be no

9    testimony that will provide a definition of manufacturing to

10   which our clients could never have been put on notice.  We will

11   leave it at that.

12               THE COURT:  All right.

13               MR. ROBINSON:  That's why we narrowly tailored our

14   position on that proffer.

15               THE COURT:  That's fine.

16               Then as to the government's objections to the

17   defendant's expert, these are my thoughts at this point in

18   time.

19               I looked at the items that the defense is

20   proffering that there are six subject areas that Mr. Lieberman

21   is going to be testifying about.

22               The problem I have is much of what he is going to

23   be opining on is his view of the law, Items 1 through 4.  I

24   mean, that is basically what he's going to be talking about.

25               Again, the Court will define the law for the

1  jury.  It's not up to an expert to come in and say what he or

2  she thinks the law is because that pretty much is irrelevant,

3  unless, of course, he or she is nine members of the Supreme

4  Court, that, I think, I would have to accept.

5          But barring that, I don't think I have to accept

6  that.  I have to define what the law is.

7          Also, some of what he seems that he's going to be

8  talking about may not be particularly relevant, although, he

9  might be coming in -- to the extent he comes into counter

10  something that is said by the government's expert, that I can

11  understand.

12          So, in other words, if the government's expert

13  was talking about, for example, Item No. 4 about how the ATF

14  interpretations of the law have affected citizens -- how

15  citizens can legally make a firearm, if the government's expert

16  talks about that, then I would allow the defense expert to

17  opine on the same thing, assuming he has a basis, you know,

18  like a *Daubert* basis for those opinions.

19          But it seems to me that one of the problems I

20  have with Mr. Lieberman is that some of the stuff he wants to

21  talk about may not be -- to counter something the government

22  says, but maybe something that is not particularly relevant to

23  the current case.

24          So this is what I would want from -- well,

25  actually, before I get to that.

1              Also again, some of what he is opining, I can't
2    tell from these little categorizations, the six categories he
3    proffers, what's the basis for his opinions at all.
4              So as a result of this, I would require that the
5    defense set out in more detail what Mr. Lieberman is going to
6    be saying with the understanding that he probably would be
7    allowed to counter Mr. Chimileski's opinions, assuming he has a
8    basis for doing so.
9              But, for example, Items 1 through 3, you know,
10   again, he wants to offer these definitions -- legal
11   definitions.  They don't come from him.
12              MR. HAIG:  Well, Your Honor, the reason why we think
13   it is appropriate is because this is a case in which the ATF
14   routinely advises members of the public as to what the meaning
15   of manufacturing is, what the meaning of dealing is, giving
16   examples of things that can and cannot be done by a private
17   person or entity unless they have got a federal firearms
18   license, a manufacturing license, or a gunsmithing license, for
19   example.  And the ATF routinely visits people and tells them
20   about certain things, like, hey, you can't do this.
21              THE COURT:  Had they done that here?
22              MR. HAIG:  They did.
23              THE COURT:  In other words, they came to the
24   defendants and talked to them about it?
25              Well, that is going to come in then.

```
1              MR. HAIG:  It sure will.

2              THE COURT:  Why does he need to testify?

3              MR. HAIG:  He needs to testify because he is in the

4    Southern California area, he is an FFL, he does have much

5    communication with the ATF, he trains law enforcement officers

6    on --

7              THE COURT:  That's all fine and dandy, but unless he

8    was also involved in this case, why would he be coming to

9    testify?

10             MR. HAIG:  He's not a percipient witness, Your

11   Honor.

12             THE COURT:  So I don't understand what his expertise

13   is.

14             MR. HAIG:  We're dealing with the issue of

15   willfulness.

16             THE COURT:  I understand that, but he can't

17   determine willfulness.

18             MR. HAIG:  He can't determine willfulness.  He can

19   determine what the prevailing view of the community is of what

20   can and cannot be done with a home-built weapon, how it can be

21   made, how it can be procured, and the technical steps that are

22   needed to turn a weapon.

23             THE COURT:  Let me hear from the government, what is

24   the government's response?

25             MR. FAERSTEIN:  Yes, Your Honor.
```

1              Well, I think, first of all the government shares

2     in the Court's concern about Mr. Lieberman's qualifications to

3     testify --

4              THE COURT:  That's not the question.

5              The first question is did the ATF officers speak

6     to the defendants?

7              MR. FAERSTEIN:  When they executed search warrants

8     in June 2017 at the last day of the conspiracy -- so they

9     didn't speak to them prior to the execution of search warrants.

10             THE COURT:  In other words, the defendants could not

11    have relied upon the ATF for whatever they did in this case?

