

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,

                        Plaintiff,

        vs.                          Case No. CR 19-343-GW

TRAVIS SCHLOTTERBECK,
JAMES BRADLEY VLHA,
                        Defendants.
_____/

REPORTER'S TRANSCRIPT OF
PRETRIAL CONFERENCE
Monday, July 11, 2022
10:00 a.m.
LOS ANGELES, CALIFORNIA

TERRI A. HOURIGAN, CSR NO. 3838, CCRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4311
LOS ANGELES, CALIFORNIA  90012
(213) 894-2849

UNITED STATES DISTRICT COURT

1                        **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        UNITED STATES ATTORNEY'S OFFICE
         United States Attorney
5        BY:  BRIAN R. FAERSTEIN
             DANIEL BOYLE
6         Assistant United States Attorneys
         United States Courthouse
7        312 North Spring Street
         Los Angeles, California  90012
8

9

10   **FOR THE DEFENDANT:  TRAVIS SCHLOTTERBECK**

11       EDWARD M. ROBINSON, A PROFESSIONAL LAW CORPORATION
         BY:  EDWARD M. ROBINSON
             BRIAN ARTHUR ROBINSON
12       Attorneys at Law
         21515 Hawthorne Boulevard, Suite 730
13       Torrance, California  90503

14

15   **FOR THE DEFENDANT:  JAMES BRADLEY VLHA**

16       LAW OFFICE OF JEROME J. HAIG
         BY: JEROME J. HAIG
17       Attorney at Law
         21143 Hawthorne Boulevard, Suite 454
18       Torrance, California  90503

19

20

21

22

23

24

25

                  **UNITED STATES DISTRICT COURT**

```
 1            LOS ANGELES, CALIFORNIA; MONDAY, JULY 11, 2022

 2                            8:30 a.m.

 3                            --oOo--

 4

 5

 6            THE COURTROOM DEPUTY:  Please come to order this

 7   United States District Court is again in session.

 8            THE COURT:  All right.  Let me call the matter of

 9   United States versus Schlotterbeck.  Let me have appearances

10   starting with government counsel first.

11            MR. FAERSTEIN:  Good afternoon, AUSA Brian Faerstein

12   and Daniel Boyle on behalf of the United States.

13            THE COURT:  All right.  For the defense?

14            MR. ROBINSON:  Good afternoon, Your Honor.  Edward

15   Robinson appearing virtually with Travis Schlotterbeck.

16            THE COURT:  All right.  For the other defendant?

17            MR. HAIG:  Good afternoon, Jerome Haig appearing

18   virtually as well with Mr. Vlha who is also appearing

19   virtually.

20            THE COURT:  All right.  My understanding is they

21   previously filed a waiver of personal appearance, right?

22                 The most important questions for the day we want

23   to figure out what Mr. Haig did what he was at the British Open

24   and things of that sort, oh, Wimbledon.

25            MR. HAIG:  A week ago today I was at center court
```

```
 1   and I had a grand time and thank you very much.
 2           THE COURT:  Such a world traveler, so lucky.
 3           MR. HAIG:  I am entitled to vacations from time to
 4   time.  It's my first one since pre-COVID.  It's nice to be able
 5   to do.
 6           THE COURT:  Let me ask counsel, I think the two
 7   major things that are still on calendar at this point in time
 8   -- well, there is a third thing, but I don't think it's that
 9   serious, the two things that are as to the motion to dismiss as
10   recently briefed in light of the -- is it the Bruen case, and
11   then the second one is the testimony of the both the government
12   and the defense experts.
13           On the motion to dismiss, let me just ask the
14   defense counsel this question:  You know, I don't think I would
15   approach the issues exactly the same way as the government did
16   in this case, but it seems to me that the argument that the
17   defense wants to make has pretty much been precluded by Heller.
18   Although, it's precluded perhaps by dicta in Heller, but dicta
19   in Heller is pretty good.
20           You are on mute, Mr. Robinson.
21           MR. ROBINSON:  I was speaking to Brian Robinson who
22   was giving me a clue how to answer your question, Your Honor.
23           Hold on a second.  His point is my point as well.
24           I think if we talk about Count 3, first of all.
25   With respect to Count 3 on its face, the prohibited person, a
```

1    felon, it seems like that is going by the wayside under the --

2            THE COURT:  Well, the first thing one is supposed to

3    look at is the language of amendment itself.

4            And even if we did like the Supreme Court in

5    *Heller* and ignored more than 50 percent of the language of the

6    amendment, there is still that nub of what supposedly all of

7    the fuss is about.  But, you know, the language there doesn't

8    talk about any sort of any limitation in that regard.

9            And the language, I'm referring to in *Heller*,

10   *Heller* says, and I quote:  Although, we do not undertake an

11   exhaustive historical analysis today of the full scope of the

12   Second Amendment, nothing in our opinion should be taken to

13   cast doubt on the longstanding prohibitions on the possession

14   of firearms by felons and the mentally ill or laws forbidding

15   the carrying of firearms in sensitive places, such as schools

16   and government buildings, or laws imposing conditions and

17   qualifications on the commercial sale of arms.

18           That is the language from *Heller*.  So, it seems

19   to me that the Supreme Court already thought about the point

20   and noted that there were these longstanding prohibitions, so

21   given those longstanding prohibitions, I don't see how,

22   especially since *Bruen* did not consider these issues, but

23   considered a different issue, I don't see how we can say that

24   *Bruen* has changed the landscape as to this particular case.

25           Now, while obviously the *Bruen* case did get rid

1    of the quote, two step analysis, that was being done by many

2    Courts of Appeals and District Courts, we don't even need to

3    get there insofar as the analysis here, because I think the

4    language is fairly clear.

5            Again, the Supreme Court recognized the

6    longstanding prohibitions.

7            MR. ROBINSON:  In *Heller*.

8            THE COURT:  Yes.

9            MR. ROBINSON:  So --

10           THE COURT:  Unless you want to say *Heller* was

11   decided wrong in that topic itself.

12           MR. ROBINSON:  I don't want to say anything good

13   about *Heller*, if you don't mind.  But I will say this, the

14   *Bruen* case and one of the reasons that I'm not retreading this

15   ground seeking a continuance, but one of the reasons we asked

16   for a continuance, and I'm not being a prognosticator but

17   looking at what this Supreme Court has done this term, and how

18   untethered it might be to what it said in the past and its

19   members --

20           THE COURT:  I think we must all agree that this

21   current Supreme Court is untethered by precedent, that is true.

22           MR. ROBINSON:  By what they said they would do at

23   the confirmation hearings all of that.

24           THE COURT:  But the problem is that it's difficult,

25   if not impossible, for the Court to decide that a federal

```
 1    statute is unconstitutional, especially in this particular
 2    portion of the federal statute is unconstitutional based on
 3    what was said in Heller.
 4              Even though I will admit that this Supreme Court
 5    that we now have could go off on any direction like an
 6    unexplored land mine, it's stuff that is going to happen or
 7    maybe walk around it, but I can't basically say that a
 8    particular statute is unconstitutional because of the fact that
 9    we may have a Supreme Court that decides on a whim that it is
10    unconstitutional.
11              MR. ROBINSON:  And one of the reasons why we asked
12    for the continuance is because this is a sea change, no matter
13    what anybody says, the test, looking at the text and treating
14    not all history is created equal, as I quote in going back to
15    the time of the ratification.  You have seen what we have
16    attached.
17              THE COURT:  The problem is, is that as one said that
18    Judges are not historians, and so, I don't know -- I don't
19    understand what you expect.
20              In other words, do you expect that somebody is
21    going to do an analysis of the laws that were in existence
22    between the time that the Second Amendment was passed and also
23    the Fourteenth Amendment was passed?
24              First, I don't think you are going to be -- is
25    that the analysis that you want to get done?  It's interesting.
```

1          MR. ROBINSON:  Let me say this, it's what Justice

2   Thomas said that the government has to do.

3              And it's craziness, I get it, but Justice Thomas

4   said the government bears the burden of establishing the

5   historical basis for the present regulation.

