1  E. MARTIN ESTRADA
   United States Attorney
2  SCOTT M. GARRINGER
   Assistant United States Attorney
3  Chief, Criminal Division
   BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
4  Assistant United States Attorney
   Public Corruption and Civil Rights Section
5  DAN G. BOYLE (Cal. Bar No. 332518)
   Assistant United States Attorney
6  Asset Forfeiture Section
       1500/1400 United States Courthouse
7      312 North Spring Street
       Los Angeles, California 90012
8      Telephone: (213) 894-3819/2426
       Facsimile: (213) 894-0141/0142
9      E-mail:    Brian.Faerstein@usdoj.gov
                  Daniel.Boyle2@usdoj.gov
10
   Attorneys for Plaintiff
11 UNITED STATES OF AMERICA

12              UNITED STATES DISTRICT COURT

13         FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 UNITED STATES OF AMERICA,        No. CR 19-343-GW-1

15          Plaintiff,              GOVERNMENT'S SENTENCING POSITION
                                    FOR DEFENDANT TRAVIS
16             v.                   SCHLOTTERBECK; DECLARATION OF
                                    BRIAN FAERSTEIN; EXHIBITS
17 TRAVIS SCHLOTTERBECK,
                                    Sentencing: November 17, 2022
18          Defendant.              Time:        8:00 a.m.
                                    Location:    Courtroom of the
19                                               Hon. George H. Wu
20

21

22      Plaintiff United States of America, by and through its counsel

23 of record, the United States Attorney for the Central District of

24 California and Assistant United States Attorneys Brian Faerstein and

25 Dan Boyle, hereby files its sentencing position regarding defendant

26 Travis Schlotterbeck.

27      The government's sentencing position is based upon the attached

28 memorandum of points and authorities, the accompanying declaration

and attached exhibits, the presentence investigation report, the files and records in this case, and any other evidence or argument that the Court may wish to consider at the time of sentencing.

The government reserves the right to file any supplemental sentencing position(s) that may be necessary.

Dated: November 10, 2022          Respectfully submitted,

                                  E. MARTIN ESTRADA
                                  United States Attorney

                                  SCOTT M. GARRINGER
                                  Assistant United States Attorney
                                  Chief, Criminal Division

                                        /s/
                                  BRIAN FAERSTEIN
                                  DAN BOYLE
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

## **TABLE OF CONTENTS**

TABLE OF CONTENTS.......................................................i

MEMORANDUM OF POINTS AND AUTHORITIES...................................1

I.   INTRODUCTION.....................................................1

II.  RELEVANT PROCEDURAL HISTORY......................................2

III. DEFENDANT'S OFFENSE CONDUCT......................................3

IV.  ADVISORY SENTENCING GUIDELINES.................................10

V.   SECTION 3553(a) FACTORS........................................11

VI.  GOVERNMENT'S SENTENCING RECOMMENDATION.........................11

     A.   Term of Custody..........................................11

          1.   Nature and Circumstances of the Offense and
               History and Characteristics of the Defendant (18
               U.S.C. § 3553(a)(1)).................................12

          2.   Seriousness of the Offense, Respect for the Law,
               and Just Punishment (18 U.S.C. § 3553(a)(2)(A)).....14

          3.   Affording Adequate Deterrence and Protecting the
               Public from Further Crimes of the Defendant (18
               U.S.C. § 3553(a)(2)(B) and (C)).....................17

          4.   Avoiding Unwarranted Sentence Disparities, (18
               U.S.C. § 3553(a)(6))................................18

     B.   Supervised Release, Fine and Special Assessment.........18

VII. CONCLUSION.....................................................19

1

**TABLE OF AUTHORITIES**

2

**CASES**

3   Gall v. United States, 552 U.S. 38 (2007)..........................11

4   Molina-Martinez v. United States, 136 S.Ct. 1338 (2016)...........11

5   United States v. Carty, 520 F.3d 984 (9th Cir. 2008)..............11

6   United States v. Rita, 551 U.S. 338 (2007)........................11

7   **STATUTES**

8   18 U.S.C. § 371....................................................2

9   18 U.S.C. § 922(a)(1)(A)...........................................2

10   18 U.S.C. § 922(d)(1)...........................................2, 10

11   18 U.S.C. § 3553(a)...........................................passim

12   **OTHER AUTHORITIES**

13   U.S.S.G. § 2K2.1...................................................10

14   U.S.S.G. § 3E1.1...................................................10

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1        <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.    INTRODUCTION**

3        Defendant Travis Schlotterbeck ("Schlotterbeck"), along with his

4    co-conspirators James Bradley Vlha ("Vlha") and Ping-Yi Kwan

5    ("Kwan"), manufactured and sold untraceable AR-15-type firearms that

6    have become the weapon of choice in numerous mass shootings in recent

7    years.  They built for sale these semi-automatic and high-capacity

8    firearms without serial numbers (so-called "ghost guns"), removing

9    them from the reach and regulation of law enforcement.  Schlotterbeck

10   did so for profit (and without a license), without a hint of concern

11   as to how these deadly weapons could or would be used once they left

12   the storefronts he controlled in Bellflower, California.  Indeed,

13   Schlotterbeck sold one of the AR-15-type firearms to an individual he

14   had just met and whom he knew to be prohibited from possessing guns.

15       Fortunately, the six AR-15-type weapons that were the immediate

16   subject of the charges to which Schlotterbeck pleaded guilty were

17   purchased by a confidential informant and two undercover agents from

18   the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  But

19   the evidence reflects that Schlotterbeck and his co-conspirators

20   illegally sold AR-15-type firearms to other customers as well.  In so

21   doing, they furthered the unregulated proliferation of these weapons

22   that increasingly have become a significant source of widespread

23   bloodshed across the country.