12             Let me ask Mr. Haig, are your clients going to be

13    testifying that prior to the execution of the search warrants

14    and things like that in this case, that they talked with the

15    ATF about their activities?

16             MR. HAIG:  To be precise, Your Honor, the ATF spoke

17    to Mr. Schlotterbeck and not to Mr. Vlha, and it was at

18    Mr. Schlotterbeck's place of business, and that is actually the

19    subject of another motion in limine that I think Mr. Robinson

20    is more properly going to be dealing with regarding the

21    statements that were elicited at that time.

22             But to answer the direct question, there was

23    no --

24             THE COURT:  Had they identified themselves as ATF

25    officers at that point?

1          MR. HAIG:  At the end, after all of the transactions

2    were finished, they basically told Mr. Schlotterbeck, don't do

3    this.

4              He said, okay.

5              Now, there is a lot more that happened, of

6    course.  Mr. Vlha wasn't there that day and they weren't

7    arrested until a couple of years later when the indictment was

8    returned and unsealed.

9              During that interim time, there was no criminal

10   activity by either of the defendants.

11        THE COURT:  Well, there wasn't any indicted criminal

12   activity.

13        MR. HAIG:  There wasn't any activity.  Period.

14        THE COURT:  Well, it is left up to argument, that's

15   what the jury is going to decide.

16        MR. HAIG:  I'm talking about the ATF agents paid a

17   visit to Schlotterbeck.

18        THE COURT:  You are saying after that, they didn't

19   engage in whatever conduct they had previously engaged in, so

20   therefore, there was no new criminal conduct?

21        MR. HAIG:  Yes.

22        THE COURT:  Okay.

23        MR. ROBINSON:  If I may address the notice.  Was

24   Mr. Schlotterbeck notified prior to any of the alleged conduct

25   that what he was doing was illegal by an ATF agent.  No, he

1    wasn't.

2              In our supplement on the Rule 106 motion, we

3    excerpt texts -- excuse, me parts of conversations between

4    Mr. Schlotterbeck and the ATF agent where Mr. Schlotterbeck

5    says --

6              THE COURT:  Well, let me stop.  I'm going to get to

7    that in a second.

8              Here, at this point in time, we're talking about

9    the expert testimony, and so we will get to that stuff a little

10   bit later.

11             MR. ROBINSON:  The expert testimony will corroborate

12   the good faith belief that Mr. Schlotterbeck had that at the

13   time he was doing what he was doing because he had not been

14   placed on proper notice --

15             THE COURT:  Let me ask this question, I guess, maybe

16   this does go toward what the defense wants insofar as the

17   defendant's portion of what they had been saying, the recorded

18   portion.

19             I do understand and it seems to me that I do get

20   a sense from those portions that the defense wants to come in

21   that Mr. Schlotterbeck was trying to fit within what was -- I

22   don't know what you call it -- the 80 percent rule or something

23   to that effect.

24             So the question is that if -- maybe that's what

25   the whole purpose of Mr. Lieberman is, is to talk about the

1   80 percent rule or something of that sort and whether or not

2   that was a viable approach to manufacturing firearms that were

3   not -- that would not be -- that component would not render it

4   illegal.

5                 I can understand that.  I think that is my

6   understanding, in part, of why the defense wants -- that was

7   the additional portions of Mr. Schlotterbeck's conversations at

8   the time.

9                 Let me have the AUSA address that point.

10  Although, also taking a step back from that, even if there was

11  some compliance with that, in other words, that the manufacture

12  may not have been illegal in and of itself, the dealing in --

13  sorry, not the dealing, but the business of manufacturing,

14  which includes the commerce aspect of firearms is still at

15  play, and my understanding is you would need a license for that

16  even if -- in other words, if you made a handgun or firearm

17  that you didn't need to get a license to manufacture, you would

18  still need a license for the commerce aspect of it, the

19  business aspect of it, wouldn't you?

20                MR. HAIG:  Not -- well, that will be a question for

21  the jury as to whether --

22                THE COURT:  Well, it's a question whether or not

23  they engaged in it.

24                But conceptionally, if they met the criteria of

25  the business-of aspect, then there would be a licensing

1   requirement, wouldn't there?

2          MR. HAIG:  If they are manufacturing and they are

3   engaged in the business, yes, but those are both questions for

4   the jury.

5          THE COURT:  Well no, it's the business of

6   manufacturing.

7          MR. HAIG:  They have to manufacture the firearm and

8   they also have to --

9          THE COURT:  Well no, it's business and

10  manufacturing.  I mean that is the language of 921.

11         MR. HAIG:  That's exactly why Mr. Robinson talks

12  about it being so vague.