6          THE COURT:  Let me just ask you, given the fact that

7   *Heller* referenced the long-standing prohibitions, are you

8   saying that Scalia's opinion in *Heller* was totally unfounded?

9              I mean, he must have had something in his mind,

10  he got other Justices to go along with him in *Heller*, so I

11  presume there is something there to that "there" that is being

12  referenced.

13         MR. ROBINSON:  I'm saying that whatever Justice

14  Scalia said in *Heller* about the longstanding notions of

15  regulation, which was dicta with respect to -- the holding in

16  *Heller* is now superseded and replaced by the two-part test in

17  *Bruen*, and you know, according to the Supreme Court the

18  government has the burden, once we have established that the

19  text would support, in this case, the purchaser's right to

20  possess a firearm, the government bears the burden of proving,

21  and I will be -- I will use a little bit of poetic license

22  here, if I may, the government bears the burden of proving at

23  the time of the ratification or thereabout, not even at the

24  time of the Fourteenth Amendment, because we are not dealing

25  with the Fourteenth Amendment in this case.

1         At the time of the ratification there were laws

2 that would have prohibited the so-called felon in this case

3 from possessing a firearm.

4         If he's not one of the dangerous felons as

5 understood at the time of the ratification, then to deprive

6 that purchaser of his Second Amendment right to possess a

7 firearm would be unconstitutional, and there would be no crime

8 with Mr. Schlotterbeck selling to that person a firearm.

9         And it's not up to us to do the historical

10 analysis.  We just attached the then Judge Barrett's dissent as

11 evidence of the research that she had done, but the government

12 now, according to Justice Thomas in *Bruen,* bears the burden of

13 coming forward with the relevant history around the time the

14 ratification to show that this type of regulation that we have

15 now in 922(g) would have been consistent with the understanding

16 of the folks who ratified the Constitution with that Second

17 Amendment in it.

18         That's what the law is today.

19         One of the reasons we asked for a stay of the

20 proceedings or a brief continuance is to see what is going to

21 happen, and again, not to be a prognosticator, but I am certain

22 that 922(g) is going to be attacked and -- not that it matters

23 one bit --

24         THE COURT:  I would have thought this is a case for

25 it to be attacked; this one.

1        In other words, why should we wait for somebody

2    else, this one is here.

3        MR. ROBINSON:  I agree then, you should grant it,

4    and take it up and see what happens.

5        I'm not being facetious when I say that because

6    historically --

7        THE COURT:  Let me put it this way, I would if I

8    thought you were right; unfortunately, I don't think you are

9    right.

10        MR. ROBINSON:  Okay.  The government hasn't come

11    forward with any of the required historical proof that *Bruen*

12    requires.

13        THE COURT:  Well no.  What *Bruen* says is that when

14    the Second Amendment's plain text covers an individual's

15    conduct, the Constitution presumptively protects that conduct.

16    That's not what we have here.

17        In other words, there is nothing in the Second

18    Amendment that says or refers to the possession and sale of a

19    firearm to a convicted felon.

20        There is nothing -- I mean, I don't know how many

21    words there are in the Second Amendment, assuming that we don't

22    look at the introductory portion of the Second Amendment, which

23    talks about something regulated militia, we are not looking at

24    that, we're just looking at this other portion.

25        MR. HAIG:  Your Honor, if I could say something

1    since it's a joint motion.

2              There was nothing in the Second Amendment that

3    actually talks about somebody having a concealed permit to

4    possess a firearm outside of their own home.  That is what

5    *Heller* talked about, possession of a firearm in your own home.

6              *Bruen* talks about possession of a firearm

7    concealed on one's person in a public place, so to the extent

8    that the Court is looking at *Heller* as kind of a bench mark on

9    what may or may not be precluded -- just like Mr. Robinson said

10   *Bruen* --

11             THE COURT:  Let me ask you then, when the Supreme

12   Court said in *Bruen* that one looks at the Second Amendment's

13   plain text, what was it referring to?

14             MR. HAIG:  So it was referring to, I think, Justice

15   Thomas said what was the relevant firearm regulation that the

16   government has now and what was it back in 1791.

17             Back in 1791, according to Justice Barrett, now

18   Justice Barrett --

19             THE COURT:  Let me stop.  Let me just ask you, was

20   Justice Barrett a historian?

21             MR. ROBINSON:  May I just jump in on that?

22             MR. HAIG:  She attempted to be.

23             THE COURT:  She's not a historian.  Again, it's nice

24   that she has her law clerks looking at this stuff.

25             MR. ROBINSON:  Let me see if I can try to answer

1    your question a little bit better.

2              With respect to the first part of the *Bruen*

3    analysis, what does a text cover?

4              As the Supreme Court said in *Bruen*, the Second

5    Amendment right is not like a voting right which is a so-called

6    collective right.

7              Going back to Heller, it's an individual right,

8    and is presumed that we, as individuals, and in this case the

9    purchaser of the weapon, the so-called prohibited person, a

10   felon, that person has a Second Amendment right to possess.

11        THE COURT:  I understand that is what you are

12   saying, but I don't understand how I would square that

13   assertion with the language from *Heller* itself.

14              I mean, *Bruen* is based on *Heller*.  And so, I

15   don't think -- and in *Heller*, it says that nothing in the

16   Supreme Court's opinion in *Heller* should be taken to cast doubt

17   on the longstanding prohibitions on the possession of firearms

18   by felons and the mentally ill.

19              I mean, how much clearer could the Supreme Court

20   have been?  Although, I do admit it's dicta, but what can one

21   say until the Supreme Court says, by the way, it's dicta and we

22   no longer agree with that; in fact, we think that longstanding

23   prohibitions should be -- are not the relevant focus at this

24   point.

25        MR. ROBINSON:  It's dicta, and we have a test that

1   is new, and I think all of us would agree that all things being

2   equal, forgetting -- and we will get to the felon part in a

3   second -- but that purchaser of the gun, the undercover, until

4   it is shown otherwise through historical analysis of what the

5   laws were like at the time of the ratification of the Second

6   Amendment, that individual has a Second Amendment right to

7   possess a firearm.

8             Now, the Supreme Court has said in *Bruen,* and

9   this is where it's different from *Heller*, that it is the

10  government's obligation, given the fact the Second Amendment

11  right is an individual right as opposed to a collective right

12  to show that historically -- it' not our obligation --

13  historically, not all of the history being created equal, that

14  at the time of the ratification a blanket prohibition on all

15  felons was consistent with the text and the understanding of

16  the Second Amendment and the history surrounding it, and it's

17  just flat out not.

18            THE COURT:  All right.  Let me stop you.  I

19  understand your argument.

20            Let me hear from the government, let me ask the

21  government, why isn't the defense right about it's the

22  government's burden?

23            MR. FAERSTEIN:  Well, Your Honor, as you have

24  observed the plain text is the first step.

25            And in *Heller* and in *McDonald* they re-emphasize

1    the language from *Heller*, which the Ninth Circuit actually has

2    found to be not just dicta, but that the felon in possession

3    statute, nothing is meant in *Heller* to cast doubt on the felon

4    in possession statute as being presumptively lawful.

5              *Bruen* did not speak to that whatsoever.  In fact,

6    three of the justices that were in the majority in *Bruen* wrote

7    separately in a concurrence because *Bruen* didn't speak to that

8    or overturn it or do anything in any way to cast doubt on it as

9    well.

10             Three of the justices said, yeah, that is

11   correct, and they reiterated that language from *Heller* which

12   was again, reaffirmed in *McDonald*.

13             So, there is nothing -- there is no sea change

14   here with respect to the first part of the analysis, the Second

15   Amendment even covered this conduct.

16             The only sea change, to use the defendant's

17   language, is at the second step, once you have determined that

18   particular statute or conduct is even covered and subject to

19   further analysis.