24       In light of the sentencing factors under 18 U.S.C. § 3553(a),

25   the government respectfully submits that a custodial sentence at the

26   mid-point of the advisory Guidelines range, or 37 months in prison,

27   is sufficient but not greater than necessary to achieve the goals of

28   sentencing in this case.  The government concurs with the United

1  States Probation and Pretrial Services Office's (the "USPO")

2  recommendations of three years of supervised release to follow, a

3  fine to be determined by the Court, and the $200 special assessment.

4  **II.   RELEVANT PROCEDURAL HISTORY**

5      On June 11, 2019, Schlotterbeck was charged in a three-count

6  indictment with conspiracy to engage and engaging in the business of

7  manufacturing and dealing in firearms without a license, in violation

8  of 18 U.S.C. §§ 371 and 922(a)(1)(A), as well as selling a firearm to

9  a felon, in violation of 18 U.S.C. § 922(d)(1).[1]  (Dkt. No. 1.)  On

10  July 14, 2022, one week before trial, Schlotterbeck pleaded guilty

11  pursuant to a conditional plea agreement to the conspiracy count and

12  the sale to a felon count.[2]  (Dkt. Nos. 151, 153.)

13      On October 6, 2022, the USPO filed its Presentence Investigation

14  Report ("PSR") in which it calculated a total offense level of 20

15  (taking into account a two-level reduction for acceptance of

16  responsibility) and a Criminal History Category I, resulting in an

17  advisory Guidelines range of 33 to 41 months' imprisonment.[3]  (Dkt.

18  No. 161.)  The USPO recommends that Schlotterbeck be sentenced to a

19

20      [1] Two other defendants – Vlha and Jacob Dekoning – were charged
with the conspiracy and firearms trafficking counts.  Vlha also
21  pleaded guilty to the conspiracy count on July 14, 2022 and will be
sentenced on November 17, 2022.  (Dkt. Nos. 152, 154.)  Dekoning was
22  dismissed from the case on the government's motion on February 20,
2020.  (Dkt. No. 71.)
23
      [2] Schlotterbeck preserved the right to appeal the Court's denial
24  of his motion to dismiss the indictment premised on New York State
Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111 (2022).
25  Schlotterbeck waived any and all other challenges to denials of
pretrial motions and his convictions (aside from a claim that his
26  pleas were involuntary).

27      [3] The third point for acceptance of responsibility is not
appropriate, as Schlotterbeck pleaded guilty just one week before
28  trial after the government's extensive trial preparations and
numerous pre-trial conferences in this case.  U.S.S.G. § 3E1.1(b).

1   term of 24 months in prison, three years of supervised release, a

2   $100,000 fine ($50,000 for each count of conviction), and the $200

3   mandatory special assessment.  (Dkt. No. 160.)

4       The government agrees with the USPO's offense level and criminal

5   history calculations and the resulting advisory Guidelines range of

6   33 to 41 months' imprisonment.  However, for the reasons explained

7   below, the government believes a Guidelines sentence of 37 months'

8   imprisonment is appropriate in this case and disagrees with the

9   USPO's recommendation of a nine-month variance below the Guidelines.

10  The seriousness and potential dire consequences of defendant's

11  conduct cannot be overstated, and a Guidelines sentence is necessary

12  to promote respect for the law and afford adequate deterrence.[4]

13  **III.  DEFENDANT'S OFFENSE CONDUCT**

14      Schlotterbeck operated two adjacent businesses in Bellflower --

15  Sign Imaging and Live Fire Coatings -- at which he and his co-

16  conspirators manufactured and sold semi-automatic AR-15-type ghost

17  gun rifles and pistols.  (PSR ¶ 16.)  Sign Imaging was a licensed

18  business (for making signs); Live Fire Coatings was not.  Neither

19  business nor Schlotterbeck or his co-conspirators ever applied for or

20  had been issued a firearms license to manufacture or deal in

21  firearms.  (Dkt. 151 (Plea Agreement) at pg. 8.)

22      As part of their illegal firearms manufacturing business,

23  Schlotterbeck, Vlha and Kwan took custom orders for AR-15-type rifles

24  and pistols, obtained the firearm parts, arranged for certain parts

25

26  ───────────────

27      [4] Pursuant to Federal Rule of Criminal Procedure 32(f), on
    October 20, 2022, the government informed the USPO by email (copying
    defense counsel) that it did not have any objections to the advisory

28  Guidelines calculations in the PSR but provided several proposed
    corrections and clarifications to information contained in the PSR.

(specifically, unfinished lower receivers) to be drilled for use through specialized machinery, and assembled and finished (including through the use of a customizable protective ceramic coating known as Cerakote) the AR-15-type firearms for sale.  (PSR ¶ 18.)  The AR-15-type firearms were capable of accepting large-capacity magazines, and in many cases the co-conspirators sold 10-round and 30-round magazines along with the AR-15-type weapons.  (PSR ¶¶ 17, 20.)  The weapons also did not contain any manufacturer markings or serial numbers, which allowed Schlotterbeck and his co-conspirators to manufacture and customize AR-15-type firearms for their customers without fear that the guns could be traced back to their unlicensed and illicit business.  (PSR ¶ 18.)

A confidential informant ("CI") working on behalf of ATF first informed law enforcement about Schlotterbeck's illegal firearms manufacturing business and ordered an AR-15-type rifle from Schlotterbeck and his co-conspirators in Summer 2015.  (PSR ¶ 20.a.) During one of the meetings between the CI and Schlotterbeck, the CI informed Schlotterbeck that the CI was prohibited from possessing firearms due to a prior conviction, but Schlotterbeck agreed to sell the CI a firearm anyway.  (Id.; Dkt. No. 151 at pg. 11.)