13         THE COURT:  Well, let's put it this way, it wasn't

14  vague.  It never has been raised as being vague heretofore.

15         MR. HAIG:  There are six weapons in this case over

16  the span of a little bit over a year, and whether that is the

17  business of manufacturing --

18         THE COURT:  Well, that is up for the jury to decide.

19         MR. HAIG:  That's what I said.

20         THE COURT:  That's clear, that is an issue, but that

21  is not vague.

22         MR. HAIG:  Well, no, no, no.  I mean, the jury can

23  determine whether they are in the business of manufacturing

24  when they make less than $2,000 in a year, right?  They can

25  make that determination.

1          THE COURT:  But that is not a vagueness issue.  I

2    thought you were arguing some vagueness issue.

3          MR. HAIG:  What I was arguing is we're going back

4    and forth what the statute says and what it means, that's why

5    we think it's vague.

6          THE COURT:  Let me put it this way, unless the

7    statute were to say "business means more than $5,000 a year,"

8    well then, by definition, anything that is less than that is in

9    your mind, vague.  It doesn't work that way.

10              There are lots of statutes that don't have bright

11   line cutoff points, and they are still viable criminal

12   statutes.

13          MR. HAIG:  Fair enough, Your Honor.

14          MR. ROBINSON:  But that is not our point on behalf

15   of Mr. Schlotterbeck.

16              It's not, because we take the very, very discreet

17   position that regardless of the modifier he engaged in the

18   business, manufacturing is a term that stands alone under

19   statutory construction rules that are now apparently the only

20   way in which we're supposed to look at a Constitutional Second

21   Amendment question of the history.

22              It doesn't modify and provide the necessary

23   clarity to distinguish between assembling and manufacturing, so

24   if Mr. Schlotterbeck believed that he's following the law --

25          THE COURT:  That's one of the problems I have.  I

1  don't understand why assembling can't be in manufacturing.

2          In most businesses, there would be no distinction

3  between a product that is assembled by a company as calling

4  that having been manufactured, even though the component parts

5  might be gotten from other locations.

6          As I mentioned, if cars were in that situation,

7  cell phones parts are manufactured all over the world and/or

8  assembled and derived from all different parts of the world,

9  and they are assembled in the particular location and that

10  entity is called a manufacturer of that cell phone.

11          MR. ROBINSON:  Well, if you look at the trade rules

12  that we have, everything that is manufactured in China is

13  assembled in the United States in order to be built in the

14  United States and there are two -- both parties have shown,

15  there are competing common everyday understanding from the

16  dictionary as to what assembling versus manufacturing means,

17  but forget about that, if we may for this point.

18          If Mr. Schlotterbeck believes in good faith that

19  he is following the -- we will use this term for this motion --

20  80 percent rule, and therefore, he is not manufacturing, but

21  assembling, and the expert can say that was the understanding

22  of the so-called gun community, the government will have a more

23  difficult time proving, based upon Mr. Schlotterbeck's good

24  faith, he acted willfully under whatever standard of

25  willfulness the Court can apply.

1          THE COURT:  I understand your position.

2              Let me hear from the government, why can't the

3     defendant, if it's applicable to him, argue that point that he

4     thought there was this 80 percent rule, assuming arguendo that

5     it exists, and he thought what he was doing was lawful?

6          MR. FAERSTEIN:  Well, Your Honor, I'm assuming that

7     -- I'm assuming that is something they will argue to the jury.

8          THE COURT:  Well obviously, there has to be some

9     evidence.

10             Let me indicate to defense counsel, I'm not going

11    to force your clients to testify if they don't want to, but a

12    lot of that stuff, unless they testify, I don't know how it

13    comes in.

14         MR. ROBINSON:  Under 106, it comes in, because what

15    the government has excerpted, it looks like a confession.  It

16    doesn't include 80 percent conversations of the

17    Mr. Schlotterbeck where he demonstrates to the ATF agent, hey,

18    wait a minute, I thought I was following the law.  That is

19    exactly what *Lopez* stands for in the Ninth Circuit with respect

20    to making sure --

21         THE COURT:  Let me stop you.  That gets back to

22    whether or not which portions of the transcript I'm going to

23    allow in.  As I have indicated, it seems to me the 80 percent

24    rule could come in.

25         MR. ROBINSON:  Right.

1          THE COURT:  But it's going to be limited to what he

2    said therein, and unless he testifies, nothing else is going to

3    come in as to it, so it is what it is.

4               I understand the significance of all of this, but

5    again, you know, a lot of this stuff that you want to get in,

6    unless he testifies, I don't see how it's going to come in.