20             So, with respect to the felon in possession

21   statute, which again, we're not -- what we're dealing with in

22   this case is 922(d)(1), the sale to a prohibited person, which

23   the Ninth Circuit's model instructions don't even require the

24   government to prove that the person who bought it was actually

25   even prohibited.

1          Putting that aside, even taking their point with

2    respect to 922(g)(1), nothing has been said in *Bruen* that casts

3    any doubt on *Heller* and *McDonald* Court's holdings or language

4    with respect to that statute.

5          And the Ninth Circuit, in the *United States*

6    *versus Vongxay*, and additional cases since *Heller*, has

7    specifically reiterated that 922(g)(1) is not covered by the

8    Second Amendment -- is not -- it is lawful based on the Supreme

9    Court's guidance.

10         THE COURT:  All right.  Well, that is my decision.

11         I'm not going to agree with the motion to

12    dismiss.

13         Although, it's an interesting issue, and it will

14    give the defense counsel lots and lots of wiggle room if your

15    clients get convicted, so it's an appealable issue, look at it

16    that way.

17         All right.  Then the other issue is insofar as

18    the expert opinions are concerned.

19         I'm primarily going to focus on the defendant's

20    expert witness, because again, at this point in time, I don't

21    understand exactly why his testimony is particularly relevant

22    in this case, because as I understand the -- well, there are

23    three counts obviously.  The first one is conspiracy to violate

24    18 U.S.C. 922(a)(1)(A), and the second count is the violation

25    of that particular statute, and then the third count is the

1  sale of a firearm to a prohibited person, to a felon.

2           I don't understand what exactly his expertise --

3  how it comes into play in this particular situation.

4           MR. ROBINSON:  May I just say one thing?  I'm sorry

5  to cut you off like this, Your Honor.

6           With respect to your ruling on the motion to

7  dismiss, that applies to Counts 1 and 2 as well, correct?

8           THE COURT:  Well, it comes into play primarily

9  within Count No. 3, because that was what you were focusing on

10  -- seemed to be your focus was in the most recent filing.

11           MR. ROBINSON:  But we also applied it to Counts 1

12  and 2.  I want to make sure there is no allegation of waiver.

13           THE COURT:  I don't think you have waived as to

14  that, although you didn't stress it.  I suppose an argument

15  could waived that you are also making the contention as to

16  Counts 1 and 2 as well.

17           MR. ROBINSON:  As long as your ruling is as to the

18  entirety of the indictment, we are fine.  Thank you, Your

19  Honor.

20           THE COURT:  But let me take a step back.  As I

21  understood it, the first motion to dismiss the indictment was

22  not based on *Bruen* because *Bruen* hadn't been decided on that

23  point, so when I asked for supplemental briefing it was

24  primarily on *Bruen.*

25           The focus on *Bruen* was primarily, as I saw it in

1    the defense papers, it was focusing on Count 3.

2              As to Counts 1 and 2, the same analysis would

3    apply, so I would say yes, it would cover Counts 1 and 2 as

4    well.

5              MR. ROBINSON:  We do address it in the motion, so as

6    long as it's the Court's ruling, I think the record is

7    protected, so thank you.

8              THE COURT:  I want it to be protected, because

9    again, it's an issue potentially on all three counts.

10             All right.  So turning back to the defense

11   expert.  In other words, for example, there was some discussion

12   as to whether or not he was going to testify as to what

13   sometimes is referred to 80 percent rule?

14             MR. HAIG:  That's right, Your Honor.  When we were

15   here a couple of weeks ago at the last hearing, that is

16   essentially what we proffered the expert to testify about, and

17   that is also set forth in --

18             THE COURT:  But what I don't understand is in what

19   context, because again, I don't think, at least as I understand

20   the government's case, the government is not bringing a

21   prosecution resting on the 80 percent situation.

22             What the government is arguing is that the

23   defendants were in the business of manufacturing the completed

24   firearms.

25             In another words, the fact that the firearms are

1  whatever way they are finally completed, it is kind of

2  irrelevant, because in the end, it's a completed firearm.

3         MR. HAIG:  Okay.  So I understand the Court's

4  question on that.

5         But the government is piecing their case together

6  in a few different ways.

7         In one of the ways, this lower receiver, the

8  unfinished lower receiver was actually milled and cut, if you

9  will, by a third person, or by the assistance of the alleged

10 co-conspirator and cooperator Jesse Dekoning, without the help

11 or benefit of either of the defendants.

12        THE COURT:  Well, that is not as to all of the

13 firearms.  That is only as to some of the firearms.

14        MR. HAIG:  Well, so it's as to -- well, so as to

15 some of the firearms, the actual end-user or purchaser, whether

16 that was the undercover agent or confidential informant, was

17 the person that actually was present and involved in the

18 milling and manufacturing of that lower receiver.

19        So when I say "milling or manufacturing" I mean

20 actually physically involved in the drilling of the holes by

21 either pushing a button or going over to the place where that

22 could be done, because that could not be done where the

23 defendants were actually working.

24        THE COURT:  But let me ask you, it's my

25 understanding that that particular piece, once it was completed

1  was delivered, and thereafter incorporated into the finished

2  firearm; isn't that correct?

3          MR. HAIG:  Yes.  So in order to actually make a

4  completed firearm there has to be some sort of work on that

5  unfinished lower.

6          So when that unfinished lower was completed

7  either by Mr. Dekoning at some other time and then delivered to

8  one of the defendants or both of them, it was then assembled

9  with other parts.

10          THE COURT:  Well, it's kind of like there are tons

11  of products that are -- the parts of which are manufactured by

12  other persons and then all of these various parts are put

13  together in the same room and are assembled into one item, and

14  that one item is the complete firearm.

15          So the business of the firearm is the business of

16  manufacturing the completed firearm.

17          MR. HAIG:  Well, I think the government's position

18  is that the defendants were manufacturing.

19          Our position is that there was no manufacturing

20  going on.

21          There was snapping parts together, and there was

22  no manufacturing process by any defendant.

23          THE COURT:  Let me stop.  That is a legal argument.

24  Well, let me put it this way, that is something that is up to

25  me to make the decision on.

```
 1                   I don't understand why I would be giving that
 2      issue to a jury to consider.
 3                   MR. ROBINSON:  Your Honor, if I may just jump in.
 4                   This is the problem that we have with this case
 5      and we are speaking to you in something of a void.  We have
 6      taken the position --
 7                   THE COURT:  Let me stop you.  Are you accusing me of
 8      being a void?
 9                   MR. ROBINSON:  No.  You are in the void with us.
10                   MR. HAIG:  We're in the vortex together, all of us.
11                   MR. ROBINSON:  Right.  It's a current one, it's not
12      a 17th or 18th Century one, I promise.
13                   But in any event, we have taken a position that
14      manufacturing is vague, and, you know, we cannot, in order to
15      preserve the argument on the --
16                   THE COURT:  Let me stop you.  I understand that
17      argument you have made, you already understand I have rejected
18      that argument, and it's already preserved for the record.  I
19      don't think you have to worry about that, it's clearly
20      preserved.
21                   MR. ROBINSON:  I got that.  But if we are going
22      to -- if we're going to take the position that the unmilled or
23      even the fully milled lower receiver is not a firearm --
24                   THE COURT:  I agree with you.  The lower mill --
25      well, let me put it this way, for purposes of this case, it is
```

 1    not a firearm.  I would agree with you on that.

 2                  But that is not the charge, as I understand the

 3    charges.

 4                  MR. ROBINSON:  No.  But putting together unregulated

 5    parts to build a firearm, our position is that that is

 6    assembling, it's not -- it can't be manufacturing, according to

 7    our position, and our clients.  If the Court defines

 8    manufacturing to include assembling, we have to take the

 9    position that they would never have been put on notice at the

10    time that they did this.  That is the real problem.

11                  THE COURT:  I understand that is your position, but

12    the problem is I disagree.  I think that manufacturing can be

13    assembling, because I mean Apple manufacturers the iPhone.