Thereafter, the CI and two ATF undercover agents ("UC-1" and "UC-2," and, collectively, the "UCs") purchased a total of six custom-ordered, semi-automatic AR-15-type firearms (three rifles and three pistols) from September 2015 through June 2016.  (PSR ¶ 20.a – 20.f.)  Between the six ghost gun AR-15-type firearms and assorted magazines, Schlotterbeck and his co-conspirators charged the ATF CI and the UCs $10,000.  (PSR ¶ 21.)  In particular, Schlotterbeck and his co-conspirators manufactured and sold the following six AR-15-

4

type firearms to the ATF customers after taking their customers' specifications as to style, quality and finish of each firearm:



AR-15-type rifle sold to CI on 9/23/15 (PSR ¶ 20.a; GEX 1.b.[5])



AR-15-type rifle sold to UC-1 on 10/27/15 (PSR ¶ 20.b; GEX 2.b.)



AR-15-type pistol sold to UC-1 on 2/11/16 (PSR ¶ 20.c; GEX 3.d.)



AR-15-type pistol sold to UC-2 on 3/16/16 (PSR ¶ 20.d; GEX 4.c.)



AR-15-type pistol sold to UC-1 on 5/6/16 (PSR ¶ 20.e; GEX 5.d.)



AR-15-type rifle sold to UC-2 on 6/15/16 (PSR ¶ 20.f; GEX 6.c.)

During the course of the transactions with the ATF customers, Schlotterbeck, along with Vlha and Kwan, clearly demonstrated that they understood the unlawfulness of their conduct.  For the first two firearm transactions, the co-conspirators escorted the CI and UC-1, respectively, to a third-party machine shop as an initial step so that the co-conspirators could pay for another party to machine (or "mill out") the lower receiver component of the AR-15-type firearms while the customer was present.  However, they disposed of this

---

[5] As cited herein, "GEX" refers to government exhibits that the government prepared in advance of trial in this case.  The government provided copies of these exhibits to the defense after initially producing the materials in discovery.

1  unnecessary charade once UC-1 (and, by connection, UC-2) were within

2  their circle of trust.  Specifically, during a January 26, 2016

3  meeting between Schlotterbeck, Vlha and UC-1 at Live Fire Coatings,

4  Schlotterbeck explained that they "got a bunch [of lower receivers]

5  done for people that, like-like this," and stated they could use a

6  pre-cut lower receiver that they arranged to have machined so long as

7  UC-1 said (<u>i.e.</u>, lied) that he got the lower receiver milled out

8  himself:  "This time do you, do you mind just saying you cut it?"

9  (Exh. 1.)[6]  Schlotterbeck clarified that they "got a bunch of them

10 cut" to make things easier for their customers, but clarified

11 "obviously there's a bit of a sketchy situation if we don't know the

12 guy."  (<u>Id</u>.)  Vlha similarly said the completed lower receivers were

13 for "returning customers on the builds."  (<u>Id</u>.)

14      The PSR correctly notes that text messages and images found on

15 Schlotterbeck's cellular phone reflect, in fact, that Schlotterbeck,

16 Vlha and Kwan were building and selling firearms to additional

17 customers as well.  (PSR ¶ 21.)  There was extensive evidence

18 obtained through numerous recorded in-person meetings and phone calls

19 (with the ATF customers) of the co-conspirators' manufacture and sale

20 of additional AR-15-type firearms.  For example:

21      • During a July 7, 2015 meeting, Schlotterbeck confirmed that
          they were building an AR-15-type firearm for someone "from
22        the ground up" and informed the CI that "we do it all the
          time" (Exhs. 2, 3);
23
24      • During the same meeting, Schlotterbeck informed the CI what

25      [6] All exhibits referred to herein are attached to the
   accompanying Declaration of Brian Faerstein.  A majority of the
26 exhibits are transcripts from clips of audio-video recordings of
   meetings between the co-conspirators and ATF customers.  The
27 government prepared the clips and accompanying transcripts as part of
   its trial preparations and disclosed them to the defense.  The
28 government can lodge the underlying audio-video clips with the Court
   (to supplement the transcripts) upon the Court's request.

types of firearms he built: "I don't build AR-ten's.  I only build AR-Fifteens" (Exh. 4);

- During an August 27, 2015 meeting with the CI, Schlotterbeck explained the timing it usually takes to build an AR-15-type firearm, explaining, "it usually takes me about a week to two weeks at the most . . . To build and paint, you know," (Exh. 5), and "I never took more than two weeks to build a whole one, you know?" (Exh. 6);

- On September 24, 2015, after the CI had picked up the first custom-ordered AR-15-type rifle, Schlotterbeck called the CI to make sure he was satisfied with the gun, telling the CI, "Yeah, probably one of the, the best builds I've, we've done, you know?" (Exh. 7);

- During an October 8, 2015 meeting with UC-1, Schlotterbeck said, "Yeah I'm not worried about getting the parts at all. We do it all the time."  Schlotterbeck further explained, "We used to do a few.  Sometimes five a week, you know? Not so much anymore, but . . . " (Exh. 8);

- During a January 26, 2016 meeting with UC-1, when discussing the timing of a second AR-15-type firearm order UC-1 placed, Schlotterbeck explained, "we'll keep you posted on, on it.  The whole thing.  But we have two builds that we just got the parts in today" (Exh. 9); and

- Both Schlotterbeck and Vlha discussed with the UCs their other customers' buying habits for custom-built AR-15-type firearms.  Vlha explained that "not everybody comes back," adding, "usually, a lot of people, most people that buy one, they're happy and they just- . . . Some people are good."  Schlotterbeck further explained, "And then other people are the opposite."  Vlha added, "We get some, like, some of our friends just get one, and then that's it . . . We're always building one . . . Always got one [U/I] build." (Exh. 10).