7          MR. ROBINSON:  But if you looked at what we have

8    excerpted in, and mind you, we get it, it is in the light most

9    favorable to us, there is a discussion between the ATF agent

10   and Mr. Schlotterbeck about how he believed he wasn't

11   manufacturer and he was assembling.  There was a discussion --

12         THE COURT:  That is your argument about how the jury

13   should interpret what he said, I understand that.

14         MR. ROBINSON:  Well, if that was the understanding

15   in the gun community, then to circle back, the expert's opinion

16   explaining that this was an understanding of the gun community

17   about the so-called 80 percent rule, and he has the

18   qualifications to tender that opinion, then it corroborates

19   what Mr. Schlotterbeck was saying and how can he be proven

20   guilty -- proven to have acted willfully beyond a reasonable

21   doubt if he has got this good faith belief backed up by some

22   expert testimony.

23         THE COURT:  I understand your position.  What is the

24   government's response?

25         MR. FAERSTEIN:  With respect to the expert,

1    Mr. Boyle will address with respect to the statements.

2              With respect to the expert, what they are

3    proposing is entirely impermissible under Rule 704(b).

4              They are asking the expert to opine on why the

5    defendant did not think what he was doing was unlawful.

6              THE COURT:  Let me stop you.  I would agree with

7    that.

8              In other words, the expert can't give testimony

9    as to what was going on in Mr. Schlotterbeck's mind.  I agree

10   with you 100 percent.

11             MR. ROBINSON:  Of course, he can't.

12             THE COURT:  As Mr. Haig is saying, he's not

13   intending to do that.  So everybody is agreeing with you on

14   that point.

15             MR. FAERSTEIN:  Right, Your Honor.

16             THE COURT:  But, as I see the construct that the

17   defense is going to be trying to do is that the defense is

18   going to try to get in the evidence of the existence of the

19   so-called 80 percent rule as an argument that members of the --

20   I guess gun manufacturing public -- also believed that this

21   80 percent rule, and they thought they believed that if you

22   complied with the 80 percent rule that what you were doing was

23   not illegal.

24             MR. FAERSTEIN:  Yes, Your Honor.

25             But this expert, it's unclear to the government

```
 1   what his specialized knowledge is.  Is he going to be coming in

 2   and testifying anecdotally as to what he --

 3            THE COURT:  That's the reason why I have asked the

 4   defense to give me more as to what Mr. Lieberman is going to

 5   say.

 6            Frankly, normally this type of stuff is put in

 7   some sort of report, and I understand the defense did put it in

 8   a report, but then the defense indicated that what was stated

 9   in the report wasn't exactly necessarily what he was actually

10   going to say.

11            But the problem is that unless I know what he's

12   going to say, I don't know whether or not what he is saying is

13   going to be admissible.  I also need to know the basis upon

14   which he is going to be saying what he is saying because I

15   understand the government is making a *Daubert* challenge.

16            But all things said and considered, the purpose

17   of the *Daubert* is not to prevent necessarily opinions that the

18   government disagrees with, because that is the whole purpose of

19   cross-examination.

20            I would have to make a determination that there

21   is no basis upon which -- in other words, he does not have a

22   foundation upon which he could opine or give an opinion of that

23   sort.

24            But, you know, he's claiming to be some sort of

25   person well-connected with the gun manufacturing portions of
```

```
 1    society.
 2              So, you know, I don't think the government is
 3    objecting to -- I mean, obviously the government isn't
 4    objecting to his status on certain things.  I don't believe the
 5    government is challenging his background, as I understand it.
 6              MR. FAERSTEIN:  We're challenging his specialized
 7    knowledge to testify in this case how that is going to be
 8    helpful to the jury.  And the report that the defense initially
 9    proffered raised also significant doubts in our mind as to
10    whether he actually has any foundation and the facts of this
11    case, which is a requirement of Daubert, or whether he has the
12    legal foundation and reliability to testify on these issues
13    which is also a gatekeeping consideration under Daubert.
14              THE COURT:  Let's put it this way, we're going to
15    address the issue again.  I'm ordering the defense to give me
16    more precisely what he's going to say and more precisely the
17    basis upon which he can say what he wants to say.
18              So I will give the government another chance to
19    address it once we get a firmer foundation in that regard.
20              MR. ROBINSON:  In light of that, Your Honor, could
21    we also then defer any discussion on the 106 issues, because I
22    think that we would be speaking possibly -- hopefully a --
23              THE COURT:  When you say 106, what precise 106
24    issues are you referring to?
25              MR. ROBINSON:  I'm referring to the excerpts that we
```

1    submitted as supplement.  I think it goes directly to what

2    Mr. Faerstein and Mr. Haig are talking about with respect to

3    corroboration.