14    The components of an iPhone are made at different locations and

15    put together in China.

16                  MR. HAIG:  They are assembled in China, Your Honor,

17    but the chips are manufactured and manufacturing and assembly

18    are two different things.

19                  And if I can just back up for a second.

20                  THE COURT:  Why are you saying that?  Why are you

21    saying that manufacturing cannot be assembling?

22                  MR. HAIG:  Well, in this case manufacturing

23    certainly is not assembling.

24                  THE COURT:  I don't understand why you say that.

25                  MR. HAIG:  Because manufacturing encompasses some

1    sort of actual machine work on different components, and that

2    is nothing that happened in this case.

3              All of these components are legally obtained by

4    the defendants and placed --

5              THE COURT:  I agree with you entirely 100 percent.

6    I agree with you that all of these components may be legally

7    obtained separately.

8              But when you put them together such that they

9    comprise, in the end, a usable firearm, at that point in time

10   they have been manufactured into that firearm.

11             If what you say is correct, then all of these

12   manufacturers of firearms at this point in time can simply just

13   contract out the various components of firearms, and then just

14   have all of those components delivered to their factories for

15   assembly, in which case there would be no obligation on their

16   part to obtain a license.

17             So we could have Remington not having to have a

18   license, we could have Colt not having to have a license, Smith

19   and Wesson -- I don't know if all of these companies are still

20   around, but assuming they are.

21             MR. HAIG:  Now, you are talking about dealing.

22             THE COURT:  I'm not talking about dealing at all,

23   because dealing is, again, separate from the business of

24   manufacturing.

25             And all I'm saying is one can just simply

1    assemble from parts -- different parts and not saying that that

2    is manufacturing, then there would never be a manufacturing

3    unless, you know, they actually got together, and even then,

4    what would happen if, like, 90 percent is manufactured but

5    10 percent is assembled?

6             In that situation has there been manufacturing?

7             MR. HAIG:  I don't know the answer to that, but the

8    federal government has never told us what manufacturing is.

9    It's up to the ATF to tell us.

10             THE COURT:  No.  On the contrary, the statute

11   defines what a manufacturer is, and business of manufacturing

12   is defined by statute as well, so that's what we look at.

13             MR. HAIG:  Well, but, Your Honor, you said a second

14   ago, Your Honor, that a finished lower receiver, I believe you

15   said this, I don't want to speak for you, is not a firearm.

16             THE COURT:  No.  I agree it is not a firearm.  It's

17   a component of a firearm, much the same way if somebody, you

18   know, had a rifle, let's say, the barrel of the rifle is

19   manufactured by one company and shipped to a location and then

20   the wooden butt of the firearm is manufactured by another

21   entity and shipped to that location.  You know, again, the

22   barrel is not a firearm.  The butt is not a firearm, but when

23   you put all of them together such that you get an operable

24   firearm, at that point in time, there is the firearm.

25             MR. HAIG:  Well, I don't think that is completely

1    accurate under the law.

2               The actual lower receiver on an AR-15 is

3    different than the lower receiver than almost every other

4    weapon.

5               THE COURT:  What difference does it make if it is or

6    it is not?

7               MR. HAIG:  It does make a difference.

8               THE COURT:  Let's put it this way, it doesn't make a

9    defense for this case.

10              Now, I would agree with you if the government had

11   charged the defendants with this manufacturing of a lower

12   portion of the receiver, if that -- and there have been cases

13   that have been filed along those lines, and I agree with you if

14   that is what the government did in this case, I would agree

15   with you 100 percent that your defense expert should be allowed

16   to testify.  I would agree with you.

17              But that's not what we have here.

18              MR. HAIG:  Well, it's not, but the government's

19   expert disagrees with you.  He said that the lower receiver

20   that is finished is actually a firearm.  And FFLs have been

21   using that as their guidepost, and so have Mr. Schlotterbeck

22   and Mr. Vlha.

23              THE COURT:  But the mere fact -- you can question

24   their expert I suppose on that subject, and you know, I will

25   have to say that I would disagree with their expert.

1          But hopefully the government wouldn't be going

2     along those lines where it's going to have their expert saying

3     something that is really irrelevant to this case.

4          MR. HAIG:  We have gotten a disclosure from them

5     where there has been a change of belief as to what is and what

6     is not an actual completed firearm.

7          The reason why a lower receiver, an AR-15 is not,

8     Your Honor, because it does not have two components that are

9     required under the law to be a completed firearm.  That is a

10    breach lock and the threaded barrel.  Most other lower

11    receivers have that.

12         However, an AR-15 that has been completed is

13    serialized by a manufacturer, such as Smith and Wesson or Colt.

14    It will have a serial number.  It can only be distributed to a

15    FFL dealer and it cannot be distributed in any other way.

16         THE COURT:  According to your theory that Colt

17    wouldn't have to put a serial on it if all they did was

18    contracted out all of the components to other entities and then

19    simply got together in one room and put them together at that

20    point in time, then they wouldn't have to have a serial number,

21    and it wouldn't have to be licensed.

22         MR. HAIG:  Well, they are a manufacturer and a

23    dealer, Your Honor, they would have to do it.

24         The government has decided not to proceed under a

25    dealing theory, that is their choice, we talked about that at

1    other motion hearings as well.

2              But the only thing Mr. Lieberman is going to

3    testify to, not about anything other than what the prevailing

4    view in the community was at the time, which is I think what

5    Mr. Chimileski, the government's expert, would say as well,

6    that a finished receiver, in their view, was the regulated

7    component.  It is still the regulated component.

8              For example, Your Honor, if this Court were to

9    allow -- I'm sorry, if this Court were to order a defendant as

10   a condition of pretrial release, like the defendants in this

11   case, to get rid of all of their firearms by either selling

12   them or putting them with a licensed dealer, do you know what

13   that license dealer would do, Your Honor?

14             He could strip out all of the components of that

15   firearm, with the exception of a lower receiver of an AR-15,

16   keep that lower receiver of the AR-15, and then give that --

17   all of those other components legally back to that defendant.

18   He would not be violating your rules.

19             THE COURT:  Let me ask you, would the prosecution in

20   that situation be under 18 U.S.C. Section 922(a)(1)(A) or would

21   it be under a different section?

22             MR. HAIG:  I don't think that it really matters in

23   my analysis.

24             THE COURT:  It does matter, because again, that's

25   what we have here.  There maybe other sections of various

```
 1   statutes and regulations which could come into play in other
 2   scenarios, but I don't see this in that scenario, because
 3   again --
 4             MR. HAIG:  If I could say one other thing?
 5             FFL dealers, FFL licensed dealers are allowed to
 6   legally take finished components and put them together without
 7   having an FFL manufacturing license, and without being
 8   prosecuted by the federal government, so by you saying that
 9   assembly --
10             THE COURT:  Well, let me ask the government, is he
11   right on that?
12             MR. BOYLE:  Your Honor, I don't believe Mr. Haig's
13   description of the facts in this case is correct.
14             THE COURT:  No.  That is not the question I have
15   asked you.  The question I have asked you is in fact what he is
16   saying correct; in other words, that manufacturers or producers
17   of completed handguns can assemble parts without being deemed
18   in the business of manufacturing?
19             MR. BOYLE:  There may be circumstances, however,
20   Your Honor, if they are assembling -- assembling parts to form
21   a weapon that is capable of firing a projectile, that would
22   fall under the definition of a firearm under 921.
23             That states a weapon including a starter gun
24   which will or it is designed to or may readily be converted to
25   expel a projectile or the action of an explosive.
```

1        So if someone were to say, take a firearm, and

2   take parts off and put them back, that wouldn't necessarily

3   constitute manufacturing, Your Honor.

4        We already have a firearm, they are not

5   manufacturing.

6        Taking something apart, like, to use your

7   example, Your Honor, if you were to purchase a finished

8   manufactured iPhone and take the battery out and put it back

9   in, that would not be manufacturing.