Text messages found on Schlotterbeck's phone similarly demonstrate the other customers the co-conspirators had for their illegal AR-15-type firearm manufacturing business, including:

- Customer Z.P. texted Schlotterbeck in December 2015 asking "are you still doing builds for the AR15's," and Schlotterbeck responded "Yeah" and engaged in discussion over the following days about an order Z.P. wanted to place.  Schlotterbeck texted with Z.P. again in July 2016, September 2016, and October 2016 regarding builds of AR-15-type firearms (Exh. 11);

- Customer C.C. texted Schlotterbeck in September 2016

7

writing "Hey bro I need a couple more ar's long story but I don't have mine anymore," and Schlotterbeck responded "Ok." C.C. ordered two AR-15-type firearms from Schlotterbeck and effectively informed Schlotterbeck that C.C. would be "sell[ing] it to the homie" (<u>i.e.</u>, C.C. would be reselling the firearm or firearms Schlotterbeck would be selling C.C.) (Exh. 12);

- Customer B.P. texted Schlotterbeck in December 2016 to get more information for a friend about the firearms they built and sold at the Bellflower shops, and Schlotterbeck texted some photographs of AR-15-type firearms in response (Exh. 13); and

- Numerous images of AR-15-type firearms and component parts, in various stages of construction, also were found on Schlotterbeck's phone.  (Exh. 14.)

The PSR also correctly observes that Schlotterbeck expressed appreciation to the CI for referring Schlotterbeck additional customers in the way of the UCs, and that Schlotterbeck confirmed to the UCs that they could bring in additional buyers as well.  (PSR ¶ 21.)  In fact, Schlotterbeck and his co-conspirators encouraged the ATF customers (whom, of course, they did not know worked for or on behalf of ATF) to refer them additional business.  For example:

- After the CI bought the first firearm, the CI told Schlotterbeck during a September 24, 2015 phone call that the CI would give Schlotterbeck's phone number to the CI's "boys" for additional firearm orders, and Schlotterbeck responded, "Yeah, yeah, please do" (Exh. 7);

- The CI called Schlotterbeck a week later (October 1, 2015) to let him know that the CI had given his number to another customer who would be calling (in reality, UC-1), and Schlotterbeck responded, "I appreciate you throwing it out there" (Exh. 15);

- After UC-1 called Schlotterbeck a few days later (October 5, 2015) to discuss a potential build, UC-1 told Schlotterbeck, "I could probably get you some more business too, brother," and Schlotterbeck responded, "Great" (Exh. 16);

- After UC-1 placed an order for his second AR-15-type firearm on January 26, 2016, and explained he has friends who would be interested, Schlotterbeck said, "Yeah, bring them in," "bring somebody down" (Exh. 17);

- UC-2 also informed Schlotterbeck on May 6, 2016, that he had friends that liked the first AR-15-type firearm UC-2 purchased and wanted to purchase their own, and Schlotterbeck said "sure" and asked how many he needed (Exh. 18); and

- UC-2 reiterated to Schlotterbeck on June 15, 2016, that he had friends he could refer that wanted to purchase the custom-built AR-15-type firearms, and Schlotterbeck responded, "Yeah, as long as you trust them" (Exh. 19).

Both Schlotterbeck and Vlha made clear that their generation of business through referrals was intended to maintain trust with the customers they brought in for their illegal firearm manufacture and sale activities, given the illegality of their conduct:

- After UC-1 informed Vlha on October 8, 2015, that he had other friends that may want firearms, Vlha said "For sure. Definitely," but explained, "well, obviously it's not like, we're like, hey, you know guess what we put together" and "I mean, if it's someone that you can say, like, you'll give them, like your word" (Exh. 20);

- Vlha reiterated later during the same meeting with UC-1, "Especially when it comes to guns its like . . . Like, who do you, who do you know that's not gonna open his mouth" (Exh. 21); and

- Schlotterbeck explained to UC-2 how they only dealt with business referrals from people they trust: "It's just all referral. Like you. Like, somebody brings somebody else in," further explaining, "that's kind of the only way we deal with people, you know? . . . So yeah. If you bring them in, but, and like, you trust them, then we can . . . And we trust dealing with you so, it's all good." (Exh. 19).

With respect to the ammunition magazines that the co-conspirators sold along with the AR-15-type firearms, Schlotterbeck knew the large-capacity magazines were illegal as well. For example, during the January 26, 2016 meeting between UC-1, Schlotterbeck, and Vlha, UC-1 asked if he could buy magazines in addition to a firearm, and Schlotterbeck asked whether UC-1 wanted 10-round or 30-round magazines, stating that 30-round magazines are "illegal, you know?"

9

1  Schlotterbeck nonetheless agreed to sell UC-1 those illegal 30-round
2  magazines. (Exh. 22.)

3      In addition, during the May 6, 2016 meeting, Schlotterbeck
4  acknowledged a firearm he was selling UC-1 was not legal for another
5  reason, relating to removability of the magazine:  "This isn't legal,
6  cause it doesn't have a bullet button . . . Just so you know."  (Exh.
7  23.)  Thus, with respect to both the large-capacity magazines and at
8  least one of the AR-15-type firearms, Schlotterbeck believed that the
9  items they were selling were illegal for other reasons too – in
10 addition to the fact that he knew their overall scheme of
11 manufacturing and dealing firearms without a license was unlawful.