4              THE COURT:  It seems to me a portion, but not

5    necessarily everything, but a portion of what the additional

6    materials that the defense wants does to my mind, reference

7    this 80 percent thing.

8              And again, obviously, if I were to allow it to

9    come in, then it makes those portions of Mr. Schlotterbeck's

10   statements more relevant.

11             If I don't allow it in, then it wouldn't be

12   particularly helpful to anybody.

13             So I will postpone and put off until we have

14   resolved the Lieberman issue.

15             MR. BOYLE:  This is AUSA Boyle.  Might I briefly be

16   heard on that portion?

17             THE COURT:  Sure.

18             MR. BOYLE:  So, if we go to the updated filing you

19   ordered from the defendants on the statements, and I think that

20   was extremely helpful, Your Honor, because if we look at the

21   page -- the first page of their updated filing, they note that

22   the government lists three groups of excerpts.

23             We had six originally, we withdrew one because it

24   dealt with silencers and Your Honor ruled on that.

25             So of the three groups, three of these statements

```
1    left, deal with the --
2              THE COURT:  Let me stop you, for some reason you are
3    fading in and out.
4              MR. BOYLE:  My apologies, Your Honor.
5              THE COURT:  Okay.  You said there were three groups
6    and what?
7              MR. BOYLE:  Yes.  The first group deals with
8    Mr. Schlotterbeck's knowledge that he was dealing with a
9    convicted felon.
10             THE COURT:  Those things are indicated on page 1 of
11   Docket No. 129, so your point is what?
12             MR. BOYLE:  The defendants aren't offering any
13   context or completeness statements about those, so there is
14   nothing to offer there.
15             The only statement which could potentially bring
16   in the 80 percent comment would be those -- would be the
17   Government's Exhibit C, which the defendants refer to as
18   Mr. Schlotterbeck's general knowledge of firearm licensing.
19             So there is only one statement the government has
20   offered which could potentially bring in this 80 percent
21   material.
22             I think if the Court looks at Exhibit C, the
23   Court will see that there is simply no --
24             THE COURT:  Let me stop you.  What about -- as I
25   understand it -- what about the defense's argument?  I mean,
```

1   the defense is putting a lot of its eggs or their eggs on this

2   notion of manufacture, the definition of manufacture as opposed

3   to business of manufacture.

4          So, you know, if according to maybe their hope

5   that if for some reason the term "manufacturing" is held to be

6   indefinite or something of that sort, that if a defendant is

7   found not to have violated the manufacturing element for one

8   reason or another, then the business of manufacturing kind of

9   goes away if the underlying manufacturing is somehow gotten rid

10  of.

11         What is your response to that?

12         MR. BOYLE:  My response, Your Honor, is that may be

13  a viable theory if the defendants choose to testify, but what

14  we're talking about is the defendants trying to inject their

15  statements in through the rule of completeness.

16         So they can't put in a statement that they like,

17  that they think would help support the theory, they have to

18  find a statement that the government misleadingly tailored or

19  edited it, and that simply doesn't exist here.

20         The defendants have to choose whether they are

21  going to testify and put in this theory, or they have to find

22  something that would fall under the rule of completeness where

23  the government edited or altered a statement to make it

24  misleading.

25         I think if the Court looks at Exhibit C, which is

1  the only portion they identify of somehow giving basis for this

2  rule of completeness argument, there is just nothing misleading

3  there, Your Honor.  I will read it to the Court.

4          THE COURT:  Don't read it to me, because I will

5  forget between now and then.

6              I'm going to postpone the ruling on this.  I want

7  to see how the thing plays out insofar as what Mr. Lieberman is

8  going to be allowed to say.  Then at that point in time, I will

9  be better versed in deciding in terms of how much

10 Mr. Schlotterbeck's statements will be able to come in or if

11 any additional stuff will come in other than what the

12 government wants.

13             I'm not disagreeing with you at this time,

14 Mr. Boyle, I'm saying there is no sense in my drawing a line in

15 the sand now because how I rule on Mr. Lieberman might affect

16 my ruling on this aspect as well.

17         MR. BOYLE:  Then I will submit for now, Your Honor.

18         THE COURT:  All right.  What else do we need to

19 discuss other than just housekeeping matters at this point?

20         MR. HAIG:  I have got one minor thing that wasn't on

21 the calendar, but it does relate to a ruling that the Court

22 made last week.

23             If the Court recalls it allowed the sale of a

24 high-capacity magazine that was part of one of the AR-15 or

25 more than one of the AR-15 sales.