10        Now, it might in certain circumstances qualify as

11   gunsmithing, which is not charged in this case.

12        What Mr. Haig is describing, I believe, based on

13   what he said is that scenario, where somebody is simply taking

14   apart a firearm and reassembling it.

15        That is distinct from manufacturing, which is

16   taking components, which are not capable of expelling a

17   projectile, combining them, manufacturing a weapon, which falls

18   under the definition stated in 921, Your Honor.

19        THE COURT:  All right.

20        MR. BOYLE:  I would emphasize, Your Honor, I think

21   the Court previously recognized that these are hypotheticals,

22   and the facts of this case are not about lower receivers as

23   charged in this indictment.

24        The case is about weapons which fire a

25   projectile.

1          I think the Court was correct in discerning that
2   and the issue we're discussing is whether or not an expert can
3   testify about lower receivers, not whether this expert -- well,
4   I don't know what this expert would possibly have to discuss
5   about Mr. Haig's hypothetical.
6          MR. HAIG:  I didn't proffer that hypothetical
7   because it just came up during this argument.
8          The Court has before it the latest filing, which
9   talks about what we are going to be asking Mr. Lieberman, who
10   we believe is an expert, has testified as an expert in a past,
11   is an FFL, and has over 30 years of training in firearms about
12   what the habit and custom was in the community at the time that
13   the defendants are accused of committing the crimes that they
14   are charged with in this indictment.
15          I think it's proper for Mr. Chimileski, the
16   government expert, to talk about those exact same things.
17          I'm not going to ask and we're not going to ask
18   Mr. Lieberman whether the conduct was legal or illegal, whether
19   it was manufacturing or assembly, those are not terms that an
20   expert should be able to define for us.
21          Those are terms that either the Court should
22   define or the jury should try to define on their own.
23          THE COURT:  Well, but then what is he going to
24   testify to?
25          Now, let's put it this way, obviously, if you

1   want to have a defense expert to rebut the testimony of the

2   government's expert, I can understand that, and that would be

3   sort of fine.

4           But, if he gets into this other area, then I

5   don't understand why I would allow him to testify in that

6   regard.

7           MR. HAIG:  When you say "other area," can you be

8   more specific as to what you mean by other area?

9           THE COURT:  Well, what he originally said in his

10  expert report, which I understand was not meant to be an expert

11  report, but it had discussions of these items in it.  I talked

12  about the problems -- extreme problems I had with the positions

13  that he was taking in that document.

14          If he goes there, I would say that no, he's not

15  going to be allowed to testify, but if he simply -- what?

16          MR. HAIG:  That's not what we're asking for, Your

17  Honor.  If you just look at page -- you asked us to give a

18  specific guidepost for what the expert will be asked, and that

19  is on page 3 and 4 of Document No. 141.

20          It was filed on July 7th for all counsel, so

21  that's what we talked about at the last hearing two weeks ago

22  and that is our proffer for what he will be saying and we're

23  not disavowing what was said in the report, we're not saying

24  any of those things are not his true beliefs, but it doesn't

25  mean those things are relevant or admissible.

1          THE COURT:  Let me ask the government, what is your

2    response to the defense's reference to -- was it Docket

3    No. 141?

4          MR. HAIG:  141, yes.

5          THE COURT:  Docket 141.

6          MR. BOYLE:  My response would be this is the same

7    document the Court looked at before at the previous conference

8    and then requested that the defense provide additional detail

9    about what Mr. Lieberman would be testifying about.

10          This is the same group of -- I would argue fairly

11    vague topics that the Court wanted more clarity about.  The

12    only clarity we have gotten is to this purported 80 percent

13    belief in the gun community.

14          To the extent that defendants are discussing this

15    80 percent belief, I think we have outlined in our submission

16    why that is not a -- for variety of reasons -- not proper here.

17          But these original topics, these were the same

18    topics where the Court was deeply concerned about the basis for

19    the defense's expert purported expertise, and the lack of

20    detail.

21          THE COURT:  Well, let me ask you this question, what

22    if the expert were to testify, assuming that there is a

23    foundational basis for him to testify, about the gun

24    community's belief in the 80 percent rule.

25          In other words, if it's 80 percent, then it's not

1    unlawful, you don't need a license.

2                  Why wouldn't that go toward willfulness?

3                  MR. BOYLE:  Because the gun community is not on

4    trial here, Your Honor.  And it would potentially violate the

5    prohibition in 704 on commenting on a mental state.

6                  To have an expert testify as to what uncharged

7    third parties' mental states might be serves no purpose other

8    than to ask the jury to infer the defendant's mental state.

9    That is an improper inference for an expert to offer.

10                 I think this is fairly well laid out in the

11   defendant's cited authority, which I'm pointing to -- the

12   citation now and that is the *Morales* case.

13                 In *Morales* the Ninth Circuit stated that it is

14   proper to have an expert opine on predicate facts, but it's not

15   proper to interfere in the province of the jury as to the

16   defendant's mental state.

17                 In this case, the defendants are not offering

18   Mr. Lieberman to testify to predicate facts, such as, for

19   example, the expertise of these defendants in firearms or

20   something similar.

21                 Instead, unlike in *Morales*, here, the defendants

22   are offering an expert to testify to the mental state of third

23   parties.

24                 It would be as if in *Morales*, the bookkeeper, who

25   was the defendant there, to avoid conviction offered an expert

1   who testified that other bookkeepers don't think what she did

2   was illegal.

3           That is not what the Ninth Circuit approved of in

4   *Morales*.

5           Instead, in *Morales*, the Ninth Circuit said an

6   expert can testify to knowledge of general facts, not knowledge

7   of the law.

8           THE COURT:  Well, let me ask you this question:

9   What happens if a defendant testifies that that is what his

10  belief was, and thereafter, the defense wants to offer

11  Mr. Lieberman as saying, well, that was what was understood in

12  the gun industry at the time or gun enthusiasts at the time.

13          MR. BOYLE:  Your Honor, in that case, the defendant

14  has already provided the best evidence of its mental state.

15          The government would certainly seek to impeach

16  it, but at that point, offering testimony that other third

17  parties agree with me would simply be buttressing.  There is no

18  relevance to that testimony, Your Honor.

19          MR. HAIG:  It is not buttressing.

20          MR. ROBINSON:  I'm sorry.  Looking at the affidavit

21  that supports the search warrant in this case, and it's the

22  affidavit that supports the complaint as well, and in that the

23  case agent from ATF specifically talks about the understanding

24  in the firearm industry of the 80 percent when talking about

25  the AR-15 lower receiver.

1            And so to amplify what you just said, if we put

2    our clients on, and they testified about their understanding of

3    the 80 percent rule, which has some relevance to their

4    willfulness and the government then cross-examines them about

5    how ridiculous that may be and it sounds contrived and all of

6    the things we can imagine happening, and are not allowed to

7    present the fact that in the community there was an -- it's a

8    unique community -- there was an understanding about what an

9    80 percent lower receiver was specifically for the AR-15 which

10   is why the government is going to have a hard time proving

11   willfulness, that will be our argument.

12            If we're not allowed to do that then we have been

13   deprived of a defense that we should be able to present through

14   cross-examination of the government's own witnesses.

15            This is not something that is contrived as

16   evidenced by *Roh* and *Jimenez*.

17            It's clear that anybody who is involved in this

18   activity understands what the rules are with respect to

19   unfinished 80 percenters as they are called.

20            THE COURT:  Let me ask this, what exactly is this

21   rule?  What exactly does it say?

22            MR. ROBINSON:  Well, what does it say?

23            It says that if 80 percent -- the understanding

24   is I get it, and please don't hold me to this if I'm wrong, but

25   an unfinished lower receiver for an AR-15 is 80 percent of a

1   firearm because it hasn't been milled out, and it hasn't been

2   -- I will use the phrase with a smile on my face --

3   manufactured to become something else.

4          The real fact of the matter is that even a fully

5   milled lower isn't a firearm, as we have discussed a number of

6   times now in which I believe everybody concedes in this case,

7   but it's relevant to what Mr. Schlotterbeck thought.