12 **IV.  ADVISORY SENTENCING GUIDELINES**

13      Applying the November 1, 2021 Sentencing Guidelines, and taking
14 into account relevant conduct, the USPO grouped together
15 Schlotterbeck's convictions for Counts One (conspiracy) and Three
16 (sale to a felon) and calculated the total offense level for the
17 group as 20 based on the following calculations:  base offense level
18 of 20 under U.S.S.G. § 2K2.1(a)(4)(B)(i)(I) and (ii)(II) (offenses
19 involving semiautomatic firearm capable of accepting a large capacity
20 magazine and conviction under 18 U.S.C. § 922(d)); two additional
21 levels for the offenses involving between three and seven firearms
22 under U.S.S.G. § 2K2.1(b)(1)(A); and a two-level reduction for
23 acceptance of responsibility under U.S.S.G. §§ 3E1.1(a).  (PSR ¶¶ 25-
24 40.)  In addition, the USPO determined that Schlotterbeck has zero
25 criminal history points, resulting in a Criminal History Category I.
26 (See id. ¶¶ 42-45.)  With a total offense level of 20 and a Criminal
27 History Category I, the resulting advisory Guidelines range is 33 to
28 41 months' imprisonment.

10

1    **V.   SECTION 3553(a) FACTORS**

2         The Court should impose a sentence sufficient, but not greater

3    than necessary, to reflect the purposes of sentencing identified in

4    18 U.S.C. § 3553(a).  <u>United States v. Carty</u>, 520 F.3d 984, 991 (9th

5    Cir. 2008).  The advisory Guidelines range provides the "starting

6    point and . . . initial benchmark" for this Court's consideration of

7    an appropriate sentence.  <u>Molina-Martinez v. United States</u>, 136 S.Ct.

8    1338, 1345 (2016) (quoting <u>Gall v. United States</u>, 552 U.S. 38, 49

9    (2007)).  Although the Guidelines are not binding, they "reflect a

10   rough approximation of sentences that might achieve section 3553(a)'s

11   objectives."  <u>United States v. Rita</u>, 551 U.S. 338, 350 (2007).

12        Under 18 U.S.C. § 3553(a), in arriving at the appropriate

13   sentence, the Court should consider, among other factors, the nature

14   and circumstances of the offense and the history and characteristics

15   of the defendant, § 3553(a)(1); the need for the sentence imposed to

16   reflect the seriousness of the offense, to promote respect for the

17   law, and to provide just punishment for the offense, § 3553(a)(2)(A);

18   the need for the sentence imposed to afford adequate deterrence to

19   criminal conduct, § 3553(a)(2)(B); the need for the sentence imposed

20   to protect the public from further crimes of the defendant,

21   § 3553(a)(2)(C); and the need to avoid unwarranted sentence

22   disparities, § 3553(a)(6).

23   **VI.  GOVERNMENT'S SENTENCING RECOMMENDATION**

24        **A.   Term of Custody**

25        In light of the relevant 18 U.S.C. § 3553(a) factors, a sentence

26   at the mid-point of the advisory Guidelines range – that is, 37

27   months' imprisonment – is sufficient, but not greater than necessary,

28   to achieve the goals of sentencing in this case.

1          1.   Nature and Circumstances of the Offense and History
2               and Characteristics of the Defendant (18 U.S.C.
                § 3553(a)(1))

3      Schlotterbeck willfully engaged in manufacturing and selling

4  extremely dangerous AR-15-type firearms with full knowledge as to the

5  destructive capacity of the weapons he purveyed.  By all accounts

6  from the evidence summarized above, this was neither a hobby nor an

7  isolated event.  Schlotterbeck engaged in this illegal conduct, along

8  with his co-conspirators Vlha and Kwan, as a sustained business,

9  admittedly building and selling "[s]ometimes five a week" at one

10 point and encouraging referrals of additional customers.  (Exhs. 7-8,

11 15-19.)

12     Schlotterbeck took pride in the quality of the customized, semi-

13 automatic firearms he and his co-conspirators manufactured "from the

14 ground up."  (Exh. 2.)  On one occasion, Schlotterbeck boasted to the

15 CI -- whom he had just recently met and whom he knew was a felon who

16 could not possess firearms -- that the AR-15-type rifle they

17 manufactured and sold to the CI was "one of the . . . best builds

18 I've, we've done."  (Exh. 7.)  Schlotterbeck placed that phone call

19 to provide customer service, making sure the CI was satisfied with

20 his purchase after Schlotterbeck was not present when the CI picked

21 up the AR-15-type firearm.  (Id. ("they said you liked it and

22 everything.  I was like all right well, let me give him a call.").)

23     Schlotterbeck and his co-conspirators sold these weapons to

24 relative strangers.  They had just recently met the CI when they

25 built the first AR-15-type rifle for the CI in September 2015.  The

26 CI introduced UC-1 to the co-conspirators when the CI picked up his

27 firearm, and Schlotterbeck began discussing with UC-1 a customized

28 AR-15-type firearm order (the first of three sold to UC-1) a week

                                    12

1    later.  And UC-1 introduced UC-2 to the co-conspirators and they sold

2    UC-2 two customized AR-15-type firearms as well.

3         As to their other customers not actually associated with ATF,

4    Schlotterbeck's text messages further reflected his lack of concern

5    about whose hands the AR-15-type firearms ended up in.  For example,

6    a customer texted Schlotterbeck in September 2016 writing "Hey bro I

7    need a couple more ar's long story but I don't have mine anymore."

8    (Exh. 12.)  The customer ordered two more AR-15-type firearms from

9    Schlotterbeck and effectively informed Schlotterbeck that the

10   customer would be "sell[ing] it to the homie," which gave

11   Schlotterbeck no pause.  (Id.)  In fact, in this exchange, the

12   customer asked Schlotterbeck to "Txt me saying 1200 for them plz" so

13   the customer could "screen shot to sell to the homie," inferentially

14   for the purpose of facilitating the customer's resale of the AR-15-

15   type firearm to another customer for more than $1,200.  (Id.)