1              There is a current case before the United States

2    Supreme Court called *Duncan versus Bonta*.  It's Docket

3    Number 21-1194, and that is a challenge to the

4    constitutionality, and I hate to go back to this, but

5    challenges the constitutionality of the high-capacity magazine

6    ban in California.

7              It's an interesting issue, and the reason it's an

8    interesting issue because Mr. Schlotterbeck made a comment

9    about the perceived illegality of that; however, in light of

10   *New York Pistol and Rifle Association versus Bruen*, the case

11   that was decided by the U.S. Supreme Court last week, where

12   they abrogated the two-step approach that the U.S. Court of

13   Appeal in Ninth Circuit used to affirm the constitutionality of

14   that statute.  Most legal scholars are saying that that --

15             THE COURT:  That raises two issues.

16             The first issue is whether or not that law will

17   go by the way side and be declared unconstitutional, which is

18   one aspect.

19             Another aspect, which is an interesting

20   tangential interesting aspect is well is at the time he made

21   the statement, it was illegal under California law.

22             Can that knowledge of illegality be used against

23   him in a situation where even if that statute was found to be

24   unconstitutional, he thought it was -- he knew he was aware of

25   that law that prohibited it at the time.

1          MR. ROBINSON:  Your Honor, if we're going to address

2    this in the felon sales to a felon motion, I guess it becomes

3    sort of an ex post facto thought --

4          THE COURT:  I'm saying that Mr. Haig is bringing it

5    up.  We're not going to resolve the issue now, but it's

6    something that perhaps we should address.

7          MR. HAIG:  Well, I brought it up briefly when we had

8    a conference call with the government yesterday, I think I did,

9    but if we didn't, I apologize.

10          I just wanted to make sure that I let everybody

11    know that the -- let the Court know that will probably be

12    something that it will have to consider.

13          I agree with what you just said, it's kind of a

14    strange thing, the law maybe declared unconstitutional, but at

15    the time, it's your actual thought process that might be more

16    important.

17          So I don't know how that is going to come out.

18          THE COURT:  I don't know what the law is on that, I

19    don't know of any cases that specifically addresses it, but

20    probably some Court somewhere has.

21          Let me also ask one last thing, do you guys want

22    to try to resolve the case?

23          MR. HAIG:  Your Honor, there have been discussions

24    that got somewhere, but not too close.  Actually, we got fairly

25    close, Mr. Vlha and I.

```
 1              THE COURT:  He's going to abandon Mr. Schlotterbeck?
 2              MR. HAIG:  No, no, it has nothing to do with that.
 3    It's just that we were --
 4              THE COURT:  Let me put it this way, I think all of
 5    us recognize the fact this area is constantly evolving, and you
 6    know, you guys could spend a lot of time and money doing this,
 7    but in the end, the issue, if the government gets conviction,
 8    it may go up to higher Courts and who knows what is going to
 9    happen then.
10              But conversely, the government is still
11    interested in getting some pound of flesh, so maybe it's a
12    situation where the parties can discuss and see if they can
13    resolve the matter rather than getting something for certain
14    rather than living in a situation where there is a lot
15    high-level of uncertainty.
16              MR. ROBINSON:  We also discussed, and I know the
17    Court -- we're not treading on Rule 11 here, I hope.
18              THE COURT:  No.  I can't force you guys to settle.
19    I am just saying it's always a good opportunity at this point
20    in time to see if you can resolve it, especially since new
21    developments have occurred.
22              MR. ROBINSON:  We have talked in the past about
23    conditional pleas and that kind of thing, and I'm not saying
24    that the government is in a position to agree with that, but
25    given what we have here, I think it would be wise for us to at
```

1    least talk about the possibility of conditional pleas or a

2    court trial or something like that.

3              Like I said earlier, 90 percent of this case is

4    all about what the law is or what it will be, and it's a

5    very -- it's a fascinating part of the law that is evolving.

6         THE COURT:  Just a comment that I have, I have at

7    this point in time a case which involved medical marijuana and

8    certain aspects of medical marijuana, and it was a criminal

9    case.

10             And I think I rendered a decision in that case --

11   well, let's put it this way, it's been on appeal now for over

12   ten years.  It's still on appeal over ten years.

13             Sometimes these interesting cases involve

14   changing conditions and there are strange aspects that occur in

15   that regard.

16             Sometimes it's better to have a bird in the hand

17   rather than chasing after birds in the open.

18        MR. HAIG:  After saying that, Your Honor, our

19   request for short continuance is looking better.