8          As I have shown the Court in the excerpts on the

9   106 issue, that is what Mr. Schlotterbeck talked to the ATF

10  agent about when he was being questioned at the time his place

11  was searched, that is, 80 percent goes straight to willfulness.

12         THE COURT:  But the problem is again, I don't

13  understand how this 80 percent rule comes into play since here

14  the business of manufacturing is as to an operable firearm.

15         MR. ROBINSON:  Our position is it has to be

16  assembling which is not manufacturing, which leads us back to

17  the starting point of all of the problems we're having in this

18  case.

19         THE COURT:  But you already know my ruling on that,

20  so that will be my ruling, and that's the problem I have.

21         I don't think you are right on that particular

22  point, I don't think that -- I don't think it's ambiguous, and

23  I think it's clear you can manufacture by assembling.

24         MR. ROBINSON:  May I ask a Court a question, just so

25  we're clear on this?

1              If we were to try to present evidence, like we
2    are here, and if we were to try to argue to a jury that the
3    government has failed to prove manufacturing and they have only
4    proven assembling, would you preclude that evidence and
5    preclude that argument?
6              THE COURT:  When you say, would I preclude it, what
7    I will indicate to the jury that one can manufacture by
8    assembling.
9              MR. ROBINSON:  But if the Court gives that -- so
10   let's say that Schlotterbeck gets up on the stand and he
11   testifies and he is cross-examined, and I seek to introduce
12   his prior statements to the ATF agent, his prior consistent
13   statements, where he says:  I was just assembling with the
14   80 percent.
15              And he firmly believes that, and we're in a gray
16   area as we can establish through cross-examination, then your
17   instruction will direct the verdict against Mr. Vlha and
18   Mr. Schlotterbeck, and that's why manufacturing needs to be
19   defined by Congress and not by any of us, otherwise, we may not
20   have to deal with 922(g) on appeal.
21              MR. HAIG:  Especially, Your Honor, let me give you
22   an absurd example as to why the Court cannot equate
23   manufacturing with assembly and take that question away from
24   the jury.
25              I could go today and purchase an unfinished lower

1   receiver, an 80 percenter, I could take it to a C&C shop, and I

2   could put 100 of them into -- one after another -- into a C&C

3   machine, and then I don't own, I push the button on all of

4   those, they then become 100 percenters, basically completed

5   lowers.  I could take them back to my house, I could purchase

6   all of these parts and assemble 100 completed AR-15 firearms

7   and all 100 of those would be legal under federal law because I

8   was not manufacturing them.

9           I do not need a manufacturing FFL.

10          Now, if I assembled those 100 AR-15s and sold

11  them to you, then I have got big problems, because I don't have

12  an FFL to sell them.

13          THE COURT:  Exactly.  That is what we have here.

14  He's -- they are charged with the business of manufacturing.

15          MR. HAIG:  The business of manufacturing, but Your

16  Honor, I could manufacture -- but I'm not manufacturing those,

17  Your Honor, I am just assembling those.

18          THE COURT:  Let me put it this way, the business of

19  manufacturing includes assembling for sale.

20          MR. HAIG:  Well, I don't think they are necessarily

21  including each other, and that is what the Court is saying.

22          You can't assemble and manufacture but you can

23  assemble without manufacturing.

24          THE COURT:  In your situation there is no problem

25  with your clients getting together, taking these unfinished

1    lower receivers during the process by which they are finished,

2    taking them to their home, and thereafter, completing them to

3    completed fully functional AR-15s and then just keeping them

4    there in locked safety boxes.

5              At that point in time, they are not involved in

6    the business of manufacturing.

7              MR. HAIG:  But they weren't manufacturing anyway.

8    If I wanted to sell those 100 AR-15s.

9              THE COURT:  That's where you and I disagree.

10             MR. HAIG:  As a matter of law, the Court cannot say

11   that.

12             THE COURT:  Well, a couple of things:  One, I just

13   said it, and so when you say I can't say that, that is not true

14   because I have just said it.

15             MR. HAIG:  I don't mean to be presumptuous, I didn't

16   mean it that way.  What I do mean is I don't believe the Court

17   should take that definition and define it for the jury.

18             If it defines it for the jury, it doesn't matter

19   what the defendants put on.

20             THE COURT:  It's a legal point, it's not a factual

21   point.

22             In other words, what constitutes manufacturing

23   for purposes of the business manufacturing is up to the Court

24   to define.

25             Now, you may think that I have defined it

1    incorrectly, in which case, if your clients get convicted, they

2    have a really good appealable issue.

3         MR. HAIG:  Well, I think the issue of willfulness

4    and the issue of enhanced willfulness, because we have the ATF

5    and the government deciding what manufacturing is, and then the

6    Court has to go along with that decision, the Court has already

7    said that assembling equals manufacturing, and I would ask the

8    Court not to rule that way.

9         I would ask the Court to listen to all of the

10   evidence in this case, and ask the jury to make their own

11   decision, which I think is also perilous.

12        THE COURT:  Well, let's put it this way, the people

13   from the ATF, according to the current Supreme Court, we

14   shouldn't be given Chevron deference anymore.

15        So therefore, I mean the people in ATF can say

16   all of the things they want to, and apparently I'm not supposed

17   to be giving them any deference.

18        MR. HAIG:  I don't mean to be strident, really, I

19   didn't, and I apologize to you for saying --

20        THE COURT:  Let me stop you.  I think you are doing

21   a wonderful job defending your client.

22        I don't think anything you have done so far is

23   problematic.  I think we have a difference in the

24   interpretation of what the law is.

25        You have taken the position, which I don't think,

1    you know, you may be the wave of the future, and I'm just a

2    dinosaur and I can't recognize what the inevitable is.

3            That is great, I don't mind being told I'm wrong

4    by the Appellate Courts, that happens with a large frequency.

5            MR. ROBINSON:  Can I jump in for a quick second,

6    Your Honor?

7            THE COURT:  Sure.

8            MR. ROBINSON:  By the way, you asked if you are

9    supposed to be a historian, maybe not, but now you are supposed

10   to be an expert on carbon emission.

11           Anyway, just so you know, if I take your point as

12   a ruling that as we sit here today you are inclined to tell the

13   jury that assembling is manufacturing, I almost --

14           THE COURT:  What I would tell the jury is one can

15   manufacture by assembling.

16           MR. ROBINSON:  And we would have to take the

17   position that directs a verdict with respect to our client.  It

18   overrides their evidence of a lack of willfulness, and it

19   defeats a genuine good faith belief that they were acting

20   within what may be called a loophole, but what we would call as

21   being within the law.

22           I almost think we should sit down and discuss a

23   conditional plea, and get the facts in order.

24           THE COURT:  Let's put it this way, if that's what

25   you want, let's put it this way, I'm not going to force your

1    clients to plea.

2              MR. ROBINSON:  Of course.

3              THE COURT:  But, you know, my position, and it might

4    very well be that this type of stuff should be sent up to the

5    Appellate Courts and be trotted out to the Supreme Court.

6              MR. ROBINSON:  I think that we all, to a large

7    degree, if not entirely agree on the facts of the case.  And

8    it's the legal definitions of manufacturing.

9                   And now we have the Second Amendment issues that

10   are creating the vortex that I referred to earlier where it is

11   -- and recognizing that you are in charge of this vortex, we're

12   all somewhat floating around in it, and it would be nice to get

13   direction --

14             THE COURT:  In other words, you are circling the

15   sink hole, and I'm the sink hole, is what you are saying?

16             MR. ROBINSON:  Well, you may be in front of us of a

17   sink hole.

18             THE COURT:  Let me hear from the government, does

19   the government have any further comments?

20             MR. BOYLE:  Very briefly, Your Honor.

21                  First, I think the Court is correct by

22   identifying the importance of the sale element here.