16   Schlotterbeck obliged the customer's request, responding "$1200

17   each."  (Id.)

18        In short, Schlotterbeck and his co-conspirators were not

19   confining their sales of these deadly weapons to friends but rather

20   to customers, both returning and new, who were willing to pay cash

21   for the custom-ordered firearms.  But discretion still was a key

22   component of their business.  Schlotterbeck told UC-2 that he could

23   bring in additional customers "as long as you trust them."  (Exh.

24   19.)  Trust was critical because Schlotterbeck knew they were

25   manufacturing and selling firearms illegally, and the AR-15-type

26   ghost guns themselves were lethal weapons.

27        The government acknowledges, as reflected in the PSR,

28   Schlotterbeck's reportedly supportive family ties and his prior

1    service to the country in the United States Marine Corp.  But it is

2    his experience as a Marine that underscores his knowledge of the

3    devastating force of the semi-automatic, high-capacity AR-15-type

4    firearms he and his co-conspirators manufactured and sold.

5    Schlotterbeck had the background and training to know, better than

6    anyone, the bloodshed that could be wrought by the ghost guns ending

7    up in the wrong hands.  And Schlotterbeck engaged in the manufacture

8    and sale of these firearms to relative strangers while he continued

9    to serve in the Marines, sworn to protect the country against all

10   enemies, foreign and domestic.  Schlotterbeck did just the opposite,

11   for money, without a license, and in a manner (i.e., unserialized and

12   without manufacturing markings) designed to evade detection.

13           2.    Seriousness of the Offense, Respect for the Law, and
                   Just Punishment (18 U.S.C. § 3553(a)(2)(A))
14

15        The stakes of Schlotterbeck's offense conduct could not have

16   been higher.  His manufacture and sale of AR-15-type firearms carried

17   potentially dire consequences, as made evident by the mass shootings

18   involving AR-15-type firearms that have become so tragically

19   commonplace in recent years.

20        Less than three weeks ago, a 19-year-old gunman killed a teacher

21   and a tenth-grade student at a high school in St. Louis, Missouri

22   using an AR-15-type rifle.[7]  Earlier this year, the gunman who killed

23   19 children and 2 adults at Robb Elementary School in Uvalde, Texas

24

25

26

27        [7] "School gunman had AR-15-style weapon, 600 rounds of ammo,"
     _Politico_, available at https://www.politico.com/news/2022/10/25/st-
28   louis-school-gunman-ar15-ammo-00063438 (last visited November 10,
     2022).

                                      14

on May 24, 2022 used an AR-15-type rifle.[8]  According to reports, numerous other shootings that have claimed the lives of hundreds of victims over the last decade have involved in some capacity AR-15-type firearms, including, among others:

- the May 14, 2022 shooting at a Tops Friendly Market in Buffalo, New York (10 people killed);

- the March 22, 2021 shooting at the King Soopers market in Boulder, Colorado (10 people killed);

- the August 31, 2019 shooting from a vehicle in Midland and Odessa, Texas (7 people killed);

- the August 4, 2019 shooting at a bar in Dayton, Ohio (9 people killed);

- the October 27, 2018 shooting at the Tree of Life synagogue in Pittsburg, Pennsylvania (11 people killed);

- the February 14, 2018 shooting at Marjory Stoneman Douglas High School in Parkland, Florida (17 people killed);

- the November 5, 2017 shooting a church in Sutherland Springs, Texas (26 people killed);

- the October 1, 2017 shooting at an outdoor music festival in Las Vegas, Nevada (58 people killed);

- the June 12, 2016 shooting at Pulse nightclub in Orlando, Florida (49 people killed);

- the December 2, 2015 shooting at the Inland Regional Center in San Bernardino, California (14 people killed);

- the December 14, 2012 shooting at Sandy Hook Elementary School in Newtown, Connecticut (27 people killed); and

- the July 20, 2012 shooting at a movie theater in Aurora, Colorado (12 people killed).[9]

---

[8] "Where AR-15-style rifles fit in America's tragic history of mass shootings," *NPR*, available at: https://www.npr.org/2022/05/26/1101274322/uvalde-ar-15-style-rifle-history-shooter-mass-shooting (last visited November 10, 2022).

[9] See id.; see also "22 Mass Shootings. 374 Dead. Here's Where the Guns Came From," *U.S. News and World Report*, available at: https://www.usnews.com/news/politics/articles/2022-05-27/mass-shooters-exploited-gun-laws-loopholes-before-carnage (last visited November 10, 2022); "Mass shooters' favorite gun," *The Week*,

*(footnote cont'd on next page)*

The gunmen in these incidents shot and wounded countless others in addition to those they killed.  Whether these gunmen obtained AR-15-type firearms illegally or through lawful channels, the catastrophic consequences of their access to these deadly weapons are manifest in just the sampling of shootings listed above.  There have been many, many more.[10]

Schlotterbeck and his co-conspirators directly contributed to this epidemic of easily accessible AR-15-type firearms through their illegal business.  They callously did so without a license, for profit, in an untraceable manner, and with full knowledge of the unlawfulness of their conduct.  They put these ghost guns in the hands of people they barely knew and without any background checks.  And, at least in the case of the CI, Schlotterbeck sold the AR-15-type rifle to someone he knew was prohibited from possessing it.

The sentence in this case must reflect the seriousness of Schlotterbeck's conduct and recognize the societal backdrop against which he engaged in his scheme, as mass shooting after mass shooting involving AR-15-type firearms tragically unfolded -- including several during the time period of the charged conspiracy.  The sentence must also promote respect for the law and provide just punishment for Schlotterbeck's willful conduct.  A sentence within

---

available at: https://theweek.com/gun-violence/1014276/mass-shooters-favorite-gun (last visited November 10, 2022).