20        THE COURT:  You know, it works against asking for a

21   continuance, because now it's not my problem, it's the

22   Appellate Court's problem.

23             Let's talk about scheduling now.

24        MR. FAERSTEIN:  Your Honor, may I jump in with one

25   other substantive point that goes back to a ruling Your Honor

1   made on last Thursday?

2           THE COURT:  Yes.

3           MR. FAERSTEIN:  With respect to the silencer issue,

4   the discussions of purchasing silencers by the defendants from

5   the UC and the CI.

6               We have looked back at the recordings and there

7   is going to be some recordings we're not going to use anymore.

8               There are others -- there is one that we can edit

9   but there are a few, two or three recordings where the parties,

10  the defendants and the customers are speaking about the topic

11  of silencers, but very obliquely.

12              And it is not even -- no words are used that

13  would lead a juror to understand what they are talking about.

14  It's kind of part and parcel of their conversation about the

15  sales of firearms, and if we don't bring it up -- if the

16  witness doesn't say, oh, that was -- we were talking about

17  potentially buying silencers, so it seems to us that there is

18  nothing that would --

19              THE COURT:  Well, let me do it this way, why don't

20  you propose to the defense, see what the defense's response is.

21              If you can reach a agreement, that is fine with

22  me.  If you can't reach an agreement, you can always make a

23  request that I can consider it based upon a new edited version

24  of those portions that you want in.

25              MR. ROBINSON:  We can work something out on that.

```
 1   It shouldn't be difficult.
 2              THE COURT:  So let's talk about scheduling.
 3              MR. HAIG:  Your Honor, I'm leaving today, I will be
 4   back on July 7th in the evening.
 5              So, really from July 8th, I have got the Court --
 6   the case I had today in Judge Lynch's Court, and she said hi to
 7   you as well.
 8              On July 8th, I have a trial starting in that case
 9   on July 11th, but it might get resolved.
10              THE COURT:  Uh-huh.
11              MR. HAIG:  It's a retrial, so there is no time
12   waiver from the defendant on that case.
13              That's only about a week long, but that whole
14   week of July 11th, I'm available, and I can even be here on
15   July 8th, if the Court wants us to be.
16              THE COURT:  No.  Why would I have you -- first of
17   all, we have to discuss when all of this additional briefing
18   and all of this additional submissions are going to be made.
19              I'm obviously going to have to have time to look
20   at it.  I don't always like to shoot from the seat of my pants,
21   although apparently I do it a lot.
22              MR. HAIG:  You have got two people named Robinson
23   that are on the call.
24              THE COURT:  It may be the big Robinson and the
25   minion?
```

1           MR. HAIG:  I have read what she writes, and she's

2    anything but a minion.

3           THE COURT:  She's probably better than he is.

4           MR. HAIG:  Oh yeah, just between us.

5           MR. ROBINSON:  There is no question about that, Your

6    Honor, it's fairly well known.

7           MR. HAIG:  I will be in communication with them for

8    sure.

9           THE COURT:  Again, because I'm going to be gone

10   starting from the 17th through the 21st, so I'm not going to be

11   able to start -- we're still going to be starting the trial the

12   day after I get back, so I would probably want to talk with you

13   guys certainly on the 11th, and if it's necessary on the 14th.

14           I want to get some materials so I can look at the

15   stuff so we can have a better conversation.

16           So, why don't you guys give me whatever you

17   can -- well, let me ask Mr. Haig, are you giving Mr. Robinson

18   and Ms. Robinson the ability to file stuff for you?

19           MR. HAIG:  Yes.  As you can see, Your Honor, a lot

20   of our papers are -- most of them are jointly filed, and we

21   have corroborated on much of our work where it makes sense to

22   corroborate.

23           The only one we haven't is the 106.

24           THE COURT:  Sure.  Why don't we have you file

25   everything you can by noon on the 6th of July, and we will talk

1    about the stuff on July 11th.

2              Also, you guys are going to give me -- just to

3    make sure all of the rest of the stuff is fine, like, the

4    witness list and all of the other type of stuff we have already

5    dealt with, so all of this stuff is prepared at this point.

6              MR. HAIG:  What time on 11th?

7              THE COURT:  8:30.

8              MR. HAIG:  Let me check my calendar.

9              THE COURT:  Where are you going?  Are you going to

10   Ireland?

11             MR. HAIG:  London.  I'm going to Wimbledon on

12   July 4th, Your Honor.  I am very excited about that.

13             THE COURT:  Why?  You just go like this all day.

14                  (Court indicating.)

15             MR. HAIG:  So actually, my seats are behind the --

16             THE COURT:  All right.  Anything else from the

17   government?

18             MR. BOYLE:  Your Honor, from the government, I note

19   under Rule 12(d), the Court is empowered to defer consideration

20   of a pretrial motion.