23                  The firearms laws protect the ability of someone

24   to make their own firearm.  But the second someone starts

25   selling those firearms for livelihood and profit, then we

1    approach the definitions in 921.

2             Second, I would respectfully disagree with

3    Mr. Robinson that the facts are all agreed upon here.

4             I think the government and the defense have some

5    differences on what actually happened with respect to the

6    manufacturing here or the manufacturing and sale, and our

7    position is that a trial record is necessary to flush this out.

8             But we will certainly be preparing for trial in

9    the meantime.

10            Finally, I think we're far afield from the

11    specific question the Court was requesting briefing on, which

12    is what this expert is going to testify about, and at this

13    point, I don't know that we have substantially more clarity

14    than we started with, Your Honor.

15          THE COURT:  Well, let me put it this way, I have

16    indicated insofar as their defense expert would testify, first

17    of all, I agree with the government that the defense expert can

18    testify as to what was going on in the particular defendant's

19    minds.  That is a given.

20           And I do think, however, that if the defendants

21    were to get on the stand and testify of their belief insofar as

22    some rule, for purposes of argument, although we don't have

23    that defined yet, the 80 percent rule -- the problem, I guess I

24    have is that assuming that there is -- let's assume that

25    everybody would agree that within the gun enthusiasts community

1   there was a belief of the 80 percent rule, if you feel within

2   the 80 percent rule, you could be subject to the licensing

3   requirement provisions.

4            To what extent -- I mean, the part of the

5   willfulness aspect is knowledge that your activity was

6   unlawful.

7            Let me ask, this is a question for the

8   government, that is an element the government has to prove,

9   right?

10           MR. BOYLE:  Yes.  That is a standard under *Brian*,

11  Your Honor.  A general knowledge of unlawfulness, not the

12  firearms law specifically, Your Honor.

13           THE COURT:  Can you repeat that what you just said?

14           MR. BOYLE:  I believe Mr. Faerstein briefed this, if

15  the Court wants more detail, but under *Brian* just the

16  willfulness element is a general knowledge of unlawfulness, not

17  a knowledge of which firearm statutes an individual is alleged

18  to have broken.

19           MR. FAERSTEIN:  Just to put a finer point on that,

20  Your Honor, in *Brian* the Supreme Court found you don't have to

21  know the licensing scheme, you don't have to know your conduct

22  was running afoul of the licensing statute, but you have to

23  know that your conduct was unlawful generally.

24           That was a specific holding in *Brian*, and you

25  know, as we have briefed in our jury instruction submissions

1    here, they don't have to know that they were in violation of

2    922(a)(1)(A) or the specific licensing requirement, but they

3    need to know what they were doing without a license was

4    unlawful.

5              THE COURT:  Again, this is somewhat of a problematic

6    area.

7              It seems to me that one might have the situation

8    where, let's say for a hypothetical -- you have a particular

9    defendant who thought that it was not unlawful to assemble for

10   purposes of using the word of that sort, assemble a firearm.

11             Well, see the problem is this:  I mean, the

12   problem is there is a difference between assembling and then

13   there is a difference between the business of manufacturing.

14             And so there is a problem there, and so I could

15   see somebody thinking that they are not violating the law

16   insofar as they are putting it together, a completed firearm,

17   but that does not necessarily mean that that person does not

18   know that there is -- even if you have put it together

19   lawfully, that you are not allowed to sell -- in other words,

20   not allowed to engage in the business of manufacturing.

21             MR. FAERSTEIN:  Right, Your Honor.  The government

22   agrees with that distinction.

23             To the extent that they are going to be arguing

24   we thought this was all lawful, because people in the community

25   were putting together these guns for themselves, we believe

1    that is irrelevant.

2              The facts here they were doing this for sale to

3    multiple customers, that they were getting referrals, and I

4    will add as well, that, you know, they were assembling these

5    completed weapons, which is a definition of firearm under 921,

6    but they were also -- and this is alleged in the indictment and

7    we briefed this in our opposition to their first motion to

8    dismiss on vagueness -- they were both assembling these

9    completed weapons, which we believe, and under the law is

10   manufacturing, but that not only were they doing that, they

11   were also arranging for the lower receiver components to be

12   machined as part of the process of manufacturing the completed

13   firearms.

14             So in a way, it's assembly, plus, let's say, all

15   for sale, all without a license, and to that end we don't agree

16   with the defendants on the facts.  I mean, it's just

17   fundamental here, and all of this will be borne out through the

18   trial record.

19             THE COURT:  All right.  Let me ask counsel, is there

20   anything else I should be doing at this point?

21             MR. HAIG:  Are you saying about the motions before

22   the Court right now?

23             THE COURT:  I have indicated that as to the

24   defendant's expert, I would allow the expert to rebut the

25   government's expert, but I won't allow him to interject items

 1    that are irrelevant to this action.

 2              MR. ROBINSON:  Are you deeming our cross-examination

 3    of the government's expert at this time about the 80 percent

 4    lowers irrelevant, or is that something we are going to -- do

 5    you believe it's relevant or?

 6              THE COURT:  Let me ask you, the 80 percent rule goes

 7    towards the manufacturing, I suppose, but it doesn't go towards

 8    the business of manufacturing.

 9              MR. ROBINSON:  Right.  Not to be so repetitive that

10    it's overwhelming, but that is our problem with the definition

11    of manufacturing which Congress has to do.  But let's assume

12    we're going to -- obviously, we will prepare, given what you

13    give us as the definition of manufacturing, but with respect to

14    the 80 percent, it goes directly to Mr. Schlotterbeck's and

15    Mr. Vlha's willfulness.

16              THE COURT:  But the problem is that the willfulness,

17    in other words, they are not accused of just the simple act of

18    manufacturing.

19              They are accused of engaging in the business of

20    manufacturing.  And so, you know, they could have been wrong or

21    correct, you know, because even assuming that they are right

22    about manufacturing, in other words, if the 80 percent rule is

23    valid and accepted everywhere, they would still need to get a

24    license if they are going to be engaged in the business of

25    manufacturing.

1          MR. HAIG:  Well not if they are assisting the

2     end-user in building their own firearm, which I know the

3     government contests that that was not the case with some of the

4     weapons.

5              But if I went to Mr. Schlotterbeck and Mr. Vlha

6     with a milled lower, and said, hey, can you help me put this

7     together, I don't really know what I'm doing, that is not a

8     violation of the law, even if you take a fee for doing it.

9          THE COURT:  Let's put it this way, on something of

10     that sort that may be something that should go to the jury.

11              For example, if that is only one instance where

12     he did it, that would be one situation, if he is known to set

13     up a business for other people to put together these components

14     for a number of people who paid them, that is another

15     situation.

16              Either of those two situations are what we have

17     here supposedly.

18              What we have here is for the majority of these

19     guns to have been put together by the defendants, not for the

20     assistance of other people.  Like, the first two were maybe

21     something that fell toward that, but that's not here in the

22     majority of the guns.

23          MR. ROBINSON:  I just want to make sure that I'm not

24     later accused of forfeiting or waiving anything.

25              We take the position, just so that this record is

1    clear, that manufacturing isn't defined and the vagueness in

2    that term is not clarified by "for the business of."

3                    It's like a reverse *Heller*, Your Honor, the

4    second half of the clause is surplusage, not the first.

5                    But our position is that these gentlemen were

6    assembling.  They believed they were following the law based

7    upon the 80 percent gun community mindset, not to overstate it,

8    and it goes to the government's ability to prove willfulness,

9    and that's why we asked for the heightened willfulness be

10   entered, because a general misunderstanding of -- being

11   generally knowing you violated the law is different from

12   knowing the specific regulations that are involved here, which

13   is what this case is all about.

14                   And I'm not asking the Court to reconsider

15   anything that I have said here, but if we're going to prepare

16   for trial, we need to have direction from the Court on what we

17   can question the expert about and what we can't, and that

18   direction has to be against the backdrop of the assumption that

19   Mr. Schlotterbeck will testify.

20                   And he's going to testify, as I have set forth in

21   those 106 pleadings, about how he believed he was following the

22   law, particularly with respect to the 80 percent unmilled lower

23   receivers.