[10] See generally "The terrible numbers that grow with each mass shooting," *The Washington Post*, available at: https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/?itid=lb_boulder-shooting-what-to-know_5 (last visited November 10, 2022); "The Rifle That Ruined America," *The Atlantic*, available at: https://www.theatlantic.com/ideas/archive/2022/06/ar-15-rifle-mass-shootings-gun-control/661275/ (last visited November 10, 2022).

the advisory Guidelines range -- specifically, 37 months in custody
-- is necessary to meet the goals of sentencing in this case.

        3.  Affording Adequate Deterrence and Protecting the
            Public from Further Crimes of the Defendant (18 U.S.C.
            § 3553(a)(2)(B) and (C))

    A Guidelines sentence also would serve as an effective
deterrent, especially as to others in society engaging in similar
unlicensed and illegal firearms manufacturing and sales and further
contributing to the proliferation of unregulated and untraceable AR-
15-type ghost guns on the street.

    The USPO's recommendation of a nine-month downward variance (to
24 months in custody) sends the wrong message.  The advisory
Guidelines range in this case appropriately captures the core of
Schlotterbeck's conduct, recognizing both the illegal firearms
manufacturing and sale conspiracy as well as his knowing sale of one
of those firearms to a felon.  If anything, the advisory Guidelines
range in this case understates the seriousness of Schlotterbeck's
offenses.  The many statements by the co-conspirators described above
regarding additional firearms they built and sold as well as similar
evidence found on Schlotterbeck's phone strongly suggest that the co-
conspirators' conspiracy involved far more than seven firearms, even
though the Guidelines here account for an upward adjustment of only
two levels for the offense involving three-to-seven firearms (i.e.,
the six specific AR-15-type firearms Schlotterbeck admitted selling
to the ATF customers).

    Schlotterbeck's overall conduct warrants a Guidelines sentence
in this case, and holding Schlotterbeck accountable for that conduct
will deter others from engaging in the same illegal activities.
Given the lives that are put at risk by the continued unlicensed

1   proliferation of ghost gun AR-15-type semi-automatic firearms,

2   affording adequate deterrence is an especially important sentencing

3   factor in this case.

4          4.   Avoiding Unwarranted Sentence Disparities, (18 U.S.C.
                § 3553(a)(6))
5

6          As for co-defendant and co-conspirator Vlha, Schlotterbeck is

7   differently situated.  Schlotterbeck's higher advisory Guidelines

8   range is driven in part by his conviction for selling a firearm to a

9   felon (Count Three), for which Vlha was not charged because he was

10  not part of the conversation with the CI when the CI informed

11  Schlotterbeck of the CI's prohibited status.  Schlotterbeck also

12  controlled the storefronts in Bellflower at which the co-conspirators

13  conducted their illegal firearms trafficking business.  And the

14  evidence obtained from Schlotterbeck's cell phone underscored the

15  broader scope of Schlotterbeck's illegal activities.  (The government

16  was not able to seize and review Vlha's cell phone during its

17  investigation.)

18         The government believes a Guidelines sentence is appropriate for

19  Vlha as well, as explained in its sentencing position as to Vlha.

20  But the difference in the government's sentencing recommendations as

21  to Schlotterbeck and Vlha do not reflect an unwarranted disparity but

22  rather a recognition that the applicable Guidelines calculations as

23  to both defendants represent the appropriate range in this case.

24    **B.   Supervised Release, Fine and Special Assessment**

25         The government concurs with the USPO's recommendation of three

26  years of supervised release following Schlotterbeck's release from

27  prison as well as the USPO's recommended conditions of supervised

28  release.

18

As for a fine, the government agrees that Schlotterbeck appears able to pay a significant fine in this case, which would provide an additional punitive measure to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence.  U.S.S.G. § 5E1.2(d)(1).  The government defers to the Court on the appropriate amount of the fine.

Schlotterbeck also should be ordered to pay the combined $200 mandatory special assessment for both counts of conviction.

**VII.  CONCLUSION**

For the reasons set forth above, the government respectfully requests that defendant Schlotterbeck be sentenced as follows: (1) a custodial sentence of 37 months' imprisonment; (2) a three-year period of supervised release to follow; (3) a fine to be determined by the Court; and (4) a mandatory special assessment of $200.

1

<u>**DECLARATION OF BRIAN FAERSTEIN**</u>

2

I, Brian Faerstein, declare as follows:

3

1.    I am an Assistant United States Attorney in the United

4

States Attorney's Office for the Central District of California.  I

5

represent the government in <u>United States v. Travis Schlotterbeck and</u>

6

<u>James Bradley Vlha</u>, Case No. 2:19-CR-343-GW.

7

2.    Attached hereto as **<u>Exhibit 1</u>** is a true and correct copy of

8

a transcript for a clip of a video recording made on January 26,

9

2016.  The clip and full version of the video recording, along with

10

the underlying transcript, were produced to the defense in discovery

11

and in preparation for trial (identified as GEX 139.c) in this case.

12

3.    Attached hereto as **<u>Exhibit 2</u>** is a true and correct copy of

13

a transcript for a clip of a video recording made on July 7, 2015.

14

The clip and full version of the video recording, along with the

15

underlying transcript, were produced to the defense in discovery and

16

in preparation for trial (identified as GEX 101.d) in this case.

17

4.    Attached hereto as **<u>Exhibit 3</u>** is a true and correct copy of

18

a transcript for a clip of a video recording made on July 7, 2015.

19

The clip and full version of the video recording, along with the

20

underlying transcript, were produced to the defense in discovery and

21

in preparation for trial (identified as GEX 101.e) in this case.

22

5.    Attached hereto as **<u>Exhibit 4</u>** is a true and correct copy of

23

a transcript for a clip of a video recording made on July 7, 2015.