21             So specifically with request to this new

22   constitutional motion, the Court is empowered to consider that

23   motion after trial so long as it doesn't interfere with either

24   a conviction or the right to appeal.

25             I don't know that this is a matter we have to

UNITED STATES DISTRICT COURT

1   resolve pre-trial, particularly, considering it's a question of
2   law.
3           THE COURT:  I'm not indicating I'm intending to
4   resolve it pre-trial.
5           I just want to make sure that everything --
6   because again, as I have indicated, I don't think that much of
7   what they are saying is an issue of law.  And again, what they
8   are arguing, in fact, is what they expect the law to be, not
9   necessarily what the law is at this point in time.
10          So I think what I have said so far, I don't think
11  what they have said has caused me to change my views on what
12  the law is.
13          Although, I might be fearful as to what the law
14  may be in the future, as you will be, but not what the law is
15  at this point in time.
16          So I agree with you, I don't have to resolve it
17  prior to trial.  Although, I would want to have some, I guess,
18  some discussion -- let's put it this way, what I might very
19  well do is I could tell the defense what exactly do you expect
20  that the law to be or law to have changed to that would affect
21  how I would conduct this trial?
22          If you don't expect that it's going to come about
23  unless I make the actual ruling in the course of the case, then
24  why would I do anything different for purposes of the trial?
25          MR. ROBINSON:  We will present to you the reasons

1    why we believe that ruling needs to take place before the jury

2    is instructed and before the parties present their cases.

3              We will have that for you by the 6th, that won't

4    be difficult, Your Honor.

5              THE COURT:  Okay.

6              MR. ROBINSON:  We're in good shape.

7              THE COURT:  Anything else we need to discuss at this

8    point?

9              MR. FAERSTEIN:  Just to clarify, the 6th is the

10   deadline for the submission by all parties -- that would be the

11   defense's motions and the government's opposition?

12             THE COURT:  No, no.  I just want by the 6th the

13   defense and the government to have discussed the issue, because

14   I want to know precisely those legal arguments that the defense

15   wants to make and how the defense feels that that could affect,

16   for example, specific jury instructions that the Court would be

17   giving in this case, and then I just want the government's

18   short response.

19             I'm not going to resolve the issue, I just want

20   to be informed because it may dawn on me, okay, actually, I

21   think now the defendant is right, in which case, I probably

22   would continue the trial or something of that sort.

23             But I might say, well, I understand that the

24   defense has a wish list of what they want the Appellate Courts

25   to do in the future, but that is like a wish list and I want to

1    win the lottery too.

2                Sorry, I didn't hear Mr. Robinson?

3                MR. ROBINSON:  We're hoping to win the lottery and

4    get a new date for the trial.  We will work for Mr. Faerstein

5    and Mr. Boyle.

6                THE COURT:  We can all do a pool and see if we can

7    get this Quick 6 or whatever it is.

8                MR. HAIG:  Your Honor, on the 6th, you want us to

9    flesh out more of what Mr. Lieberman is going to specifically

10   be saying?

11               THE COURT:  Yes, that is primarily what I want.

12   That is No. 1 thing, I want to know what exactly his opinions

13   are going to be specifically and the basis for those.

14               And again, but you guys need to coordinate with

15   the government, because again, I want there to be both sides

16   represented in this regard, and if you guys could do it in one

17   document for each of these things, that would be the best

18   because that would make it really quick for me to get into all

19   of this stuff.

20               MR. FAERSTEIN:  Your Honor, given the long holiday

21   weekend, it seems like we're going to have to do a lot of

22   coordination back and forth.

23               THE COURT:  All right.  By noon on the 7th.

24               MR. FAERSTEIN:  Thank you, Your Honor.

25               THE COURT:  Anything else from anyone?

1           MR. ROBINSON:  No.  Thank you very much.

2           THE COURT:  Everybody, have a very, very nice day

3  and have a happy 4th, and Mr. Haig, don't drink too much of

4  that alcoholic stuff.

5           MR. HAIG:  That ruins it for me than makes it fun,

6  but thank you anyway.

7           THE COURT:  Are you speaking from experience?

8           MR. ROBINSON:  We will make up for it back here.

9           THE COURT:  All right.  Everybody, have a nice

10  weekend.

11           MR. FAERSTEIN:  Thank you, Your Honor.

12              (The proceedings concluded at 11:20 a.m.)

13                          *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5

6            I, TERRI A. HOURIGAN, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date: 8th day of July, 2022.

17

18

19                           /s/ TERRI A. HOURIGAN

20   _____
                  TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
21                      Federal Court Reporter

22

23

24

25