24                   THE COURT:  Well again, let me hear a response from

25   the government.  What is the government's response?

1           MR. FAERSTEIN:  Your Honor, I'm not sure exactly
2    what I'm responding to.
3                I think we have obviously already litigated the
4    vagueness challenge, and Your Honor's ruling with respect to a
5    assembly and our explanation of the facts of trial are going to
6    bear out --
7           THE COURT:  Let me stop you.  What I think the
8    defense counsel is asking that he intends to cross-examine your
9    expert on such topics as the 80 percent rule and things of that
10   sort.
11               The question he wants to know is would I sustain
12   that objection?  I think that's what you are asking,
13   Mr. Robinson?
14          MR. ROBINSON:  Yes, it is, thank you.
15          THE COURT:  So let me ask the government, what is
16   the government's -- what would the government's response be,
17   assuming that Mr. Robinson gets up and starts crossing your
18   expert about that subject?
19          MR. FAERSTEIN:  Right.  Your Honor, with respect to
20   the 80 percent rule, and I'm not sure it's a rule, but we have
21   called it a rule here today, that is irrelevant because these
22   guys were not doing it for themselves.  They were doing it for
23   sale.
24               This idea that they were just helping people put
25   together their own completed AR-15 weapons will be borne out as

1    not accurate at trial.

2              Even to the extent the first two could arguably

3    fall under that, and we would disagree with that, there is a

4    conversation the defendants have with an undercover in this

5    case where they basically say, you know, we're going to do the

6    whole thing.  If anyone ever asks you who cut, meaning the

7    machine, the lower receiver, just say you did it yourself,

8    which, you know, I think is very strong evidence of

9    willfulness.

10             So to the extent they want to go down some rabbit

11   hole with respect to individuals doing this for their own

12   building of their own personal firearms, we would object that

13   that is irrelevant to the facts of this case and the charges.

14             THE COURT:  All right.  And I would probably agree

15   with the government on that.

16             Again, the 80 percent rule -- I mean, if this

17   situation had been not the business of manufacturing, but just

18   simply the question of manufacturing, then I would say, yeah,

19   the 80 percent rule might come into play.

20             But that is how the guns got together to exist as

21   operable firearms is not particularly at issue, the issue is

22   whether or not they were engaged in the business of

23   manufacturing these firearms.

24             MR. ROBINSON:  Obviously, we take a different

25   position, but I'm not going to retread that ground.

```
 1                    Is the Court inclined to do a written ruling with
 2      respect to this?
 3                    THE COURT:  No, I'm not.
 4                    MR. ROBINSON:  Can we maybe present something to you
 5      to say yes or no so that this record could be clear?
 6                    THE COURT:  The problem is I'm not going to be here,
 7      you know, we're supposed to start trial on the 22nd of July,
 8      and I'm not going to be here between the 18th and the 21st, so
 9      I'm not going to have much time to respond.
10                    MR. ROBINSON:  A joint filing?  Maybe we can talk to
11      the government about it.
12                    I don't -- I'm not sure there is a big factual
13      difference.
14                    THE COURT:  Well, last thing, because I'm not going
15      to be here, if the parties, for some reason -- I'm not
16      insisting on it -- if the parties agree on some sort of
17      stipulation insofar as a plea, but preserving various issues
18      for purposes of appeal, I have no problem with that.
19                    Give my clerk notice, because we have a jury on
20      order.  So I want to be able to not call the jury in if it's a
21      situation where you guys resolve the case prior to the trial
22      date, okay?
23                    MR. HAIG:  So the 22nd is confirmed so we know that?
24                    THE COURT:  Yes, in other words, I have a jury
25      ordered for the 22nd of July.
```

1          Give my clerk as much advance notice if it's a

2   situation where they are not going to be needed.

3          MR. HAIG:  I was going to ask, is the Court going to

4   issue any rulings today on the status of the jury instructions

5   and which ones the Court is going to give, especially in

6   regards to the enhanced willfulness instruction that we're

7   asking for?

8          THE COURT:  No.  But I will tell you what, if I have

9   the time is there a particular instruction -- give me the

10  docket number and the particular jury instruction, and I will

11  take a look at that one in particular.

12         MR. HAIG:  I will have my co-counsel do that, I

13  don't exactly know which document it is in.

14         MR. FAERSTEIN:  Your Honor, I can weight in.

15          So the parties or the defendants filed a disputed

16  jury instructions submission, it's Docket No. 126, and they

17  were kind enough to include the government's position on the

18  instructions that they are disputing, and that includes the

19  willfulness definition.

20         THE COURT:  Okay.  I will take a look at the Docket

21  No. 126 in particular, the willfulness instruction, and I will

22  get back to you hopefully before the end of the week on that.

23         MR. HAIG:  Okay.  I'm sorry, go ahead,

24  Mr. Faerstein.

25         MR. FAERSTEIN:  Your Honor, I would just raise two

1    issues, hopefully they are quick.

2              One, is in light of Your Honor's ruling on the

3    motion to dismiss today, the *Bruen*-based motion, which is

4    predicated on the Second Amendment, the government now is to

5    some degree concerned about the defendants raising the Second

6    Amendment at trial as inviting nullification.

7              We think it's entirely irrelevant to this case

8    for all of the reasons we have briefed in our opposition, and

9    that is something that would be a motion in limine typically

10   you weren't aware of this until they filed their motion, but we

11   think it would be improper for them to refer to the Second

12   Amendment as protecting any of the conduct that is charged in

13   this case.

14            MR. ROBINSON:  On behalf of Mr. Schlotterbeck, we

15   would agree, that is a legal question, so we're not going to

16   raise that issue.

17            MR. HAIG:  It's not our intent either on behalf

18   plaintiff Vlha.

19            THE COURT:  Anything else from either side then?

20            MR. BOYLE:  One housekeeping issue, Your Honor.

21   With respect to the actual firearms and some firearm parts, the

22   government intends to bring actual firearms into court.  We

23   were coordinating with the U.S. Marshals and we intend to have

24   the firearms there during the presentation of the jury.

25            I'm aware some of the Judges in the district have

1    restrictions on firearms in the courtroom.

2             Does the Court have any specific instructions for

3    us with respect to those which will obviously be unloaded, made

4    safe, and so on.

5             THE COURT:  Yes.  As long as they are unloaded, made

6    safe, I have no problem.

7             MR. BOYLE:  Thank you, Your Honor.

8             THE COURT:  Let me have you guys come back on

9    Thursday.  Hopefully I will be able to look at Docket No. 126

10   on the willfulness issue and give you my thoughts.

11            MR. HAIG:  This Thursday, Your Honor?

12            THE COURT:  Yes.  Are you available?

13            MR. HAIG:  Yes.

14            THE COURT:  All right.  Thank you.

15            THE COURTROOM DEPUTY:  What time Judge?

16            THE COURT:  Let's put them at 9:30.

17            MR. ROBINSON:  One second, please.

18            MR. HAIG:  Your Honor, is that defendants as well or

19   do you want us all there?

20            THE COURT:  No.  It's -- I'm just going to talk to

21   you about my thoughts on the willfulness instruction at that

22   point in time.  The defendants can be here if you they want,

23   they don't have to be here if they don't want, either way is

24   fine.  Anything else?

25            MR. ROBINSON:  No.  Thank you, Your Honor.

1          THE COURT:  Everybody, have a nice day.

2          MR. BOYLE:  Thank you, Your Honor.

3          MR. HAIG:  Thank you, Your Honor.

4          (The proceedings concluded at 2:53 p.m.)

5                          *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1        **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6            I, TERRI A. HOURIGAN, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date: 13th day of July, 2022.

17

18

19                          /s/ TERRI A. HOURIGAN

20   _____
                     TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
21                          Federal Court Reporter

22

23

24

25

**UNITED STATES DISTRICT COURT**