24

The clip and full version of the video recording, along with the

25

underlying transcript, were produced to the defense in discovery and

26

in preparation for trial (identified as GEX 102.e) in this case.

27

6.    Attached hereto as **<u>Exhibit 5</u>** is a true and correct copy of

28

a transcript for a clip of an audio recording made on August 21,

2015.  The clip and full version of the audio recording, along with the underlying transcript, were produced to the defense in discovery and in preparation for trial (identified as GEX 104.c) in this case.

7.   Attached hereto as **Exhibit 6** is a true and correct copy of a transcript for a clip of a video recording made on August 27, 2015. The clip and full version of the video recording, along with the underlying transcript, were produced to the defense in discovery and in preparation for trial (identified as GEX 106.d) in this case.

8.   Attached hereto as **Exhibit 7** is a true and correct copy of a transcript for a clip of an audio recording made on September 24, 2015.  The clip and full version of the audio recording, along with the underlying transcript, were produced to the defense in discovery and in preparation for trial (identified as GEX 121.d) in this case.

9.   Attached hereto as **Exhibit 8** is a true and correct copy of a transcript for a clip of a video recording made on October 8, 2015. The clip and full version of the video recording, along with the underlying transcript, were produced to the defense in discovery and in preparation for trial (identified as GEX 126.e) in this case.

10.  Attached hereto as **Exhibit 9** is a true and correct copy of a transcript for a clip of a video recording made on January 26, 2016.  The clip and full version of the video recording, along with the underlying transcript, were produced to the defense in discovery and in preparation for trial (identified as GEX 139.d) in this case.

11. Attached hereto as **Exhibit 10** is a true and correct copy of a transcript for a clip of a video recording made on May 6, 2016. The clip and full version of the video recording, along with the underlying transcript, were produced to the defense in discovery and in preparation for trial (identified as GEX 151.f) in this case.

12.   Attached hereto as **Exhibit 11** is a true and correct copy of a summary exhibit of text messages found on Travis Schlotterbeck's cellular phone between December 2015 and October 2016.  The summary exhibit was produced to the defense in preparation for trial (identified as GEX 411) in this case.

13.   Attached hereto as **Exhibit 12** is a true and correct copy of a summary exhibit of text messages found on Travis Schlotterbeck's cellular phone on or about September 11, 2016.  The summary exhibit was produced to the defense in preparation for trial (identified as GEX 415) in this case.

14.   Attached hereto as **Exhibit 13** is a true and correct copy of a summary exhibit of text messages found on Travis Schlotterbeck's cellular phone on or about December 21, 2016.  The summary exhibit was produced to the defense in preparation for trial (identified as GEX 416) in this case.

15.   Attached hereto as **Exhibit 14** is a true and correct copy of a compilation of images found on Travis Schlotterbeck's cellular phone of AR-15-type firearms and component parts, in various stages of construction.  The compilation of images was produced to the defense in preparation for trial (identified as GEX 405, GEX 406, and GEX 407) in this case.

16.   Attached hereto as **Exhibit 15** is a true and correct copy of a transcript for a clip of an audio recording made on October 1, 2015.  The clip and full version of the audio recording, along with the underlying transcript, were produced to the defense in discovery and in preparation for trial (identified as GEX 122.c) in this case.

17.   Attached hereto as **Exhibit 16** is a true and correct copy of a transcript for a clip of an audio recording made on October 5,

3

2015.  The clip and full version of the audio recording, along with the underlying transcript, were produced to the defense in discovery and in preparation for trial (identified as GEX 123.c) in this case.

18.  Attached hereto as **Exhibit 17** is a true and correct copy of a transcript for a clip of a video recording made on January 26, 2016.  The clip and full version of the video recording, along with the underlying transcript, were produced to the defense in discovery and in preparation for trial (identified as GEX 139.f) in this case.

19.  Attached hereto as **Exhibit 18** is a true and correct copy of a transcript for a clip of a video recording made on May 6, 2016. The clip and full version of the video recording, along with the underlying transcript, were produced to the defense in discovery and in preparation for trial (identified as GEX 151.c) in this case.

20.  Attached hereto as **Exhibit 19** is a true and correct copy of a transcript for a clip of a video recording made on June 15, 2016. The clip and full version of the video recording, along with the underlying transcript, were produced to the defense in discovery and in preparation for trial (identified as GEX 157.f) in this case.

21.  Attached hereto as **Exhibit 20** is a true and correct copy of a transcript for a clip of a video recording made on October 8, 2015. The clip and full version of the video recording, along with the underlying transcript, were produced to the defense in discovery and in preparation for trial (identified as GEX 124.d) in this case.

22.  Attached hereto as **Exhibit 21** is a true and correct copy of a transcript for a clip of a video recording made on October 8, 2015. The clip and full version of the video recording, along with the underlying transcript, were produced to the defense in discovery and in preparation for trial (identified as GEX 124.h) in this case.

1      23.  Attached hereto as **Exhibit 22** is a true and correct copy of

2  a transcript for a clip of a video recording made on January 26,

3  2016.  The clip and full version of the video recording, along with

4  the underlying transcript, were produced to the defense in discovery

5  and in preparation for trial (identified as GEX 139.e) in this case.

6      24.  Attached hereto as **Exhibit 23** is a true and correct copy of

7  a transcript for a clip of a video recording made on May 6, 2016.

8  The clip and full version of the video recording, along with the

9  underlying transcript, were produced to the defense in discovery and

10  in preparation for trial (identified as GEX 150.c) in this case.

11      I declare and affirm under penalty of perjury that the foregoing

12  is true and correct to the best of my knowledge.

13      Executed on November 10, 2022, at Los Angeles, California.

BRIAN FAERSTEIN

5